## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Department of Justice, Antitrust Division<br>600 E Street, NW, Suite 9500<br>Washington, D.C. 20530,<br><br>      Plaintiff,<br><br>      v.<br><br>PEARSON PLC,<br>80 Strand<br>WC2R 0RL<br>London, England,<br><br>PEARSON EDUCATION INC.,<br>One Lake Street<br>Upper Saddle River, New Jersey 07458,<br><br>REED ELSEVIER PLC,<br>1-3 Strand<br>WC2N 5JR<br>London, England,<br><br>REED ELSEVIER NV,<br>Radarweg 29<br>1043 NX Amsterdam<br>The Netherlands,<br><br>HARCOURT ASSESSMENT INC.,<br>14500 Bulverde Road<br>San Antonio, Texas 78259,<br><br>      Defendants. | CASE NO.:<br><br>JUDGE:<br><br>DECK TYPE:  Antitrust<br><br>DATE STAMP: |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the

United States, brings this civil antitrust action to enjoin the proposed acquisition by Pearson plc

and Pearson Education Inc. (collectively "Pearson"), of Harcourt Assessment Inc., (hereafter

"Harcourt") a wholly-owned subsidiary of Reed Elsevier PLC and Reed Elsevier, NV

(collectively "Reed Elsevier"), and to obtain equitable and other relief.  The United States

complains and alleges as follows:

## I.  NATURE OF THE ACTION

1.      On or about May 4, 2007, and amended on May 21, 2007, Pearson and Reed

Elsevier signed a sale and purchase agreement for Pearson to acquire all of the outstanding

voting securities of Harcourt, as well as additional Reed Elsevier assets, for approximately $950

million in cash.

2.      Pearson and Harcourt both develop, publish, market, sell, and distribute

individually-administered standardized norm-referenced comprehensive clinical tests (hereafter

"clinical tests"), including adaptive behavior and speech and language clinical tests.  Pearson's

proposed acquisition of Harcourt would combine the two largest publishers of such tests in the

United States.  Pearson also develops, publishes, markets, sells, and distributes market-leading

adult abnormal personality clinical tests.  Harcourt has invested substantial resources in the

development of a new adult abnormal personality clinical test and plans to enter the market for

such tests within the next year.

3.      The markets for adaptive behavior, speech and language, and adult abnormal

personality clinical tests are highly concentrated and there are high barriers to enter these

markets. Pearson's proposed acquisition of Harcourt will eliminate competition between Pearson

and Harcourt in these markets.

4.      The United States brings this action to prevent Pearson's proposed acquisition of Harcourt because it would substantially lessen competition in the markets for adaptive behavior, speech and language, and adult abnormal personality clinical tests in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II. **PARTIES TO THE PROPOSED ACQUISITION**

5.      Pearson plc, a U.K. corporation with its headquarters in London, England, operates businesses in educational publishing, business information, and consumer publishing. Pearson Education Inc. (hereafter "Pearson Education"), a wholly-owned subsidiary of Pearson plc, is a Delaware corporation with its headquarters in Upper Saddle River, New Jersey. Pearson Education develops, markets, sells, and distributes clinical tests throughout the United States.

6.      Reed Elsevier PLC, a U.K. corporation with its headquarters located in London, England, and Reed Elsevier NV, a Dutch corporation with its headquarters located in Amsterdam, Netherlands, jointly own Harcourt. Harcourt, a New York corporation with its headquarters located in San Antonio, Texas, develops, markets, sells, and distributes clinical tests throughout the United States.

3

### III.  JURISDICTION AND VENUE

7.      The United States brings this action under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

8.      Defendants develop, market, sell, and distribute clinical tests in the flow of interstate commerce.  Defendants' activities in developing, marketing, selling, and distributing these products substantially affect interstate commerce.  This Court has subject matter jurisdiction over this action pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

9.      Defendants have consented to venue and personal jurisdiction in this judicial district and venue is proper under 28 U.S.C. 1391 (d).

### IV.  TRADE AND COMMERCE

#### A. Clinical Tests Generally

10.      Psychologists and clinicians, among others, use a variety of clinical tests to test for, and diagnose individuals with, certain disorders or disabilities, as well as to identify individuals at risk for such disorders or disabilities.   Clinical tests can also be used to develop and provide intervention strategies for, and to monitor the progress of treatments for, such disorders or disabilities.

11.      Publishers, including the Defendants, develop, edit, standardize, norm-reference, market, and distribute clinical tests for a wide range of disorders and disabilities that have been designed and authored by leading experts in such disciplines.

12.    Standardization is the process of developing a test that reliably, validly, and consistently assesses a specific discipline. Standardized tests are authored, designed, and developed so that the test materials, test procedures, and test scoring are consistent across each test administration. Standardized test scores can then be documented empirically and compared across test administrations.

13.    Norm-referencing is the process of determining average test scores across demographics. Publishers norm-reference a standardized test by administering the test to a representative sample of individuals and then determining an average test score. Norm-referenced tests can then be used to compare an individual's test score to an average test score of similarly-situated individuals.

14.    Comprehensive tests are tests that fully assess the subject area being tested, as well as its various domains and degrees of affliction. By contrast, non-comprehensive tests, often termed "screeners," are far less thorough and may be designed simply to indicate the likely presence or absence of a disorder or disability.

15.    In addition to clinical tests, non-standardized, non-norm-referenced assessments *(e.g.,* charts published in books or journals, single-scale tests, and free material available on the internet) are available to school psychologists and clinicians. However, such test materials are inferior to clinical tests because they do not provide the same levels of validity and reliability, nor can they be used in many situations in which a clinical test is required, for example, where such tests must be administered before a certain diagnosis or classification can be made in order for an individual to qualify for special services, such as special education or speech and language instruction.

## B. Relevant Product Markets

### 1. Adaptive Behavior Clinical Tests

16.    Pearson and Harcourt each publish the market-leading adaptive behavior clinical tests.  Pearson publishes the Vineland Adaptive Behavior Scales, which is currently in its second edition, and Harcourt publishes the Adaptive Behavior Assessment System, which is currently in its second edition.

17.    School psychologists and clinicians, among others, use adaptive behavior clinical tests to assess an individual's competence in meeting their independent needs and satisfying the social demands of their environment.  Generally, adaptive behavior tests assess three broad domains of adaptive behavior:  conceptual (*e.g.*, communication, functional academics, self-direction, and health and safety), social (*e.g.*, social skills and leisure), and practical (*e.g.*, self-care, home living, community use, and work).

18.    Non-comprehensive adaptive behavior tests, such as those that only assess narrow adaptive behavior domains, are not substitutes for adaptive behavior clinical tests because such tests are not sufficiently broad to assess all relevant areas of adaptive behavior.  Other adaptive behavior assessment scales, such as neuropsychological behavioral or emotional scales, do not assess the same domains as do adaptive behavior clinical tests.  Moreover, non-standardized, non-norm-referenced adaptive behavior tests are not substitutes for adaptive behavior clinical tests because they do not provide the same levels of validity or reliability as clinical tests.

19.    A small but significant post-acquisition increase in the price of adaptive behavior clinical tests would not cause customers to substitute other types of tests, or to otherwise reduce their purchases of adaptive behavior clinical tests, in sufficient quantities so as to make such a

price increase unprofitable.

20.    Accordingly, the development, marketing, sale, and distribution of adaptive behavior clinical tests constitutes a line of commerce and a relevant product market pursuant to Section 7 of the Clayton Act.

### 2. Speech and Language Clinical Tests

21.    Pearson and Harcourt each publish market-leading speech and language clinical tests. Pearson publishes two such tests known as the Comprehensive Assessment of Spoken Language and the Oral and Written Language Scales, each of which is in its first edition. Harcourt publishes a speech and language clinical test known as the Clinical Evaluation of Language Fundamentals, which is currently in its fourth edition.

22.    Speech-language pathologists, among others, use speech and language clinical tests to diagnose individuals having difficulties with understanding others, expressing thoughts and ideas, producing speech sounds, as well as other related difficulties. Speech and language clinical tests assess various domains, including receptive and expressive language.

23.    Non-comprehensive speech and language tests, such as those that only assess narrow speech and language domains, are not substitutes for speech and language clinical tests because such tests are not sufficiently broad to assess all relevant areas of speech and language. Moreover, non-standardized, non-norm-referenced speech and language tests are not substitutes for speech and language clinical tests because they do not provide the same levels of validity or reliability as clinical tests.

24.    A small but significant post-acquisition increase in the price of speech and language clinical tests would not cause customers to substitute other types of tests, or to otherwise reduce

their purchases of speech and language clinical tests, in sufficient quantities so as to make such a price increase unprofitable.

25.    Accordingly, the development, marketing, sale, and distribution of speech and language clinical tests constitutes a line of commerce and a relevant product market pursuant to Section 7 of the Clayton Act.

### 3. Adult Abnormal Adult Personality Clinical Tests

26.    Pearson publishes two series of adult abnormal personality clinical tests known as the Minnesota Multiphasic Personality Inventories, which are currently in their second edition, and the Millon Clinical Multiaxial Inventories, which are currently in their third edition. Harcourt is developing an adult abnormal personality clinical test known as the Emotional Assessment System that it expects to make commercially available in late 2008.

27.    Adult abnormal personality tests are generally used by clinicians and psychologists to diagnose and assess chronic, inflexible, and maladaptive patterns of perceiving, thinking, and behaving that seriously impair an individual's ability to function in social settings. Such disorders include clinical disorders, such as anxiety, as well as personality disorders, such as paranoia. Many clinicians employ adult abnormal personality clinical tests to obtain comprehensive diagnoses of both kinds.

28.    Other methods of assessing abnormal personality, such as using structured interviews or non-standardized tests (including developing one's own tests), are inferior to adult abnormal personality clinical tests because they do not have the same degree of reliability, and because interpreting one's own tests would introduce subjective elements into the analysis not present with the use of clinical tests. In addition, in some locations, for some applications, clinical

tests are required by law and other methods of assessment cannot be used.

29.    Non-comprehensive adult abnormal personality tests, such as those that only assess certain clinical or personality disorders, are not substitutes for adult abnormal personality clinical tests because such tests are not sufficiently broad to assess all relevant disorders of adult abnormal personality.  Moreover, non-standardized, non-norm-referenced adult abnormal personality tests are not substitutes for adult abnormal personality clinical tests because they do not provide the same levels of validity or reliability as clinical tests.

30.    A small but significant post-acquisition increase in the price of adult abnormal personality clinical tests would not cause customers to substitute other types of tests, or to otherwise reduce their purchases of adult abnormal personality clinical tests, in sufficient quantities so as to make such a price increase unprofitable.

31.    Accordingly, the development, marketing, sale, and distribution of adult abnormal personality clinical tests constitutes a line of commerce and a relevant product market pursuant to Section 7 of the Clayton Act.

### C. Relevant Geographic Market

32.    The Defendants sell adaptive behavior, and speech and language clinical tests throughout the United States to psychologists, clinicians, speech-language pathologists, and others.  Pearson also sells adult abnormal personality tests to psychologists, clinicians, and others in the United States.  In the United States, customers would not purchase clinical tests published outside the United States because such tests have not been standardized or norm-referenced on samples of individuals located in the United States.

33.    A small but significant post-acquisition increase in the price of adaptive behavior,

speech and language, and adult abnormal personality clinical tests would not cause customers to turn to clinical tests published outside of the United States for the purchase of such tests.

34. Accordingly, the United States constitutes the relevant geographic market pursuant to Section 7 of the Clayton Act.

## D. Anticompetitive Effects:  Reduced Price and Innovation Competition

### 1. Adaptive Behavior Clinical Tests

35. The proposed acquisition will eliminate price and innovation competition between Pearson and Harcourt in the market for adaptive behavior clinical tests throughout the United States.

36. The adaptive behavior clinical test market is highly concentrated.  Pearson and Harcourt's revenues currently account for approximately 66 percent and 26 percent of the revenues of the market, respectively.  Pearson's proposed acquisition of Harcourt would therefore result in a post-merger share of approximately 92 percent of the adaptive behavior clinical test market.

37. The proposed acquisition will substantially increase the likelihood that Pearson will unilaterally increase the price, or reduce the number or quality, of adaptive behavior clinical tests published in the United States.

38. Any response of competing publishers of adaptive behavior clinical tests would not be sufficient to constrain the unilateral exercise of market power by Pearson after the acquisition. A significant number of customers regard Pearson and Harcourt as their first and second choices when purchasing adaptive behavior clinical tests, and consider such tests from other publishers to be a distant third choice.  Therefore, an insufficient number of customers of adaptive behavior

clinical tests would purchase a competing publisher's test to defeat an anticompetitive price increase by Pearson.

39.    The proposed acquisition will therefore substantially lessen competition in the development, marketing, sale, and distribution of adaptive behavior clinical tests in the United States in violation of Section 7 of the Clayton Act.

## 2.  Speech and Language Clinical Tests

40.    The proposed acquisition will eliminate price and innovation competition between Pearson and Harcourt in the market for speech and language clinical tests throughout the United States.

41.    The speech and language clinical test market is highly concentrated.  Harcourt and Pearson's revenues currently account for approximately 64 percent and 26 percent of the revenues of the market, respectively.  Pearson's proposed acquisition of Harcourt would therefore result in a post-merger share of approximately 90 percent of the speech and language clinical test market. Only one other firm in the United States develops, markets, and publishes a competing speech and language clinical test, and that test accounts for the remaining 10 percent of the market, on a revenue basis.

42.    The proposed acquisition will substantially increase the likelihood that Pearson will unilaterally increase the price, or reduce the number or quality, of speech and language clinical tests published in the United States.

43.    Any response of the competing publisher of speech and language clinical tests would not be sufficient to constrain the unilateral exercise of market power by Pearson after the acquisition because there are a significant number of customers who regard Pearson and

Harcourt's speech and language clinical tests as their first and second choices, and consider the competing publisher's test to be a distant third. Therefore, an insufficient number of customers of speech and language clinical tests would purchase the competing publisher's test to defeat an anticompetitive price increase by Pearson.

44.    The proposed acquisition will therefore substantially lessen competition in the development, marketing, sale, and distribution of speech and language clinical tests in the United States in violation of Section 7 of the Clayton Act.

### 3. Adult Abnormal Personality Clinical Tests

45.    The proposed acquisition will eliminate price and innovation competition between Pearson and Harcourt in the market for adult abnormal personality clinical tests.

46.    The adult abnormal personality clinical test market is highly concentrated and dominated by Pearson, which accounts for approximately 93 percent of the revenues for such tests. After many years of trying, only one other publisher in the United States has managed to obtain more than an insignificant share of this market. Customers prefer Pearson's tests and have made a significant investment in learning how to work with and use Pearson's tests. Such customers are committed to Pearson's tests and thus far have been unwilling to substitute another test. The small share that Pearson's only competitor has gained after many years is an indicator that customers consider the competitor's test to be a distant second choice to Pearson's tests.

47.    Harcourt has invested substantial resources over a prolonged period of time in the development of a new computer-based adaptive adult abnormal personality clinical test that will utilize computer technology to reduce test administration time. Harcourt is in the standardization and norm-referencing phase of development and is in the process of collecting data from clinical

12

and non-clinical examinees. Harcourt plans to enter the market for such tests to compete with Pearson in 2008. To date, no other publisher has formed plans to enter this market, and any potential entry by another publisher would require considerable lead time and development effort of the sort that Harcourt has already incurred.

48.    Harcourt plans to enter the market with a new adult abnormal personality clinical test that will offer new features and functionality that customers desire. Such new features and functionality are not currently offered by either Pearson or the other competing publisher. Accordingly, Harcourt's entry would likely benefit clinicians and their patients through price and innovation competition for adult abnormal personality clinical tests.

49.    The proposed acquisition will therefore substantially lessen competition in the development, marketing, sale, and distribution of adult abnormal personality clinical tests in the United States in violation of Section 7 of the Clayton Act.

**E.  Entry: New Entrants Will Not Defeat an Exercise of Market Power**

50.    Successful entry into the markets for the development, marketing, sale, and distribution of adaptive behavior, speech and language, and adult abnormal personality clinical tests in the United States is difficult, time consuming, and costly.

51.    Entry into such markets in the United States takes many years. A new entrant would need to contract with an author qualified to write a clinical test and then assemble a sophisticated editorial staff to develop the test. Clinical test development requires analyzing, editing, standardizing, and norm-referencing a new test, which takes two to four years to complete.

52.    New entrants also would need to convince customers to switch from their current

13

adaptive behavior, speech and language, or adult abnormal personality clinical test of choice to the entrant's new test.

53.    Therefore, entry by any firm into the markets for the development, marketing, sale, and distribution of adaptive behavior, speech and language, and adult abnormal personality clinical tests would not be timely, likely, or sufficient to counter the anticompetitive effects of Pearson's proposed acquisition of Harcourt.

## V.  VIOLATIONS ALLEGED

### CAUSE OF ACTION

(Violation of Section 7 of the Clayton Act)

54.    The United States incorporates the allegations of paragraphs 1 through 53 above.

55.    The proposed acquisition of Harcourt by Pearson would substantially lessen competition in interstate trade and commerce in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

56.    Unless restrained, the acquisition will have the following anticompetitive effects, among others:

      a.    competition in the adaptive behavior clinical test market in the United States will be lessened substantially;

      b.    actual and potential competition between Pearson and Harcourt in the development, marketing, sale, and distribution of adaptive behavior clinical tests in the United States will be eliminated;

      c.    prices for adaptive behavior clinical tests in the United States likely will

14

increase, and innovation likely will decline;

d.    competition in the speech and language clinical test market in the United

States will be lessened substantially;

e.    actual and potential competition between Pearson and Harcourt in the

development, marketing, sale, and distribution of speech and language

clinical tests in the United States will be eliminated;

f.    prices for speech and language clinical tests in the United States likely will

increase, and innovation likely will decline;

g.    competition in the adult abnormal personality clinical test market in the

United States will be lessened substantially;

h.    actual and potential competition between Pearson and Harcourt in the

development, marketing, sale, and distribution of adult abnormal

personality clinical tests in the United States will be eliminated; and

i.    potential decreases in prices for adult abnormal personality clinical tests in

the United States likely will be eliminated, and innovation likely will

decline.

## VI.  REQUEST FOR RELIEF

57.    The United States requests that this Court:

a.    adjudge and decree the proposed acquisition to violate Section 7 of the

Clayton Act, 15 U.S.C. § 18;

b.    enjoin and restrain the Defendants and all persons acting on their behalf

from consummating the proposed acquisition or from entering into or

carrying out any contract, agreement, plan, or understanding, the effect of

which would be to combine Pearson with the operations of Harcourt;

c.    award the United States its costs for this action; and

d.    grant the United States such other and further relief as the Court deems

just and proper.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:


Thomas O. Barnett (D.C. Bar #426840)
Assistant Attorney General
Antitrust Division


David L. Meyer (D.C. Bar #414420)
Deputy Assistant Attorney General
Antitrust Division


Patricia A. Brink
Deputy Director of Operations
Antitrust Division


James J. Tierney (D.C. Bar #434610)
Chief, Networks and Technology
Enforcement Section
Antitrust Division


Scott A. Scheele (D.C. Bar #429061)
Assistant Chief, Networks and Technology
Enforcement Section
Antitrust Division


Damon J. Kalt
Sanford M. Adler
John C. Filippini (D.C. Bar #165159)
Danielle M. Ganzi
Attorneys
United States Department of Justice
Antitrust Division
Networks and Technology
Enforcement Section
600 E Street, NW, Suite 9500
Washington, D.C. 20530
(202) 307-6200

Dated:  January 24, 2008

CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

**I (a) PLAINTIFFS**

United States

**DEFENDANTS**

Pearson plc, Pearson Education Inc., Reed Elsevier PLC, Reed Elsevier NV, and Harcourt Assessment Inc.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)        U.K.
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Damon J. Kalt, Esq.
U.S. Department of Justice, Antitrust Division
Networks and Technology Enforcement Section
600 E Street, N.W., Suite 9500
Washington, D.C. 20530
(202) 307-6164

ATTORNEYS (IF KNOWN)

For Pearson plc and Pearson Education Inc.: Harry T. Robins, Esq., Morgan, Lewis & Bockius, LLP
For Reed Elsevier PLC, Reed Elsevier NV, and Harcourt Assessment Inc.: Robert A. Lipstein, Esq., Crowell & Moring LLP

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

◉ 1 U.S. Government Plaintiff
○ 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

◉ **A. Antitrust**

[X] 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**        OR        ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI.  CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

The United States brings this action under 15 U.S.C. section 25 to prevent the defendants from violating section 7 of the Clayton Act.

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ [_____] Check YES only if demanded in complaint    JURY DEMAND:    YES ☐    NO ☐

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE  January 24, 2008    SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.