**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CASE NO.: |
| v. | JUDGE: |
| PEARSON PLC, | DECK TYPE:  Antitrust |
| PEARSON EDUCATION INC., | |
| REED ELSEVIER PLC, | DATE STAMP: |
| REED ELSEVIER NV, and | |
| HARCOURT ASSESSMENT INC., | |
| Defendants. | |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files

this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in

this civil antitrust proceeding.

## I.    NATURE AND PURPOSE OF THE PROCEEDING

The United States filed a civil antitrust Complaint on January 24, 2008, seeking to enjoin

the proposed acquisition by Pearson plc and Pearson Education Inc. (collectively "Pearson") of

Harcourt Assessment Inc. (hereafter "Harcourt"), a wholly-owned subsidiary of Reed Elsevier

PLC and Reed Elsevier NV (collectively "Reed Elsevier").  The Complaint alleges that the likely

effects of this acquisition would be to lessen competition substantially in the markets for

individually-administered standardized norm-referenced comprehensive clinical tests (hereafter

"clinical tests") in the subject areas of:  (1) adaptive behavior; (2) speech and language; and (3)

adult abnormal personality, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  The

loss of competition caused by the acquisition will result in increased prices and decreased

innovation for adaptive behavior and speech and language clinical tests in the United States.  It

will also eliminate likely reductions in prices for adult abnormal personality clinical tests and

increased innovation for such tests that would otherwise result from Harcourt's impending entry

into this market.

At the same time the Complaint was filed, the United States also filed a Hold Separate

Stipulation and Order ("Hold Separate") and a proposed Final Judgment, which are designed to

eliminate the anticompetitive effects of the acquisition.  Under the proposed Final Judgment,

which is explained more fully below, the Defendants are required to divest certain adaptive

behavior, speech and language, and adult abnormal personality clinical tests (hereafter

"Divestiture Assets").  Until the divestitures required by the Final Judgment have been

accomplished, the Hold Separate requires Pearson and Harcourt to take steps to ensure that their

clinical assessment businesses – Pearson Clinical Assessments (as defined in the Hold Separate)

and Harcourt Clinical Assessments (as defined in the Hold Separate) – will continue to operate as

separate, independent, economically viable, and ongoing competitive businesses; that the

Divestiture Assets will be maintained and operated by Pearson Clinical Assessments and

Harcourt Clinical Assessments as ongoing, economically viable, and active business concerns;

and that competition is maintained during the pendency of the ordered divestitures.

The United States and Defendants have stipulated that the proposed Final Judgment may

be entered after compliance with the APPA.  Entry of the proposed Final Judgment would

terminate this action, except that the Court would retain jurisdiction to construe, modify, or

enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II.    DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATIONS

### A.    The Defendants and the Proposed Transaction

Pearson plc, a U.K. corporation with its headquarters in London, England, operates

businesses in educational publishing, business information, and consumer publishing.  Pearson

Education Inc. (hereafter "Pearson Education"), a wholly-owned subsidiary of Pearson plc, is a

Delaware corporation with its headquarters in Upper Saddle River, New Jersey.  Pearson

Education develops, markets, sells, and distributes clinical tests throughout the United States.

Reed Elsevier PLC, a U.K. corporation with its headquarters located in London, England,

and Reed Elsevier NV, a Dutch corporation with its headquarters located in Amsterdam,

Netherlands, jointly own Harcourt.  Harcourt, a New York corporation with its headquarters

located in San Antonio, Texas, develops, markets, sells, and distributes clinical tests throughout

the United States.

On or about May 4, 2007, and amended on May 21, 2007, Pearson and Reed Elsevier

signed a sale and purchase agreement for Pearson to acquire all of the outstanding voting

securities of Harcourt, as well as additional assets, for approximately $950 million in cash.

### B.    The Competitive Effects of the Transaction on Clinical Test Publishing

#### 1.    Clinical Test Publishing

Clinical tests are used to screen, diagnose, provide intervention strategies for, and to

monitor progress of individuals with disabilities or individuals at risk for disabilities.  These tests

are individually administered and scored by trained clinicians such as psychologists or speech-

language pathologists rather than being administered and scored on a mass scale like state-wide

summative educational achievement tests.  These tests are also standardized by publishers.

3

Standardization is the process of developing a test that reliably, validly, and consistently assesses a specific discipline. Standardized tests are authored, designed, and developed so that the test materials, test procedures, and test scoring are consistent across each test administration. Standardized test scores can be documented empirically and compared across test administrations, and if normed, compared across populations and relative to others in similarly-situated groups. Norming is the expensive and time-consuming process of giving a standardized test to a representative sample of individuals in order to determine average (or normal) test scores. Norms can then be used to compare the scores of an individual with those of other individuals in the specified representative sample.

In addition to clinical tests, non-standardized, non-norm-referenced assessments *(e.g., charts published in books or journals, single-scale tests, and free material available on the internet)* are available to school psychologists and clinicians. However, such test materials are inferior to clinical tests because they do not provide the same levels of validity and reliability, nor can they be used in many situations in which a clinical test is required, for example, where such tests must be administered before a certain diagnosis or classification can be made in order for an individual to qualify for special services, such as special education or speech and language instruction.

      2.     <u>Relevant Product Markets</u>

The Complaint alleges that the development and sale of adaptive behavior, speech and language, and adult abnormal personality clinical tests are relevant product markets pursuant to Section 7 of the Clayton Act.

4

a.    Adaptive Behavior Clinical Tests

Pearson and Harcourt each publish the market-leading adaptive behavior clinical tests. Pearson publishes the Vineland Adaptive Behavior Scales, which is currently in its second edition, ("Vineland") and Harcourt publishes the Adaptive Behavior Assessment System, which is currently in its second edition ("ABAS").

Adaptive behavior generally reflects an individual's competence in meeting their independent needs and satisfying the social demands of their environment in three broad domains: conceptual (*i.e.,* communication, functional academics, self-direction, and health and safety), social (*i.e.,* social skills and leisure), and practical *(i.e.,* self-care, home living, community use, and work). School psychologists and clinicians, among others, use adaptive behavior clinical tests to assess an individual's ability to meet these needs and demands. Other adaptive behavior assessment scales, such as neuropsychological behavioral or emotional scales, do not assess the same domains as do adaptive behavior clinical tests. Moreover, non-standardized charts or scales for adaptive behavior provide inferior assessments of adaptive behavior and do not provide the same levels of validity and reliability as do clinical tests.

A small but significant post-acquisition increase in the price of adaptive behavior clinical tests would not cause customers to substitute other types of tests, charts, or scales, or to otherwise reduce their purchases of adaptive behavior clinical tests, in sufficient quantities so as to make such a price increase unprofitable. For these reasons, such other tests, charts, and scales are not in the same product market as adaptive behavior clinical tests. Accordingly, the development, marketing, sale, and distribution of adaptive behavior clinical tests constitutes a line of commerce and a relevant product market pursuant to Section 7 of the Clayton Act.

        b.    <u>Speech and Language Clinical Tests</u>

Pearson and Harcourt each publish market-leading speech and language clinical tests. Pearson publishes two such tests, known as the Comprehensive Assessment of Spoken Language ("CASL") and the Oral and Written Language Scales ("OWLS"), which are each in their first edition. Harcourt publishes a speech and language clinical test known as the Clinical Evaluation of Language Fundamentals, which is currently in its fourth edition ("CELF").

Speech and language disorders generally refer to problems with understanding others, expressing thoughts and ideas, and producing speech sounds. Speech and language clinical tests may assess several areas such as vocabulary, grammar, receptive and expressive language, semantics, morphology, and pragmatics. Other speech and language assessments, such as those that only assess narrow areas like phonology or grammar, are not as broad as clinical tests. Moreover, non-standardized, non-norm-referenced comprehensive speech and language tests are inferior to clinical tests as they do not provide the same levels of validity or reliability as do clinical tests.

A small but significant post-acquisition increase in the price of speech and language clinical tests would not cause customers to substitute other types of tests or non-standardized, non-norm-referenced tests, or to otherwise reduce their purchases of speech and language clinical tests, in sufficient quantities so as to make such a price increase unprofitable. For these reasons, such other tests are not in the same product market as speech and language clinical tests. Accordingly, the development, marketing, sale, and distribution of speech and language clinical tests constitutes a line of commerce and a relevant product market pursuant to Section 7 of the Clayton Act.

6

c.    Adult Abnormal Personality Clinical Tests

Pearson publishes two series of adult abnormal personality clinical tests known as the Minnesota Multiphasic Personality Inventories, which are currently in their second edition ("MMPI"), and the Millon Clinical Multiaxial Inventories, which are currently in their third edition ("MCMI"). Harcourt is developing an adult abnormal personality clinical test known as the Emotional Assessment System ("EAS") that it expects to make commercially available in late 2008.

Generally, abnormal personality disorders are chronic, inflexible, maladaptive patterns of perceiving, thinking, and behaving that seriously impair an individual's ability to function in social settings. Adult abnormal personality disorders include: (1) clinical disorders such as anxiety, and (2) personality disorders such as paranoia. Many clinicians employ adult abnormal personality clinical tests to obtain comprehensive diagnoses of both kinds. Other methods of assessing abnormal personality, such as using structured interviews or non-standardized tests (including developing one's own tests), are inferior to adult abnormal personality clinical tests because they do not have the same degree of reliability, and because interpreting one's own tests would introduce subjective elements into the analysis not present with the use of clinical tests. In addition, in some locations, for some applications, clinical tests are required by law and other methods of assessment cannot be used.

A small but significant post-acquisition increase in the price of adult abnormal personality clinical tests would not cause customers to substitute structured interviews or non-standardized tests, or to otherwise reduce their purchases of adult abnormal personality clinical tests, in sufficient quantities so as to make such a price increase unprofitable. For these reasons, structured interviews and non-standardized tests are not in the same product market as adult

7

abnormal personality clinical tests.  Accordingly, the development, marketing, sale, and distribution of adult abnormal personality clinical tests constitutes a line of commerce and a relevant product market pursuant to Section 7 of the Clayton Act.

      3.     Relevant Geographic Market

The Complaint alleges that the Defendants sell adaptive behavior and speech and language clinical tests throughout the United States, and that Pearson also sells adult abnormal personality clinical tests throughout the United States.  United States customers of Defendants' clinical tests would not purchase other clinical tests published outside the United States because such other tests have not been standardized or norm-referenced on samples of individuals located in the United States.  Because customers in the United States would not substitute other clinical tests published outside of the United States for the Defendants' clinical tests published in the United States, the United States constitutes the relevant geographic market for all three relevant products pursuant to Section 7 of the Clayton Act.

      4.     Anticompetitive Effects of the Acquisition

            a.     Adaptive Behavior and Speech and Language Clinical Test Markets

The proposed acquisition will eliminate competition between Pearson and Harcourt and substantially increase market concentration in the already highly-concentrated markets for adaptive behavior and speech and language clinical tests.  In the adaptive behavior clinical test market, the proposed acquisition will result in Pearson controlling 92 percent of the market for such tests in which Pearson's Vineland and Harcourt's ABAS are considered to be the best substitutes for each other.  In the speech and language clinical test market, the proposed acquisition will result in Pearson controlling 90 percent of the market for such tests where Pearson's CASL and OWLS are considered substitutes for Harcourt's CELF.

8

The loss of this head-to-head competition in these markets will make it likely that Pearson will unilaterally increase the price of, or reduce innovation with respect to, these clinical tests. The responses of other publishers of adaptive behavior and speech and language clinical tests would not be sufficient to constrain a unilateral exercise of market power by Pearson after the acquisition, and new entry would not be timely, likely, or sufficient to defeat the likely anticompetitive effects of Pearson's proposed acquisition of Harcourt. For all of these reasons, the proposed transaction would substantially lessen competition in the development, marketing, sale, and distribution of adaptive behavior and speech and language clinical tests in the United States in violation of Section 7 of the Clayton Act.

    b.    Adult Abnormal Personality Clinical Tests

Pearson is the dominant supplier of adult abnormal personality clinical tests, with its MMPI and MCMI having approximately 93 percent share of the market for such tests sold in the United States. Harcourt is developing a computer-based adaptive adult abnormal personality clinical test known as the EAS, which it plans to make commercially available in late 2008. Harcourt is in the standardization and norm-referencing phase of development and is in the process of collecting data from clinical and non-clinical examinees. The EAS will offer new, desirable features and functionality that are not currently offered by either Pearson or the other competitor. Harcourt plans to sell and market the EAS to Pearson's adult abnormal personality clinical test customers and projects that the EAS will achieve a significant market share within a number of years.

The proposed acquisition would eliminate Harcourt as a new supplier of adult abnormal personality clinical tests and thereby prevent the reduction in prices and greater innovation for such tests that would have otherwise resulted from Harcourt's entry. Other new entry would not

9

be timely, likely, or sufficient to defeat the likely anticompetitive effects of Pearson's proposed acquisition of Harcourt. For all of these reasons, the proposed transaction would substantially lessen actual and potential competition in the development, marketing, sale, and distribution of adult abnormal personality clinical tests in the United States in violation of Section 7 of the Clayton Act.

## III.    EXPLANATION OF THE PROPOSED FINAL JUDGMENT

### A.    The Divestiture Assets

The proposed Final Judgment requires that the Defendants divest all of its assets related to clinical tests in these markets where competition would otherwise be harmed. The divestitures provided for in the proposed Final Judgment will eliminate the anticompetitive effects of the proposed acquisition in the markets for adaptive behavior, speech and language, and adult abnormal personality clinical tests. The Divestiture Assets must be divested in such a way as to satisfy the United States in its sole discretion that they can and will be operated by the acquirer(s) as viable, ongoing clinical test publishing concerns that can compete effectively in their respective relevant markets; and the Defendants must take all reasonable steps necessary to accomplish the divestitures quickly and shall cooperate with prospective acquirers.

Specifically, the Divestiture Assets include:

a.    In the adaptive behavior clinical tests market, Harcourt's ABAS first- and second-edition titles, incorporating the Downward Extension of the ABAS, and Harcourt's ABAS Second Edition Intervention Planner (collectively "ABAS Assets");

b.    in the speech and language clinical tests market, either:

(1) Pearson's CASL, which is in its first edition ("CASL Assets"); <u>and,</u> Pearson's

OWLS, including the Oral Expression and Listening Comprehension Scales, the

Written Expression Scale, and the OWLS second edition, which is under

development (collectively "OWLS Assets"); <u>or</u>

(2) Harcourt's CELF, including the first-, second-, third-, and fourth-edition titles,

the CELF Screener first-, second-, third-, and fourth-edition titles, the CELF

Preschool first-, and second-edition titles, the CELF Spanish first-, second-, third-,

and fourth-edition titles, and the CELF Spanish Preschool, which is under

development; excluding however, the Retained CMS and WMS Content

(collectively "CELF Assets"); and

c.    in the adult abnormal personality clinical tests market, Harcourt's EAS, which is

under development ("EAS Assets").

The Divestiture Assets also include all tangible and intangible assets that comprise each of

the above-listed Divestiture Assets; the OWLS Assets also include all tangible assets relating to

the development of the OWLS second-edition titles; and the EAS Assets also include all tangible

and intangible assets relating to the development of the EAS.

The sale of the Divestiture Assets according to the terms of the proposed Final Judgment

will eliminate the anticompetitive effects of the acquisition in the markets for adaptive behavior,

speech and language, and adult abnormal personality clinical tests.  In each market, the

divestitures will establish a new, independent, and economically viable competitor.

**B.    Selected Provisions of the Proposed Final Judgment**

In antitrust cases involving acquisitions in which the United States seeks a divestiture

remedy, it requires completion of the divestiture within the shortest period of time reasonable

under the circumstances.  A quick divestiture has the benefits of restoring competition lost in the

11

acquisition and reducing the possibility of dissipation of the value of the assets. Paragraph IV(A) of the proposed Final Judgment requires the Defendants to divest, as independent and economically viable ongoing clinical test publishing concerns, the Divestiture Assets within ninety (90) calendar days after the filing of the Complaint in this matter, or five (5) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later.[1] The Divestiture Assets must be divested in such a way as to satisfy the United States in its sole discretion that they can and will be operated by the acquirer(s) as viable, ongoing clinical test publishing concerns that can compete effectively in their respective relevant markets; and Defendants must take all reasonable steps necessary to accomplish the divestitures quickly and shall cooperate with prospective acquirers.

Several provisions of the proposed Final Judgment address licenses needed to effectuate the divestitures or to tailor the proposed relief to the anticompetitive concerns without disrupting the Defendants' other businesses. For example, paragraph II(F)(5) provides that the acquirer(s) of the ABAS Assets and CELF Assets will obtain royalty-free licenses to use the Harcourt corporate trademark and trade name for the purpose of distributing finished inventory of the ABAS Assets and CELF Assets held by Harcourt. Similarly, paragraph II(F)(7) provides that the acquirer of the CASL Assets and OWLS Assets will obtain a royalty-free licenses to use the Pearson corporate trademark and trade name for the purpose of distributing finished inventory of the CASL Assets and OWLS Assets held by Pearson. These licenses will ensure that the acquirer(s) of the

---

[1] The proposed Final Judgment also provides that this ninety- (90) day time period may be extended by the United States in its sole discretion for a total period not exceeding sixty (60) calendar days, and that the Court will receive prior notice of any such extension.

Divestiture Assets will not infringe the Defendants' intellectual property rights in the course of distributing the finished inventory of products sold by or under any of the Divestiture Assets.

Paragraphs II(F)(6) and II(F)(8) provide for licenses relating to Pearson and Harcourt's scoring software, which the Defendants currently distribute for use with products sold by or under the Divestiture Assets. Paragraph II(F)(6) provides that the acquirer(s) of the ABAS Assets and CELF Assets will have the option to obtain a non-exclusive license to distribute Harcourt's Scoring Assistant Software (as defined in the proposed Final Judgment) for use with the ABAS Assets and CELF Assets; if the acquirer(s) exercise this option, the Defendants shall provide to the acquirer(s) all technical information and support necessary for the distribution and administration of the Scoring Assistant Software. Similarly, paragraph II(F)(8) provides that the acquirer of the CASL Assets and OWLS Assets will have the option to obtain a non-exclusive license to distribute Pearson's ASSIST Software (as defined in the proposed Final Judgment) for use with the CASL Assets and OWLS Assets; if the acquirer exercises this option, the Defendants shall provide to the acquirer all technical information and support necessary for the distribution and administration of the ASSIST Software. These provisions assure the acquirer(s)' access to scoring software that may be needed to facilitate the future sale and marketing of products sold by or under the Divestiture Assets by the acquirer(s).

Paragraphs II(F)(9) and IV(E) provide for licenses relating to certain content of the Divestiture Assets that is also employed in the marketing, sale, and distribution of other Harcourt tests that the proposed Final Judgment does not require the Defendants to divest. First, Harcourt's CELF employs certain content used in Harcourt's Children's Memory Scale ("CMS") and Harcourt's Wechsler Memory Scale ("WMS"). Since the proposed Final Judgment does not require the Defendants to divest the CMS or WMS, paragraph II(F)(9) provides that the acquirer

of the CELF Assets will obtain a license to use the Retained CMS and WMS Content (as defined in the proposed Final Judgment) to market, sell or distribute any tests produced by the CELF Assets. This license will permit the acquirer of the CELF Assets unfettered rights to use the Defendants' Retained CMS and WMS Content, and to do so without infringing the Defendants' intellectual property rights.

Second, Harcourt's Bayley Scales of Infant and Toddler Development (the "Bayley"), another test that the proposed Final Judgment does not require the Defendants to divest, employs certain content used in the ABAS. That content will be divested to the acquirer, but paragraph IV(E) provides that the Defendants shall have the right to obtain from the acquirer a license to use the Licensed-Back ABAS Content (defined in the proposed Final Judgment) for a period of time no longer than is necessary for the Defendants to market, sell or distribute the Bayley, and that such license shall be subject to final review and approval by the United States. This license will permit the Defendants to continue to use the Licensed-Back ABAS Content without interfering with the acquirer's use of that content, and infringing intellectual property rights relating to the ABAS Assets that will be divested to the acquirer.

Paragraph IV(F) of the Proposed Final Judgment provides for an orderly transition of the Divestiture Assets to the acquirer(s). It addresses the possibility that customers might continue to place orders for the divested clinical tests with Pearson or Harcourt. To the extent that Defendants receive any purchase orders or inquiries for the ABAS, the CASL, the OWLS, or the CELF tests, and an acquirer has already purchased the Divestiture Assets relating to such test, Defendants shall forward such orders and inquiries to the respective acquirer. The Defendants' obligation under this provision shall not exceed two (2) years.

14

Paragraph V of the proposed Final Judgment provides that in the event the Defendants do not accomplish the divestitures within the periods prescribed in the proposed Final Judgment, the Court will appoint a trustee selected by the United States to effect the divestitures. If a trustee is appointed, the proposed Final Judgment provides that Defendants will pay all costs and expenses of the trustee. The trustee's commission will be structured so as to provide an incentive for the trustee based on the price obtained and the speed with which the divestitures are accomplished. After his or her appointment becomes effective, the trustee will file monthly reports with the Court and the United States setting forth his or her efforts to accomplish the divestiture. At the end of six (6) months, if the divestitures have not been accomplished, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate, in order to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

### C.    The Hold Separate Stipulation and Order

In order to help ensure that, pending the divestitures, competition between the Divestiture Assets and the competing assets retained by Defendants is preserved, the Divestiture Assets are maintained as ongoing, economically viable, and active business concerns, and Defendants will accomplish the divestitures required by the proposed Final Judgment, Defendants have entered into the Hold Separate filed simultaneously with the Court. The Hold Separate requires Pearson and Harcourt to take steps to ensure that their clinical assessment businesses – Pearson Clinical Assessments and Harcourt Clinical Assessments – will each continue to operate as separate, independent, economically viable, and ongoing competitive businesses with management, development, sales, and marketing held separate and apart from those of each other as well as

those of Defendants' other operations; and that management of the Divestiture Assets by Pearson

Clinical Assessments and Harcourt Clinical Assessments will not be influenced by Defendants. In

order to help implement the Hold Separate obligations, Defendants will appoint a person or

persons to oversee Pearson Clinical Assessments and Harcourt Clinical Assessments, and those

persons will be responsible for Defendants' compliance with the provisions of the Hold Separate.

The Hold Separate does not require the Defendants to operate separate and independent support

and operational services relating to the Divestiture Assets. Such support and operational services

include warehousing, printing, order processing, accounting, customer service, technical

assistance, merchandising, distribution, and delivery and are used by numerous Pearson and

Harcourt products that are not being divested. The Hold Separate requires the Defendants to

provide support and operational services to the businesses being held separate, including the

Divestiture Assets, and also requires them to maintain such services relating to the Divestiture

Assets at 2007 or previously approved levels for 2008, whichever are higher.

## IV.    REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been

injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to

recover three times the damages the person has suffered, as well as costs and reasonable attorneys'

fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any

private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15

U.S.C. § 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent private

lawsuit that may be brought against Defendants.

16

## V.    PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> James J. Tierney
> Chief, Networks and Technology Enforcement Section
> Antitrust Division
> United States Department of Justice
> 600 E Street, NW, Suite 9500
> Washington, D.C. 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the Defendants may apply to the Court for any order necessary or appropriate for the modification,

interpretation, or enforcement of the Final Judgment.

## VI.    ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial

on the merits against Defendants.  The United States could have continued the litigation and

sought preliminary and permanent injunctions against Pearson's acquisition of all of the

outstanding voting securities of Harcourt, as well as additional assets, from Reed Elsevier.  The

United States is satisfied, however, that the divestiture of assets described in the proposed Final

Judgment will preserve competition for the provision of clinical tests in the relevant markets

identified by the United States.  Thus, the proposed Final Judgment would achieve all or

substantially all of the relief the United States would have obtained through litigation, but avoids

the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII.    STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in

antitrust cases brought by the United States be subject to a sixty-day comment period, after which

the Court shall determine whether entry of the proposed Final Judgment "is in the public interest."

15 U.S.C. § 16(e)(1).  In making that determination, the court, in accordance with the statute as

amended in 2004, is required to consider:

> (A)    the competitive impact of such judgment, including termination of
> alleged violations, provisions for enforcement and modification, duration of
> relief sought, anticipated effects of alternative remedies actually
> considered, whether its terms are ambiguous, and any other competitive
> considerations bearing upon the adequacy of such judgment that the court
> deems necessary to a determination of whether the consent judgment is in
> the public interest; and

18

(B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B).  In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act).[2]

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62.  With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001).  Courts have held that:

[t]he balancing of competing social and political interests affected by a proposed antitrust

---

[2]  The 2004 amendments substituted "shall" for "may" in directing relevant factors for a court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns,* 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is *within the reaches of the public interest.*" More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[3]  In determining whether a

proposed settlement is in the public interest, a district court "must accord deference to the

government's predictions about the efficacy of its remedies, and may not require that the remedies

perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also*

*Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's

predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland*

*Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the

United States' prediction as to the effect of proposed remedies, its perception of the market

structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting their

own decrees following a finding of liability in a litigated matter.  "[A] proposed decree must be

approved even if it falls short of the remedy the court would impose on its own, as long as it falls

within the range of acceptability or is 'within the reaches of public interest.'" *United States v.*

---

[3]  *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

*Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60. As this court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The language wrote

into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator

Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended

proceedings which might have the effect of vitiating the benefits of prompt and less costly

settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of

Senator Tunney). Rather, the procedure for the public interest determination is left to the

discretion of the court, with the recognition that the court's "scope of review remains sharply

proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F.

Supp. 2d at 11.[4]

---

[4] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973)("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized."); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.").

## VIII.  DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated:  January 24, 2008

Respectfully submitted,

Damon J. Kalt
Sanford M. Adler
John C. Filippini (D.C. Bar # 165159)
Danielle M. Ganzi
Attorneys
United States Department of Justice
Antitrust Division
Networks and Technology
Enforcement Section
600 E Street, NW, Suite 9500
Washington, D.C. 20530
(202) 307-6200

23