## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.:   **08 0143** |
| | ) | |
| v. | ) | JUDGE: |
| | ) | |
| PEARSON PLC, | ) | DECK TYPE:  Antitrust |
| PEARSON EDUCATION INC., | ) | |
| REED ELSEVIER PLC, | ) | DATE STAMP: |
| REED ELSEVIER NV, and | ) | |
| HARCOURT ASSESSMENT INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## HOLD SEPARATE STIPULATION AND ORDER

It is hereby stipulated and agreed by and between the undersigned parties, subject to approval and entry by the Court, that:

### I. Definitions

As used in this Hold Separate Stipulation and Order ("Hold Separate"):

A.      "Pearson" means Defendants Pearson plc, a U.K. corporation with its headquarters in London, England, and Pearson Education Inc., a Delaware corporation with its headquarters in Upper Saddle River, New Jersey, and includes their successors and assigns, and their subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

B.      "Reed Elsevier" means Defendants Reed Elsevier PLC, a U.K. corporation with its headquarters in London, England, Reed Elsevier NV, a Dutch corporation with its headquarters in Amsterdam, Netherlands, and Harcourt Assessment Inc., ("Harcourt") a New

York corporation with its headquarters in San Antonio, Texas and includes their successors and

assigns, and their subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and

their directors, officers, managers, agents, and employees.

C.      "Pearson Clinical Assessments" means the Pearson's Clinical Assessment

business, and includes its successors and assigns, and its subsidiaries, divisions, groups,

affiliates, partnerships and joint ventures, and their directors, officers, managers, agents, and

employees.

D.      "Harcourt Clinical Assessments" means the Harcourt's Clinical division, and

includes its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships

and joint ventures, and their directors, officers, managers, agents, and employees.

E.      "Divestiture Assets," for the purpose of this Hold Separate, means: (1) Reed

Elsevier's Adaptive Behavior Assessment System ("ABAS") first- and second-edition titles,

incorporating the Downward Extension of the ABAS, and Reed Elsevier's ABAS Second

Edition Intervention Planner (collectively "ABAS Assets"); (2) Pearson's Comprehensive

Assessment of Spoken Language ("CASL Assets"); (3) Pearson's Oral and Written Language

Scales ("OWLS"), including the Oral Expression and Listening Comprehension Scales, the

Written Expression Scale, and the OWLS second edition, which is under development

(collectively "OWLS Assets"); (4) Reed Elsevier's Clinical Evaluation of Language

Fundamentals ("CELF") including the first-, second-, third-, and fourth-edition titles, the CELF

Screener first-, second-, third-, and fourth-edition titles, the CELF Preschool first-, and second-

edition titles, the CELF Spanish first-, second-, third-, and fourth-edition titles, and the CELF

Spanish Preschool, which is under development; excluding however, the Retained CMS and

2

WMS Content (collectively "CELF Assets"); and (5) Reed Elsevier's Emotional Assessment System, ("EAS") which is under development ("EAS Assets").

The Divestiture Assets include:

1.      all tangible assets that comprise each of the Divestiture Assets including, but not limited to, all historic and current research data and activities and development activities relating to the Divestiture Assets; all original and digital artwork, film plates and other reproductive materials relating to the Divestiture Assets including, but not limited to, all manuscripts, illustrations, any other content, and any revisions or revision plans thereof in print or digital form; all finished inventory of the Divestiture Assets including, but not limited to, all examination kits, manuals, test booklets, record forms, and response booklets; all contracts, agreements, commitments, certifications, and understandings relating to the Divestiture Assets, including, but not limited to, publishing agreements, author agreements, research agreements, author permissions and other similar agreements, supply and distribution agreements for the Divestiture Assets; all customer lists, contracts, accounts, and credit records or similar records of all sales and potential sales of the Divestiture Assets; all sales support and promotional materials, advertising materials, and production, sales and marketing files, and all other records relating to the Divestiture Assets;

2.      all intangible assets used in the development, production, servicing, sale and distribution of each of the Divestiture Assets, including, but not limited to, all patents, licenses and sublicenses, adaptation licenses, intellectual property,

copyrights, contract rights, trademarks (registered and unregistered), trade names, service marks, and service names relating to the Divestiture Assets, but excluding corporate-level trademarks of Pearson and Harcourt; all technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, scoring rules, scoring algorithms, and specifications for materials relating to the Divestiture Assets; all quality assurance and control procedures, design tools and simulation capability relating to the Divestiture Assets; all manuals and technical information used for any purpose relating to the Divestiture Assets or that Defendants provide to their own employees, customers, suppliers, agents or licensees for use in relation with the Divestiture Assets; and all other intangible research data concerning historic and current research and development efforts relating to the Divestiture Assets, including, but not limited to, designs of experiments, and the results of successful and unsuccessful designs and experiments;

3.      the OWLS Assets also specifically include all tangible assets relating to the development of the OWLS second-edition titles including, but not limited to, all research data and development activities; all tryout and standardization easels, administration materials, record forms, tryout data, standardization data, and data for reliability and validity studies;

4.      the EAS Assets also specifically include all tangible and intangible assets relating to the development of the EAS including, but not limited, to all research data and development activities; all tryout and standardization easels, administration

materials, record forms, tryout data, standardization data, and data for reliability and validity studies; and all algorithmic data including, but not limited to, data relating to item banking, continuous item rotation, item analysis, item calibration, norming, test equating, scale development, computer-based testing, and computer-adaptive testing; and all applications of Sampling Theory, the Generalized Graded Unfolding model, Generalizability Theory model, Structural Equation model, and other Item Response Theory models;

5.    a royalty-free license to the Acquirer(s) of the ABAS Assets and CELF Assets to use the Harcourt corporate trademark and trade name for the sole and limited purpose of distributing finished inventory of the ABAS Assets and CELF Assets;

6.    at the option of the Acquirer(s) of the ABAS Assets and CELF Assets, a non-exclusive license to distribute the Scoring Assistant Software for use with the ABAS Assets and CELF Assets; and in the event that the Acquirer exercises such option, the Defendants shall provide to the Acquirer(s) of the ABAS Assets and CELF Assets all technical information and support necessary for the distribution and administration of the Scoring Assistant Software;

7.    a royalty-free license to the Acquirer of the CASL Assets and OWLS Assets to use the Pearson corporate trademark and trade name for the sole and limited purpose of distributing finished inventory of the CASL Assets and OWLS Assets;

8.    at the option of the Acquirer of the CASL Assets and OWLS Assets, a non-exclusive license to distribute the ASSIST Software for use with the CASL Assets and OWLS Assets; and in the event that the Acquirer exercises such option, the

5

Defendants shall provide to the Acquirer of the CASL Assets and OWLS Assets all technical information and support necessary for the distribution and administration of the ASSIST Software; and

9. a license to the Acquirer of the CELF Assets to use the Retained CMS and WMS Content to market, sell or distribute any tests produced by the CELF Assets.

F. "Acquirer" or "Acquirers" means the entity or entities to whom Defendants divest the Divestiture Assets.

G. "Scoring Assistant Software" means Reed Elsevier's software for computerized scoring of individually-administered standardized norm-referenced comprehensive clinical tests ("clinical tests") to assist test administrators including, but not limited to, software related to scoring of test results; tracking test scores and test history; raw-to-derived score conversion; score interpretation; outcomes analysis and reporting capabilities; problem identification and eligibility determination; discrepancy analysis; and intervention recommendations.

H. "ASSIST Software" means Pearson's Automated System for Scoring and Interpreting Standardized Tests and encompasses software for computerized scoring of clinical tests to assist test administrators including, but not limited to, software related to scoring of test results; tracking test scores and test history; raw-to-derived score conversion; score interpretation; outcomes analysis and reporting capabilities; problem identification and eligibility determination; discrepancy analysis; and intervention recommendations.

I. "Licensed-Back ABAS Content" means the two hundred and forty one (241) ABAS items described in Exhibit A that, as of the filing of the Complaint in this matter, are also employed in the marketing, sale, and distribution of Reed Elsevier's Bayley Scales of Infant and

6

Toddler Development second- and third-edition titles.

J.      "Retained CMS and WMS Content" means the fifty (50) Children's Memory

Scale ("CMS") and Wechsler Memory Scale ("WMS") items that, as of the filing of the

Complaint in this matter, are also employed in the marketing, sale, and distribution of the CELF

Assets appearing as the Number Repetition 1 (15 items) and Familiar Sequences 1 (12 items)

subtests of the CELF-4, which are borrowed from the Numbers and Sequences CMS subtests,

respectively, and Number Repetition 2 (15 items) and Familiar Sequences 2 (8 items) subtests of

the CELF-4, which are borrowed from the Digit Span and Mental Control WMS subtests,

respectively.

## II. Objectives

The proposed Final Judgment is meant to ensure Defendants' prompt divestitures of the

Divestiture Assets for the purpose of preserving viable competition in the development and sale

of individually-administered standardized norm-referenced comprehensive clinical tests to

remedy the anticompetitive effects that the United States alleges would otherwise result from the

Defendants' merger.  This Hold Separate will ensure that until the divestitures required by the

proposed Final Judgment have been accomplished, Pearson Clinical Assessments and Harcourt

Clinical Assessments will continue to be operated as separate, independent, economically viable,

and ongoing competitive businesses, independent from, and uninfluenced by, their common

ownership; that competition between Pearson Clinical Assessments and Harcourt Clinical

Assessments will be maintained until such divestitures are completed; and that the Divestiture

Assets will be preserved and maintained.

7

### III. Jurisdiction and Venue

The Court has jurisdiction over the subject matter of this action, and Defendants waive all objections to the Court's exercise of personal jurisdiction over Defendants in this action and to the propriety of venue in the United States District Court for the District of Columbia.

### IV. Compliance with and Entry of the Proposed Final Judgment

A.      The parties stipulate that the proposed Final Judgment in the form attached hereto as Exhibit A may be filed with the Court, and that, upon the motion of any party or upon the Court's own motion, it may be entered at any time after compliance with the requirements of the Antitrust Procedures and Penalties Act (15 U.S.C. § 16), without further notice to any party or other proceedings, provided that the United States has not withdrawn its consent, which it may do at any time before the entry of the proposed Final Judgment by serving notice thereof on Defendants and by filing that notice with the Court.

B.      Defendants shall abide by and comply with the provisions of the proposed Final Judgment pending its entry by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment, and shall, from the date of the signing of this Hold Separate by the parties, comply with all the terms and provisions of the proposed Final Judgment as though the same were in full force and effect as an order of the Court.

C.      Defendants shall not consummate the transaction sought to be enjoined by the Complaint herein before the Court has signed this Hold Separate.

D.      This Hold Separate shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

E.      In the event: (1) the United States has withdrawn its consent, as provided in

8

Section IV(A) above, or (2) the proposed Final Judgment is not entered pursuant to this Hold

Separate, the time has expired for all appeals of any Court ruling declining entry of the proposed

Final Judgment, and the Court has not otherwise ordered continued compliance with the terms

and provisions of the proposed Final Judgment, then the parties are released from all further

obligations under this Hold Separate, and the making of this Hold Separate shall be without

prejudice to any party in this or any other proceeding.

   F.  Defendants represent that the divestitures ordered in the proposed Final Judgment

can and will be made, and that they will later raise no claim of mistake, hardship or difficulty of

compliance as grounds for asking the Court to modify any of the provisions contained therein.

## V. <u>Hold Separate Provisions</u>

   Until the divestitures required by the Final Judgment have been accomplished:

   A.  Defendants shall preserve, maintain, and continue to operate Pearson Clinical

Assessments and Harcourt Clinical Assessments as independent, ongoing, economically viable

competitive businesses, with management, development, sales, and marketing held entirely

separate, distinct and apart from those of each other as well as those of other operations of

Defendants. Defendants shall take all steps necessary to ensure that Pearson Clinical

Assessments and Harcourt Clinical Assessments shall preserve, hold, and continue to operate the

Divestiture Assets as ongoing, economically viable, and active business concerns and shall

operate each Divestiture Asset as a viable competitor in their respective individually-

administered standardized norm-referenced comprehensive clinical tests markets. Defendants

shall take all steps necessary to ensure that Pearson Clinical Assessments and Harcourt Clinical

Assessments shall not coordinate with one another regarding the performance of decision-making

functions, including the development, production, revision, sale, marketing, and pricing or any other terms of sale of any products of the Divestiture Assets.  Within twenty (20) days after the entry of this Hold Separate, Defendants will inform the United States of the steps Defendants have taken to comply with this Hold Separate.

      B.     Defendants shall take all steps necessary to ensure that (1) management of the Divestiture Assets by Pearson Clinical Assessments and Harcourt Clinical Assessments will not be influenced by the Defendants; and (2) the competitively sensitive sales, marketing and pricing information, and decision-making by Pearson Clinical Assessments and Harcourt Clinical Assessments concerning production, development, marketing, licensing, editorial content or sales of products by or under any of the Divestiture Assets will be kept separate and apart from Defendant's other operations.

      C.     Defendants shall use all reasonable efforts to enable Pearson Clinical Assessments and Harcourt Clinical Assessments to develop, maintain, and increase the sales and revenues of, the products and services produced, operated, developed, updated, delivered, marketed, distributed, licensed, or sold under the Divestiture Assets, and shall maintain at 2007 or previously approved levels for 2008, whichever are higher, all support and operational services relating to warehousing, printing, order processing, accounting, promotions, advertising, sales, customer service, technical assistance, marketing, merchandising, distribution and delivery for the Divestiture Assets.

      D.     Defendants shall take all steps necessary to ensure that Pearson Clinical Assessments and Harcourt Clinical Assessments fully maintain the Divestiture Assets in operable and saleable condition at no less than their current levels of support, as of the filing of the

Complaint in this matter, including inventory maintenance, and shall maintain and adhere to normal sales, development, updating, and support schedules for the Divestiture Assets.

E.      Defendants shall enable Pearson Clinical Assessments and Harcourt Clinical Assessments to continue to fund, develop, and update the Divestiture Assets at no less than previously approved levels of funding and resources, and as they would have been funded, developed, and updated absent the required divestitures in accordance with the terms of the proposed Final Judgment.

F.      Defendants shall provide sufficient working capital and lines and sources of credit to enable Pearson Clinical Assessments and Harcourt Clinical Assessments to continue to maintain the Divestiture Assets as economically viable and competitive, ongoing concerns, consistent with the requirements of Sections V (A), (B), (D), and (E) of this Hold Separate.

G.      Defendants shall not, except as part of a divestiture approved by the United States in accordance with the terms of the proposed Final Judgment, remove, sell, lease, assign, transfer, pledge or otherwise dispose of any of the Divestiture Assets.

H.      Defendants shall take no action that would jeopardize, delay, or impede the sale of the Divestiture Assets and shall take all steps necessary to ensure that Pearson Clinical Assessments and Harcourt Clinical Assessments also takes no such action.

I.      Defendants' employees involved in the management, development, marketing or sale of the Divestiture Assets shall not be transferred or reassigned to other areas within the company except for transfer bids initiated by employees pursuant to Defendants' regular, established job posting policy.  Defendants shall provide the United States with ten (10) calendar days notice of any such transfer.

11

J.    Subject to the approval of the United States, Defendants shall appoint a person or persons to oversee Pearson Clinical Assessments. This person shall be responsible for ensuring Defendants' compliance with this section, and shall have complete managerial responsibility for Pearson Clinical Assessments, subject to the provisions of this Final Judgment. In the event such person is unable to perform his duties, Defendants shall appoint, subject to the approval of the United States, a replacement within ten (10) working days. Should Defendants fail to appoint a replacement acceptable to the United States within this time period, the United States shall appoint a replacement.

K.    Subject to the approval of the United States, Defendants shall appoint a person or persons to oversee Harcourt Clinical Assessments. This person shall be responsible for ensuring Defendants' compliance with this section, and shall have complete managerial responsibility for Harcourt Clinical Assessments, subject to the provisions of this Final Judgment. In the event such person is unable to perform his duties, Defendants shall appoint, subject to the approval of the United States, a replacement within ten (10) working days. Should Defendants fail to appoint a replacement acceptable to the United States within this time period, the United States shall appoint a replacement.

L.    Defendants shall take no action that would interfere with the ability of any trustee appointed pursuant to the Final Judgment to complete the divestitures pursuant to the Final Judgment to an Acquirer or Acquirers acceptable to the United States and shall take all steps necessary to ensure that Pearson Clinical Assessments and Harcourt Clinical Assessments also takes no such action.

M.    This Hold Separate shall remain in effect until consummation of the divestitures required by the proposed Final Judgment or until further order of the Court.

Dated:

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA:


Damon J. Kalt, Esq.
U.S. Department of Justice
Antitrust Division, Networks and
Technology Enforcement Section
600 E Street, NW, Suite 9500
Washington, D.C. 20530

FOR DEFENDANTS
PEARSON PLC and PEARSON
EDUCATION INC.:


Harry T. Robins, Esq.
Morgan, Lewis & Bockius, LLP
101 Park Avenue
New York, New York 10178


FOR DEFENDANTS
REED ELSEVIER PLC, REED ELSEVIER
NV, and HARCOURT ASSESSMENT INC.:


Robert A. Lipstein, Esq. (D.C. Bar #253724)
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004


## ORDER

IT IS SO ORDERED by the Court, this 24th day of Jan. , 2008


United States District Judge

13

**EXHIBIT A**
**to the HOLD SEPARATE STIPULATION AND ORDER**

**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.: |
| | ) | |
| v. | ) | JUDGE: |
| | ) | |
| PEARSON PLC, | ) | DECK TYPE:  Antitrust |
| PEARSON EDUCATION INC., | ) | |
| REED ELSEVIER PLC, | ) | DATE STAMP: |
| REED ELSEVIER NV, and | ) | |
| HARCOURT ASSESSMENT INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **FINAL JUDGMENT**

WHEREAS, Plaintiff, United States of America, filed its Complaint on January 24, 2008,

and the United States and Defendants, Pearson plc and Pearson Education Inc. (collectively

"Pearson") and Reed Elsevier PLC, Reed Elsevier NV, and Harcourt Assessment Inc.

(collectively "Reed Elsevier"), by their respective attorneys, have consented to the entry of this

Final Judgment without trial or adjudication of any issue of fact or law, and without this Final

Judgment constituting any evidence against or admission by any party regarding any issue of fact

or law;

AND WHEREAS, Defendants agree to be bound by the provisions of this Final Judgment

pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain

divestiture of certain rights or assets by the Defendants to assure that competition is not

1

substantially lessened;

AND WHEREAS, the United States requires Defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants have represented to the United States that the divestitures required below can and will be made and that Defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. **Jurisdiction**

This Court has jurisdiction over the subject matter and each of the parties to this action. The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II. **Definitions**

As used in this Final Judgment:

A.    "Pearson" means Defendants Pearson plc, a U.K. corporation with its headquarters in London, England, and Pearson Education Inc., a Delaware corporation with its headquarters in Upper Saddle River, New Jersey, and includes their successors and assigns, and their subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

B.    "Reed Elsevier" means Defendants Reed Elsevier PLC, a U.K. corporation with

2

its headquarters in London, England, Reed Elsevier NV, a Dutch corporation with its headquarters in Amsterdam, Netherlands, and Harcourt Assessment Inc., ("Harcourt") a New York corporation with its headquarters in San Antonio, Texas and includes their successors and assigns, and their subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

C.    "ABAS Assets" means Reed Elsevier's Adaptive Behavior Assessment System ("ABAS") first- and second-edition titles, incorporating the Downward Extension of the ABAS, and Reed Elsevier's ABAS Second Edition Intervention Planner.

D.    "Speech and Language Assets" means (1) Pearson's Comprehensive Assessment of Spoken Language, ("CASL") which is in its first edition ("CASL Assets") and Pearson's Oral and Written Language Scales ("OWLS"), including the Oral Expression and Listening Comprehension Scales, the Written Expression Scale, and the OWLS second edition, which is under development (collectively "OWLS Assets") or (2) Reed Elsevier's Clinical Evaluation of Language Fundamentals ("CELF") including the first-, second-, third-, and fourth-edition titles, the CELF Screener first-, second-, third-, and fourth-edition titles, the CELF Preschool first-, and second-edition titles, the CELF Spanish first-, second-, third-, and fourth-edition titles, and the CELF Spanish Preschool, which is under development; excluding however, the Retained CMS and WMS Content (collectively "CELF Assets").

E.    "EAS Assets" means Reed Elsevier's Emotional Assessment System, ("EAS") which is under development.

3

F.      "Divestiture Assets" means: (1) the ABAS Assets; (2) the Speech and Language Assets; and (3) the EAS Assets.

The Divestiture Assets include:

1.      all tangible assets that comprise each of the Divestiture Assets including, but not limited to, all historic and current research data and activities and development activities relating to the Divestiture Assets; all original and digital artwork, film plates and other reproductive materials relating to the Divestiture Assets including, but not limited to, all manuscripts, illustrations, any other content, and any revisions or revision plans thereof in print or digital form; all finished inventory of the Divestiture Assets including, but not limited to, all examination kits, manuals, test booklets, record forms, and response booklets; all contracts, agreements, commitments, certifications, and understandings relating to the Divestiture Assets, including, but not limited to, publishing agreements, author agreements, research agreements, author permissions and other similar agreements, supply and distribution agreements for the Divestiture Assets; all customer lists, contracts, accounts, and credit records or similar records of all sales and potential sales of the Divestiture Assets; all sales support and promotional materials, advertising materials, and production, sales and marketing files, and all other records relating to the Divestiture Assets;

2.      all intangible assets used in the development, production, servicing, sale and distribution of each of the Divestiture Assets, including, but not limited to, all patents, licenses and sublicenses, adaptation licenses, intellectual property,

4

copyrights, contract rights, trademarks (registered and unregistered), trade names, service marks, and service names relating to the Divestiture Assets, but excluding corporate-level trademarks of Pearson and Harcourt; all technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, scoring rules, scoring algorithms, and specifications for materials relating to the Divestiture Assets; all quality assurance and control procedures, design tools and simulation capability relating to the Divestiture Assets; all manuals and technical information used for any purpose relating to the Divestiture Assets or that Defendants provide to their own employees, customers, suppliers, agents or licensees for use in relation with the Divestiture Assets; and all other intangible research data concerning historic and current research and development efforts relating to the Divestiture Assets, including, but not limited to, designs of experiments, and the results of successful and unsuccessful designs and experiments;

3.    the OWLS Assets also specifically include all tangible assets relating to the development of the OWLS second-edition titles including, but not limited to, all research data and development activities; all tryout and standardization easels, administration materials, record forms, tryout data, standardization data, and data for reliability and validity studies;

4.    the EAS Assets also specifically include all tangible and intangible assets relating to the development of the EAS including, but not limited, to all research data and development activities; all tryout and standardization easels, administration

materials, record forms, tryout data, standardization data, and data for reliability and validity studies; and all algorithmic data including, but not limited to, data relating to item banking, continuous item rotation, item analysis, item calibration, norming, test equating, scale development, computer-based testing, and computer-adaptive testing; and all applications of Sampling Theory, the Generalized Graded Unfolding model, Generalizability Theory model, Structural Equation model, and other Item Response Theory models;

5. a royalty-free license to the Acquirer(s) of the ABAS Assets and CELF Assets to use the Harcourt corporate trademark and trade name for the sole and limited purpose of distributing finished inventory of the ABAS Assets and CELF Assets;

6. at the option of the Acquirer(s) of the ABAS Assets and CELF Assets, a non-exclusive license to distribute the Scoring Assistant Software for use with the ABAS Assets and CELF Assets; and in the event that the Acquirer exercises such option, the Defendants shall provide to the Acquirer(s) of the ABAS Assets and CELF Assets all technical information and support necessary for the distribution and administration of the Scoring Assistant Software;

7. a royalty-free license to the Acquirer of the CASL Assets and OWLS Assets to use the Pearson corporate trademark and trade name for the sole and limited purpose of distributing finished inventory of the CASL Assets and OWLS Assets;

8. at the option of the Acquirer of the CASL Assets and OWLS Assets, a non-exclusive license to distribute the ASSIST Software for use with the CASL Assets and OWLS Assets; and in the event that the Acquirer exercises such option, the

6

Defendants shall provide to the Acquirer of the CASL Assets and OWLS Assets all technical information and support necessary for the distribution and administration of the ASSIST Software; and

9. a license to the Acquirer of the CELF Assets to use the Retained CMS and WMS Content to market, sell or distribute any tests produced by the CELF Assets.

G. "Acquirer" or "Acquirers" means the entity or entities to whom Defendants divest the Divestiture Assets.

H. "Scoring Assistant Software" means Reed Elsevier's software for computerized scoring of individually-administered standardized norm-referenced comprehensive clinical tests ("clinical tests") to assist test administrators including, but not limited to, software related to scoring of test results; tracking test scores and test history; raw-to-derived score conversion; score interpretation; outcomes analysis and reporting capabilities; problem identification and eligibility determination; discrepancy analysis; and intervention recommendations.

I. "ASSIST Software" means Pearson's Automated System for Scoring and Interpreting Standardized Tests and encompasses software for computerized scoring of clinical tests to assist test administrators including, but not limited to, software related to scoring of test results; tracking test scores and test history; raw-to-derived score conversion; score interpretation; outcomes analysis and reporting capabilities; problem identification and eligibility determination; discrepancy analysis; and intervention recommendations.

J. "Licensed-Back ABAS Content" means the two hundred and forty one (241) ABAS items described in Exhibit A that, as of the filing of the Complaint in this matter, are also employed in the marketing, sale, and distribution of Reed Elsevier's Bayley Scales of Infant and

Toddler Development second- and third-edition titles.

K.      "Retained CMS and WMS Content" means the fifty (50) Children's Memory

Scale ("CMS") and Wechsler Memory Scale ("WMS") items that, as of the filing of the

Complaint in this matter, are also employed in the marketing, sale, and distribution of the CELF

Assets appearing as the Number Repetition 1 (15 items) and Familiar Sequences 1 (12 items)

subtests of the CELF-4, which are borrowed from the Numbers and Sequences CMS subtests,

respectively, and Number Repetition 2 (15 items) and Familiar Sequences 2 (8 items) subtests of

the CELF-4, which are borrowed from the Digit Span and Mental Control WMS subtests,

respectively.

### III.  Applicability

A.      This Final Judgment applies to Pearson and Reed Elsevier, as defined above, and

all other persons in active concert or participation with any of them who receive actual notice of

this Final Judgment by personal service or otherwise.

B.      If, prior to complying with Sections IV and V of this Final Judgment, Defendants

sell or otherwise dispose of all or substantially all of their assets or of lesser business units that

include the Divestiture Assets, they shall require the purchaser to be bound by the provisions of

this Final Judgment.  Defendants need not obtain such an agreement from the Acquirer(s) of the

Divestiture Assets pursuant to this Final Judgment.

### IV.  Divestitures

A.      Defendants are ordered and directed, within ninety (90) calendar days after the

filing of the Complaint in this matter, or five (5) calendar days after notice of the entry of this

Final Judgment by the Court, whichever is later, to divest the Divestiture Assets in a manner

8

consistent with this Final Judgment to one or more Acquirers acceptable to the United States, in

its sole discretion.  The United States, in its sole discretion, may agree to one or more extensions

of this time period not to exceed sixty (60) calendar days in total, and shall notify the Court in

such circumstances.  Defendants agree to use their best efforts to divest the Divestiture Assets as

expeditiously as possible.

B.       In accomplishing the divestitures ordered by this Final Judgment, Defendants

promptly shall make known, by usual and customary means, the availability of the Divestiture

Assets.  Defendants shall inform any person making inquiry regarding a possible purchase of the

Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that

person with a copy of this Final Judgment.  Defendants shall offer to furnish to all prospective

Acquirers, subject to customary confidentiality assurances, all information and documents

relating to the Divestiture Assets customarily provided in a due diligence process except such

information or documents subject to the attorney-client privilege or work-product doctrine.

Defendants shall make available such information to the United States at the same time that such

information is made available to any other person.

C.       Defendants shall provide the Acquirer(s) and the United States the identity of any

personnel responsible for any editorial content of any Divestiture Asset, and any personnel

responsible for the sale, development, production, design, layout, standardization, norming,

analysis, or research relating to any of the Divestiture Assets, to enable the Acquirer(s) to make

offers of employment.  Defendants will not interfere with any negotiations or attempts by the

Acquirer(s) to employ or contract with any persons responsible for any such activity related to

any Divestiture Asset.

D.    Defendants shall permit prospective Acquirers of the Divestiture Assets to have reasonable access to personnel responsible for the Divestiture Assets; and to have access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

E.    Defendants shall have the right to obtain, from the Acquirer of the ABAS assets, a license to use the Licensed-Back ABAS Content for a period of time no longer than is necessary for Defendants to market, sell or distribute Reed Elsevier's Bayley Scales of Infant and Toddler Development second- and third-edition titles; such license shall be subject to final review and approval by the United States.

F.    To the extent Defendants receive any orders or inquiries for the ABAS, the CASL, the OWLS, or the CELF, and an Acquirer has obtained the Divestiture Assets relating to such test, Defendants shall forward such orders and inquiries to the respective Acquirer for a period of time not to exceed two (2) years.

G.    Defendants shall warrant to the respective Acquirer or Acquirers of the ABAS Assets, the CASL Assets and OWLS Assets, and the CELF Assets, that the respective Divestiture Assets will be operational on the date of sale.  Defendants shall warrant to the Acquirer of the EAS Assets that the EAS Assets have been developed in a manner no less vigorous than existing development plans, as of the filing of the Complaint in this matter, and maintained in a manner that has preserved the economic viability of the assets, and that, upon divestiture, Acquirer will receive good title to all the assets that comprise the EAS Assets as of the date of sale. Defendants shall warrant to the Acquirer or Acquirers that the Divestiture Assets they acquire have been maintained and operated separately in a manner as required under the Hold Separate

10

Stipulation and Order ("Hold Separate") filed simultaneously with the Court.

H.    Nothing in this Final Judgment shall be construed to require the Acquirer or Acquirers as a condition of any license granted by or to Defendants pursuant to Sections II (F)(6), (8), and (9) and IV (E) to extend to Defendants the right to use any improvements made by the Acquirer or Acquirers to any software or content used in the marketing, sale or distribution of clinical tests.

I.    Defendants shall not take any action that will impede in any way the operation or divestiture of the Divestiture Assets.

J.    Unless the United States otherwise consents in writing, the divestitures pursuant to Section IV, or by trustee appointed pursuant to Section V, of this Final Judgment, shall include the entire Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Assets can and will be used by the Acquirer(s) as part of a viable, ongoing business of publishing clinical tests.  Divestiture of the Divestiture Assets may be made to one or more Acquirers, provided that in each instance it is demonstrated to the sole satisfaction of the United States that the Divestiture Assets will remain viable and the divestiture of such assets will remedy the competitive harm alleged in the Complaint.  The divestitures, whether pursuant to Section IV or Section V of this Final Judgment,

       (1)    shall be made to an Acquirer(s) that, in the United States's sole judgment, has the intent and capability (including the necessary managerial, operational, technical and financial capability) of competing effectively in the business of publishing clinical tests; and

11

(2)     shall be accomplished so as to satisfy the United States, in its

sole discretion, that none of the terms of any agreement between

an Acquirer(s) and Defendants give Defendants the ability

unreasonably to raise the Acquirer's costs, to lower the

Acquirer's efficiency, or otherwise to interfere in the ability of

the Acquirer to compete effectively.

## V. <u>Appointment of Trustee</u>

A.      If Defendants have not divested the Divestiture Assets within the time period

specified in Section IV(A), Defendants shall notify the United States of that fact in writing.

Upon application of the United States, the Court shall appoint a trustee selected by the United

States and approved by the Court to effect the divestiture of the Divestiture Assets.

B.      After the appointment of a trustee becomes effective, only the trustee shall have

the right to sell the Divestiture Assets.  The trustee shall have the power and authority to

accomplish the divestiture to an Acquirer(s) acceptable to the United States at such price and on

such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions

of Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court

deems appropriate.  Subject to Section V(D) of this Final Judgment, the trustee may hire at the

cost and expense of Defendants any investment bankers, attorneys, or other agents, who shall be

solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the

divestitures.

C.      Defendants shall not object to a sale by the trustee on any ground other than the

trustee's malfeasance.  Any such objections by Defendants must be conveyed in writing to the

United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

        D.     The trustee shall serve at the cost and expense of Defendants, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to Defendants and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

        E.     Defendants shall use their best efforts to assist the trustee in accomplishing the required divestitures. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, and Defendants shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information. Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestitures.

        F.     After its appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the divestitures ordered under this Final Judgment. To the extent such reports contain information that the trustee deems

confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Divestiture Assets.

G.     If the trustee has not accomplished the divestitures ordered under this Final Judgment within six months after its appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestitures, (2) the reasons, in the trustee's judgment, why the required divestitures have not been accomplished, and (3) the trustee's recommendations. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States which shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

## VI. <u>Notice of Proposed Divestitures</u>

A.     Within two (2) business days following execution of a definitive divestiture agreement, Defendants or the trustee, whichever is then responsible for effecting the divestitures required herein, shall notify the United States of any proposed divestiture required by Section IV or V of this Final Judgment. If the trustee is responsible, it shall similarly notify Defendants.

14

The notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture Assets, together with full details of the same.

B.      Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from Defendants, the proposed Acquirer(s), any other third party, or the trustee, if applicable, additional information concerning the proposed divestiture, the proposed Acquirer, and any other potential Acquirer. Defendants and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C.      Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States has been provided the additional information requested from Defendants, the proposed Acquirer, any third party, and the trustee, whichever is later, the United States shall provide written notice to Defendants and the trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to Defendants' limited right to object to the sale under Section V(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by Defendants under Section V(C), a divestiture proposed under Section V shall not be consummated unless approved by the Court.

15

## VII. <u>Financing</u>

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or V of this Final Judgment.

## VIII. <u>Hold Separate</u>

Until the divestitures required by this Final Judgment have been accomplished, Defendants shall take all steps necessary to comply with the Hold Separate entered by this Court. Defendants shall take no action that would jeopardize the divestitures ordered by this Court.

## IX. <u>Affidavits</u>

A.      Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestitures have been completed under Section IV or V, Defendants shall deliver to the United States an affidavit as to the fact and manner of its compliance with Section IV or V of this Final Judgment.  Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period.  Each such affidavit shall also include a description of the efforts Defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to prospective Acquirers, including the limitations, if any, on such information.  Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by Defendants, including limitation on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

16

B.      Within twenty (20) calendar days of the filing of the Complaint in this matter,

Defendants shall deliver to the United States an affidavit that describes in reasonable detail all

actions Defendants have taken and all steps Defendants have implemented on an ongoing basis to

comply with Section VIII of this Final Judgment.  Defendants shall deliver to the United States

an affidavit describing any changes to the efforts and actions outlined in Defendants' earlier

affidavits filed pursuant to this section within fifteen (15) calendar days after the change is

implemented.

C.      Defendants shall keep all records of all efforts made to preserve and divest the

Divestiture Assets until one year after such divestitures have been completed.

## X. <u>Compliance Inspection</u>

A.      For the purposes of determining or securing compliance with this Final Judgment,

or of determining whether the Final Judgment should be modified or vacated, and subject to any

legally recognized privilege, from time to time authorized representatives of the United States

Department of Justice, including consultants and other persons retained by the United States,

shall, upon written request of an authorized representative of the Assistant Attorney General in

charge of the Antitrust Division, and on reasonable notice to Defendants, be permitted:

(1)      access during Defendants' office hours to inspect and copy, or at the

option of the United States, to require Defendants to provide hard copy or

electronic copies of, all books, ledgers, accounts, records, data, and

documents in the possession, custody, or control of Defendants, relating to

any matters contained in this Final Judgment; and

(2)      to interview, either informally or on the record, Defendants' officers,

17

employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

B.     Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, Defendants shall submit written reports or response to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C.     No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.     If at the time information or documents are furnished by Defendants to the United States, Defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United States shall give Defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XI.  <u>No Reacquisition</u>

Pearson may not reacquire any part of the Divestiture Assets during the term of this Final Judgment.

## XII.  <u>Retention of Jurisdiction</u>

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIII.  <u>Expiration of Final Judgment</u>

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

## XIV.  <u>Public Interest Determination</u>

Entry of this Final Judgment is in the public interest.  The parties have complied with the

requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making

copies available to the public of this Final Judgment, the Competitive Impact Statement, and any

comments thereon and the United States's responses to comments.  Based upon the record before

the Court, which includes the Competitive Impact Statement and any comments and response to

comments filed with the Court, entry of this Final Judgment is in the public interest.


Date: _____

                                         Court approval subject to procedures
of Antitrust Procedures and Penalties
Act, 15 U.S.C. § 16


                                         _____
United States District Judge

## EXHIBIT A

The Licensed-Back ABAS Content includes all of the items appearing in the ABAS-II Parent/Primary Caregiver (Ages 0-5) that, as of the filing of the Complaint in this matter, also appear as the Adaptive Behavior Scale subtest in Reed Elsevier's Bayley Scales of Infant and Toddler Development ("Bayley-III"). Specifically, the shared content includes all items in the following scales: Communication, Community Use, Functional Pre-Academics, Home Living, Health and Safety, Leisure, Self-Care, Self-Direction, Social, and Motor.

In addition to the shared items, the shared content within the scales listed above also includes the following:

1. administration instructions and sample items (appearing on pp. 4-5 of the Bayley-III Social-Emotional and Adaptive Behavior Questionnaire, or the "record form");

2. record form summary page content and design, including the following tables: raw-score to scaled-score conversions, sum of scaled scores to composite-score conversions, skill area scaled score profile, composite score profile and supplemental analysis – discrepancy comparisons (appearing on page 14 of the Bayley-III Social Emotional and Adaptive Behavior Questionnaire);

3. norms for the Bayley-III Adaptive Behavior subtest appearing in the Bayley-III Administration Manual, which include references describing the adaptive behavior scale, and administration and scoring instructions on pages 4, 30-39 and 173-176; and the following norms tables: A.3 Adaptive Behavior Skill Area Scales Scores by Age (p. 191-197), A.6 Sum of GAC and Adaptive Domain

21

Scaled Scores Converted to Composite Scores and GAC and Adaptive Domain Percentile Ranks and Confidence Intervals (p. 200-209), B.3 Differences Between Adaptive Domain Composite Scores Required For Statistical Significance (p. 216), and B.4 Differences Between Adaptive Domain Composite Scores Obtained By Various Percentages (p. 217); and

4. norms for the Bayley-III Adaptive Behavior subtest appearing in the Bayley-III Technical Manual, which include references describing the adaptive behavior scale, administration and scoring instructions, and technical information on pages 9, 10, 28, 45-53, 57-59, 61-62, 64-66, 70, 80-83, 97-98, and 116-119.