# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE: 1:08-cv-00143 |
| Plaintiff, | JUDGE: Kollar-Kotelly, Colleen |
| v. | DECK TYPE:  Antitrust |
| PEARSON PLC,<br>PEARSON EDUCATION INC.,<br>REED ELSEVIER PLC,<br>REED ELSEVIER NV, and<br>HARCOURT ASSESSMENT INC., | DATE STAMP: |
| Defendants. | |

## MOTION AND MEMORANDUM OF
## THE UNITED STATES IN SUPPORT OF ENTRY OF FINAL JUDGMENT

Pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act, 15 U.S.C.

§ 16(b)-(h) ("APPA" or "Tunney Act"), the United States moves for entry of the proposed Final

Judgment (attached as Exhibit A) filed in this civil antitrust case.  Defendants, Pearson plc and

Pearson Education Inc. (collectively "Pearson") and Reed Elsevier PLC, Reed Elsevier NV, and

Harcourt Assessment Inc. (collectively "Reed Elsevier") have stipulated to the entry of the

proposed Final Judgment upon compliance with the APPA and do not object to entry of this

proposed Final Judgment without a hearing.  The Competitive Impact Statement ("CIS"), filed by

the United States on January 24, 2008, explains why entry of the proposed Final Judgment is in

the public interest.  The United States is filing with this motion a Certificate of Compliance

(attached as Exhibit B), which sets forth the steps taken by the parties to comply with all

applicable provisions of the APPA and certifies that the statutory waiting periods have expired.

Thus, the proposed Final Judgment may be entered at this time without further hearing if the

Court determines that entry is in the public interest. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## I.     BACKGROUND

### A.     Pre-Complaint Investigation

On or about May 4, 2007, and amended on May 21, 2007, Pearson and Reed Elsevier signed a sale and purchase agreement for Pearson to acquire all of the outstanding voting securities of Harcourt Assessment, Inc. ("Harcourt"), as well as additional Reed Elsevier assets, for approximately $950 million in cash. For the next eight months, the United States Department of Justice ("Department") conducted an extensive, detailed investigation into the likely competitive effects of the Pearson/Reed Elsevier transaction. As part of this investigation, the Department obtained substantial documents and information from the merging parties and issued voluntary requests for information to third parties. The Department received and considered more than 10 boxes of hard-copy material and more than 100,000 electronic files. The Department conducted more than 90 interviews with customers, competitors, and other individuals with knowledge of the industry. The investigative staff carefully analyzed the information provided and thoroughly considered all of the issues presented. The Department considered the potential competitive effects of the transaction in the markets for individually-administered standardized norm-referenced comprehensive clinical tests (hereafter "clinical tests"), as well as in other markets, by obtaining information about these products from customers, competitors, and other knowledgeable parties. The Department concluded that Pearson's acquisition of Harcourt would be likely to lessen competition substantially in the

2

markets for adaptive behavior, speech and language, and adult abnormal personality clinical tests within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

Clinical tests are used by psychologists and clinicians, among others, to test for and to diagnose individuals with certain disorders or disabilities, as well as to identify individuals at risk for such disorders or disabilities. Clinical tests can also be used to develop and provide intervention strategies for, and to monitor the progress of treatments for, such disorders or disabilities. Non-standardized, non-norm-referenced tests (*e.g.*, charts published in books or journals, single-scale tests, and free material available on the internet) are inferior to clinical tests because they do not provide the same levels of validity and reliability, nor can they be used in many situations in which a clinical test is required. Publishers, including Pearson and Harcourt, develop, edit, standardize, norm-reference, market, and sell clinical tests for a wide range of disorders and disabilities.

There are no economic substitutes for adaptive behavior, speech and language, and adult abnormal personality clinical tests, respectively. A small but significant increase in the prices of these clinical tests would not cause customers to substitute other types of tests, or to otherwise reduce their purchases of these clinical tests, in sufficient quantities so as to make such price increases unprofitable.

As explained more fully in the Complaint and CIS, the acquisition of Harcourt by Pearson would have substantially lessened competition in the development, marketing, sale, and distribution of adaptive behavior, speech and language, and adult abnormal personality clinical tests. In the affected markets, the acquisition would have eliminated actual and potential competition between Pearson and Harcourt; and prices likely would have increased and

3

innovation likely would have declined. Moreover, successful entry into the markets for adaptive behavior, speech and language, and adult abnormal personality clinical tests is difficult, time consuming, and costly. Therefore, the Department filed its Complaint alleging competitive harm in these clinical test markets and sought a remedy that would ensure that such harm is prevented.

### B.    The Proposed Final Judgment

On January 24, 2008, the United States filed its Complaint in this matter alleging that the proposed acquisition of Harcourt by Pearson would violate Section 7 of the Clayton Act, 15 U.S.C. § 18. Simultaneously with the filing of the Complaint, the United States filed a proposed Final Judgment and a Hold Separate Stipulation and Order signed by plaintiff and defendants, consenting to the entry of the proposed Final Judgment after compliance with the requirements of the Tunney Act. Pursuant to those requirements, the United States also filed its CIS.

The proposed Final Judgment in this case is designed to preserve competition in the development, marketing, sale, and distribution of adaptive behavior, speech and language, and adult abnormal personality clinical tests. The proposed Final Judgment requires the divestiture of the following assets: (1)  Harcourt's adaptive behavior clinical test, the Adaptive Behavior Assessment System; (2) Harcourt's adult abnormal personality clinical test, the Emotional Assessment System, which is under development; and (3) in the speech and language clinical test market, either Pearson's Comprehensive Assessment of Spoken Language and the Oral and Written Language Scales or Harcourt's Clinical Evaluation of Language Fundamentals.

## II.    <u>COMPLIANCE WITH THE APPA</u>

The APPA requires a sixty-day period for the submission of public comments on a proposed Final Judgment. *See* 15 U.S.C. § 16(b). In compliance with the APPA, the United

States filed the CIS on January 24, 2008; published the proposed Final Judgment and CIS in the *Federal Register* on February 8, 2008 (*United States v. Pearson plc*, 73 Fed. Reg. 7593); and published summaries of the terms of the proposed Final Judgment and CIS, together with directions for the submission of written comments relating to the proposed Final Judgment, in *The Washington Post* for seven days beginning on February 16, 2008 and ending on February 22, 2008.

The sixty-day period for public comments ended on April 22, 2008.  The Division did not receive any comments.  As recited in the Certificate of Compliance, all the requirements of the APPA now have been satisfied.  It is therefore appropriate for the Court to make the public interest determination required by 15 U.S.C. § 16(e) and to enter the Final Judgment.

## III.    STANDARD FOR JUDICIAL REVIEW UNDER THE APPA

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest."  15 U.S.C. § 16(e)(1).  In making that determination, the court, in accordance with the statute as amended in 2004,[1] is required to consider:

> (A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms

---

[1]  The 2004 amendments substituted "shall" for "may" in directing relevant factors for the court to consider and amended list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms.  *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 11 (D.D.C. 2007) (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A)-(B).  In considering these statutory factors, the court's inquiry is

necessarily a limited one as the government is entitled to "broad discretion to settle with the

defendant within the reaches of the public interest."  *United States v. Microsoft Corp.*, 56 F.3d

1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp.

2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act).

As the United States Court of Appeals for the District of Columbia Circuit has held,

under the APPA a court considers, among other things, the relationship between the remedy

secured and the specific allegations set forth in the government's complaint, whether the decree

is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may

positively harm third parties.  *See Microsoft*, 56 F.3d at 1458-62.  With respect to the adequacy

of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what

relief would best serve the public."  *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988)

(citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56

F.3d at 1460-62.  Courts have held that:

[t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General.  The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree.  The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the*

6

*reaches of the public interest*." More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[2] In making its public interest

determination, a district court "must accord deference to the government's predictions about the

efficacy of its remedies, and may not require that the remedies perfectly match the alleged

violations because this may only reflect underlying weakness in the government's case or

concessions made during negotiation." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also*

*Microsoft*, 56 F.3d at 1461 (noting need for courts to be "deferential to the government's

predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland*

*Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the

United States' prediction as to the effect of proposed remedies, its perception of the market

structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting

their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must

be approved even if it falls short of the remedy the court would impose on its own, as long as it

falls within the range of acceptability or is 'within the reaches of public interest.'" *United States*

*v. AT&T Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *Gillette*, 406 F.

Supp. at 716); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky.

---

[2] *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id*. at 1459-60. As this Court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). This instruction explicitly writes into the statute the standard intended by the Congress that enacted the Tunney Act in 1974 , as Senator Tunney then explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598

8

(1973) (statement of Senator Tunney).  Rather, the procedure for the public interest

determination is left to the discretion of the court, with the recognition that the court's "scope of

review remains sharply proscribed by precedent and the nature of Tunney Act proceedings."

*SBC Commc'ns*, 489 F. Supp. 2d at 11.[3]

## IV.    CONCLUSION

For the reasons set forth in this Motion and Memorandum and in the CIS, the United

States respectfully requests the Court find that the proposed Final Judgment is in the public

interest and enter the Final Judgment without further hearings.

Dated: May 20, 2008                    Respectfully submitted,


_____

Damon J. Kalt
Attorney
United States Department of Justice
Antitrust Division
Networks and Technology
Enforcement Section
600 E Street, NW, Suite 9500
Washington, D.C. 20530
(202) 307-6200

---

[3] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized."); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) 61,508, at 71,980 (W.D. Mo. 1977) ("[T]he Court, in making its public interest finding, should . . . carefully consider the explanations of the government in order to determine whether those explanations are reasonable under the circumstances.").

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.: |
| | ) | **08 0143** |
| v. | ) | JUDGE: |
| | ) | |
| PEARSON PLC, | ) | DECK TYPE: Antitrust |
| PEARSON EDUCATION INC., | ) | |
| REED ELSEVIER PLC, | ) | DATE STAMP: |
| REED ELSEVIER NV, and | ) | |
| HARCOURT ASSESSMENT INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### FINAL JUDGMENT

WHEREAS, Plaintiff, United States of America, filed its Complaint on January 24, 2008, and the United States and Defendants, Pearson plc and Pearson Education Inc. (collectively "Pearson") and Reed Elsevier PLC, Reed Elsevier NV, and Harcourt Assessment Inc. (collectively "Reed Elsevier"), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

AND WHEREAS, Defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by the Defendants to assure that competition is not

1

substantially lessened;

AND WHEREAS, the United States requires Defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

AND WHEREAS, Defendants have represented to the United States that the divestitures required below can and will be made and that Defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. Jurisdiction

This Court has jurisdiction over the subject matter and each of the parties to this action. The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II. Definitions

As used in this Final Judgment:

A.      "Pearson" means Defendants Pearson plc, a U.K. corporation with its headquarters in London, England, and Pearson Education Inc., a Delaware corporation with its headquarters in Upper Saddle River, New Jersey, and includes their successors and assigns, and their subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

B.      "Reed Elsevier" means Defendants Reed Elsevier PLC, a U.K. corporation with

2

its headquarters in London, England, Reed Elsevier NV, a Dutch corporation with its headquarters in Amsterdam, Netherlands, and Harcourt Assessment Inc., ("Harcourt") a New York corporation with its headquarters in San Antonio, Texas and includes their successors and assigns, and their subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

C.    "ABAS Assets" means Reed Elsevier's Adaptive Behavior Assessment System ("ABAS") first- and second-edition titles, incorporating the Downward Extension of the ABAS, and Reed Elsevier's ABAS Second Edition Intervention Planner.

D.    "Speech and Language Assets" means (1) Pearson's Comprehensive Assessment of Spoken Language, ("CASL") which is in its first edition ("CASL Assets") and Pearson's Oral and Written Language Scales ("OWLS"), including the Oral Expression and Listening Comprehension Scales, the Written Expression Scale, and the OWLS second edition, which is under development (collectively "OWLS Assets") or (2) Reed Elsevier's Clinical Evaluation of Language Fundamentals ("CELF") including the first-, second-, third-, and fourth-edition titles, the CELF Screener first-, second-, third-, and fourth-edition titles, the CELF Preschool first-, and second-edition titles, the CELF Spanish first-, second-, third-, and fourth-edition titles, and the CELF Spanish Preschool, which is under development; excluding however, the Retained CMS and WMS Content (collectively "CELF Assets").

E.    "EAS Assets" means Reed Elsevier's Emotional Assessment System, ("EAS") which is under development.

F.    "Divestiture Assets" means: (1) the ABAS Assets; (2) the Speech and Language Assets; and (3) the EAS Assets.

The Divestiture Assets include:

1.    all tangible assets that comprise each of the Divestiture Assets including, but not limited to, all historic and current research data and activities and development activities relating to the Divestiture Assets; all original and digital artwork, film plates and other reproductive materials relating to the Divestiture Assets including, but not limited to, all manuscripts, illustrations, any other content, and any revisions or revision plans thereof in print or digital form; all finished inventory of the Divestiture Assets including, but not limited to, all examination kits, manuals, test booklets, record forms, and response booklets; all contracts, agreements, commitments, certifications, and understandings relating to the Divestiture Assets, including, but not limited to, publishing agreements, author agreements, research agreements, author permissions and other similar agreements, supply and distribution agreements for the Divestiture Assets; all customer lists, contracts, accounts, and credit records or similar records of all sales and potential sales of the Divestiture Assets; all sales support and promotional materials, advertising materials, and production, sales and marketing files, and all other records relating to the Divestiture Assets;

2.    all intangible assets used in the development, production, servicing, sale and distribution of each of the Divestiture Assets, including, but not limited to, all patents, licenses and sublicenses, adaptation licenses, intellectual property,

4

copyrights, contract rights, trademarks (registered and unregistered), trade names, service marks, and service names relating to the Divestiture Assets, but excluding corporate-level trademarks of Pearson and Harcourt; all technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, scoring rules, scoring algorithms, and specifications for materials relating to the Divestiture Assets; all quality assurance and control procedures, design tools and simulation capability relating to the Divestiture Assets; all manuals and technical information used for any purpose relating to the Divestiture Assets or that Defendants provide to their own employees, customers, suppliers, agents or licensees for use in relation with the Divestiture Assets; and all other intangible research data concerning historic and current research and development efforts relating to the Divestiture Assets, including, but not limited to, designs of experiments, and the results of successful and unsuccessful designs and experiments;

3.     the OWLS Assets also specifically include all tangible assets relating to the development of the OWLS second-edition titles including, but not limited to, all research data and development activities; all tryout and standardization easels, administration materials, record forms, tryout data, standardization data, and data for reliability and validity studies;

4.     the EAS Assets also specifically include all tangible and intangible assets relating to the development of the EAS including, but not limited, to all research data and development activities; all tryout and standardization easels, administration

5

materials, record forms, tryout data, standardization data, and data for reliability and validity studies; and all algorithmic data including, but not limited to, data relating to item banking, continuous item rotation, item analysis, item calibration, norming, test equating, scale development, computer-based testing, and computer-adaptive testing; and all applications of Sampling Theory, the Generalized Graded Unfolding model, Generalizability Theory model, Structural Equation model, and other Item Response Theory models;

5.      a royalty-free license to the Acquirer(s) of the ABAS Assets and CELF Assets to use the Harcourt corporate trademark and trade name for the sole and limited purpose of distributing finished inventory of the ABAS Assets and CELF Assets;

6.      at the option of the Acquirer(s) of the ABAS Assets and CELF Assets, a non-exclusive license to distribute the Scoring Assistant Software for use with the ABAS Assets and CELF Assets; and in the event that the Acquirer exercises such option, the Defendants shall provide to the Acquirer(s) of the ABAS Assets and CELF Assets all technical information and support necessary for the distribution and administration of the Scoring Assistant Software;

7.      a royalty-free license to the Acquirer of the CASL Assets and OWLS Assets to use the Pearson corporate trademark and trade name for the sole and limited purpose of distributing finished inventory of the CASL Assets and OWLS Assets;

8.      at the option of the Acquirer of the CASL Assets and OWLS Assets, a non-exclusive license to distribute the ASSIST Software for use with the CASL Assets and OWLS Assets; and in the event that the Acquirer exercises such option, the

6

Defendants shall provide to the Acquirer of the CASL Assets and OWLS Assets all technical information and support necessary for the distribution and administration of the ASSIST Software; and

9.      a license to the Acquirer of the CELF Assets to use the Retained CMS and WMS Content to market, sell or distribute any tests produced by the CELF Assets.

G.      "Acquirer" or "Acquirers" means the entity or entities to whom Defendants divest the Divestiture Assets.

H.      "Scoring Assistant Software" means Reed Elsevier's software for computerized scoring of individually-administered standardized norm-referenced comprehensive clinical tests ("clinical tests") to assist test administrators including, but not limited to, software related to scoring of test results; tracking test scores and test history; raw-to-derived score conversion; score interpretation; outcomes analysis and reporting capabilities; problem identification and eligibility determination; discrepancy analysis; and intervention recommendations.

I.      "ASSIST Software" means Pearson's Automated System for Scoring and Interpreting Standardized Tests and encompasses software for computerized scoring of clinical tests to assist test administrators including, but not limited to, software related to scoring of test results; tracking test scores and test history; raw-to-derived score conversion; score interpretation; outcomes analysis and reporting capabilities; problem identification and eligibility determination; discrepancy analysis; and intervention recommendations.

J.      "Licensed-Back ABAS Content" means the two hundred and forty one (241) ABAS items described in Exhibit A that, as of the filing of the Complaint in this matter, are also employed in the marketing, sale, and distribution of Reed Elsevier's Bayley Scales of Infant and

7

Toddler Development second- and third-edition titles.

K.      "Retained CMS and WMS Content" means the fifty (50) Children's Memory

Scale ("CMS") and Wechsler Memory Scale ("WMS") items that, as of the filing of the

Complaint in this matter, are also employed in the marketing, sale, and distribution of the CELF

Assets appearing as the Number Repetition 1 (15 items) and Familiar Sequences 1 (12 items)

subtests of the CELF-4, which are borrowed from the Numbers and Sequences CMS subtests,

respectively, and Number Repetition 2 (15 items) and Familiar Sequences 2 (8 items) subtests of

the CELF-4, which are borrowed from the Digit Span and Mental Control WMS subtests,

respectively.

### III. Applicability

A.      This Final Judgment applies to Pearson and Reed Elsevier, as defined above, and

all other persons in active concert or participation with any of them who receive actual notice of

this Final Judgment by personal service or otherwise.

B.      If, prior to complying with Sections IV and V of this Final Judgment, Defendants

sell or otherwise dispose of all or substantially all of their assets or of lesser business units that

include the Divestiture Assets, they shall require the purchaser to be bound by the provisions of

this Final Judgment. Defendants need not obtain such an agreement from the Acquirer(s) of the

Divestiture Assets pursuant to this Final Judgment.

### IV. Divestitures

A.      Defendants are ordered and directed, within ninety (90) calendar days after the

filing of the Complaint in this matter, or five (5) calendar days after notice of the entry of this

Final Judgment by the Court, whichever is later, to divest the Divestiture Assets in a manner

consistent with this Final Judgment to one or more Acquirers acceptable to the United States, in its sole discretion. The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed sixty (60) calendar days in total, and shall notify the Court in such circumstances. Defendants agree to use their best efforts to divest the Divestiture Assets as expeditiously as possible.

B.      In accomplishing the divestitures ordered by this Final Judgment, Defendants promptly shall make known, by usual and customary means, the availability of the Divestiture Assets. Defendants shall inform any person making inquiry regarding a possible purchase of the Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment. Defendants shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Divestiture Assets customarily provided in a due diligence process except such information or documents subject to the attorney-client privilege or work-product doctrine. Defendants shall make available such information to the United States at the same time that such information is made available to any other person.

C.      Defendants shall provide the Acquirer(s) and the United States the identity of any personnel responsible for any editorial content of any Divestiture Asset, and any personnel responsible for the sale, development, production, design, layout, standardization, norming, analysis, or research relating to any of the Divestiture Assets, to enable the Acquirer(s) to make offers of employment. Defendants will not interfere with any negotiations or attempts by the Acquirer(s) to employ or contract with any persons responsible for any such activity related to any Divestiture Asset.

9

D.    Defendants shall permit prospective Acquirers of the Divestiture Assets to have reasonable access to personnel responsible for the Divestiture Assets; and to have access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

E.    Defendants shall have the right to obtain, from the Acquirer of the ABAS assets, a license to use the Licensed-Back ABAS Content for a period of time no longer than is necessary for Defendants to market, sell or distribute Reed Elsevier's Bayley Scales of Infant and Toddler Development second- and third-edition titles; such license shall be subject to final review and approval by the United States.

F.    To the extent Defendants receive any orders or inquiries for the ABAS, the CASL, the OWLS, or the CELF, and an Acquirer has obtained the Divestiture Assets relating to such test, Defendants shall forward such orders and inquiries to the respective Acquirer for a period of time not to exceed two (2) years.

G.    Defendants shall warrant to the respective Acquirer or Acquirers of the ABAS Assets, the CASL Assets and OWLS Assets, and the CELF Assets, that the respective Divestiture Assets will be operational on the date of sale. Defendants shall warrant to the Acquirer of the EAS Assets that the EAS Assets have been developed in a manner no less vigorous than existing development plans, as of the filing of the Complaint in this matter, and maintained in a manner that has preserved the economic viability of the assets, and that, upon divestiture, Acquirer will receive good title to all the assets that comprise the EAS Assets as of the date of sale. Defendants shall warrant to the Acquirer or Acquirers that the Divestiture Assets they acquire have been maintained and operated separately in a manner as required under the Hold Separate

10

Stipulation and Order ("Hold Separate") filed simultaneously with the Court.

H.    Nothing in this Final Judgment shall be construed to require the Acquirer or Acquirers as a condition of any license granted by or to Defendants pursuant to Sections II (F)(6), (8), and (9) and IV (E) to extend to Defendants the right to use any improvements made by the Acquirer or Acquirers to any software or content used in the marketing, sale or distribution of clinical tests.

I.    Defendants shall not take any action that will impede in any way the operation or divestiture of the Divestiture Assets.

J.    Unless the United States otherwise consents in writing, the divestitures pursuant to Section IV, or by trustee appointed pursuant to Section V, of this Final Judgment, shall include the entire Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Assets can and will be used by the Acquirer(s) as part of a viable, ongoing business of publishing clinical tests. Divestiture of the Divestiture Assets may be made to one or more Acquirers, provided that in each instance it is demonstrated to the sole satisfaction of the United States that the Divestiture Assets will remain viable and the divestiture of such assets will remedy the competitive harm alleged in the Complaint. The divestitures, whether pursuant to Section IV or Section V of this Final Judgment,

> (1)    shall be made to an Acquirer(s) that, in the United States's sole judgment, has the intent and capability (including the necessary managerial, operational, technical and financial capability) of competing effectively in the business of publishing clinical tests; and

11

(2)    shall be accomplished so as to satisfy the United States, in its

sole discretion, that none of the terms of any agreement between

an Acquirer(s) and Defendants give Defendants the ability

unreasonably to raise the Acquirer's costs, to lower the

Acquirer's efficiency, or otherwise to interfere in the ability of

the Acquirer to compete effectively.

### V. Appointment of Trustee

A.    If Defendants have not divested the Divestiture Assets within the time period

specified in Section IV(A), Defendants shall notify the United States of that fact in writing.

Upon application of the United States, the Court shall appoint a trustee selected by the United

States and approved by the Court to effect the divestiture of the Divestiture Assets.

B.    After the appointment of a trustee becomes effective, only the trustee shall have

the right to sell the Divestiture Assets.  The trustee shall have the power and authority to

accomplish the divestiture to an Acquirer(s) acceptable to the United States at such price and on

such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions

of Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court

deems appropriate.  Subject to Section V(D) of this Final Judgment, the trustee may hire at the

cost and expense of Defendants any investment bankers, attorneys, or other agents, who shall be

solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the

divestitures.

C.    Defendants shall not object to a sale by the trustee on any ground other than the

trustee's malfeasance.  Any such objections by Defendants must be conveyed in writing to the

12

United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

D.    The trustee shall serve at the cost and expense of Defendants, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to Defendants and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

E.    Defendants shall use their best efforts to assist the trustee in accomplishing the required divestitures. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, and Defendants shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information. Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestitures.

F.    After its appointment, the trustee shall file monthly reports with the United States and the Court setting forth the trustee's efforts to accomplish the divestitures ordered under this Final Judgment. To the extent such reports contain information that the trustee deems

13

confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Divestiture Assets.

G.      If the trustee has not accomplished the divestitures ordered under this Final Judgment within six months after its appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestitures, (2) the reasons, in the trustee's judgment, why the required divestitures have not been accomplished, and (3) the trustee's recommendations. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States which shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

## VI. **Notice of Proposed Divestitures**

A.      Within two (2) business days following execution of a definitive divestiture agreement, Defendants or the trustee, whichever is then responsible for effecting the divestitures required herein, shall notify the United States of any proposed divestiture required by Section IV or V of this Final Judgment. If the trustee is responsible, it shall similarly notify Defendants.

14

The notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture Assets, together with full details of the same.

B.       Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from Defendants, the proposed Acquirer(s), any other third party, or the trustee, if applicable, additional information concerning the proposed divestiture, the proposed Acquirer, and any other potential Acquirer. Defendants and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C.       Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States has been provided the additional information requested from Defendants, the proposed Acquirer, any third party, and the trustee, whichever is later, the United States shall provide written notice to Defendants and the trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to Defendants' limited right to object to the sale under Section V(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by Defendants under Section V(C), a divestiture proposed under Section V shall not be consummated unless approved by the Court.

15

## VII. **Financing**

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or V of this Final Judgment.

## VIII. **Hold Separate**

Until the divestitures required by this Final Judgment have been accomplished, Defendants shall take all steps necessary to comply with the Hold Separate entered by this Court. Defendants shall take no action that would jeopardize the divestitures ordered by this Court.

## IX. **Affidavits**

A.    Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestitures have been completed under Section IV or V, Defendants shall deliver to the United States an affidavit as to the fact and manner of its compliance with Section IV or V of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts Defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to prospective Acquirers, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by Defendants, including limitation on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

16

B.    Within twenty (20) calendar days of the filing of the Complaint in this matter,
Defendants shall deliver to the United States an affidavit that describes in reasonable detail all
actions Defendants have taken and all steps Defendants have implemented on an ongoing basis to
comply with Section VIII of this Final Judgment.  Defendants shall deliver to the United States
an affidavit describing any changes to the efforts and actions outlined in Defendants' earlier
affidavits filed pursuant to this section within fifteen (15) calendar days after the change is
implemented.

C.    Defendants shall keep all records of all efforts made to preserve and divest the
Divestiture Assets until one year after such divestitures have been completed.

## X. Compliance Inspection

A.    For the purposes of determining or securing compliance with this Final Judgment,
or of determining whether the Final Judgment should be modified or vacated, and subject to any
legally recognized privilege, from time to time authorized representatives of the United States
Department of Justice, including consultants and other persons retained by the United States,
shall, upon written request of an authorized representative of the Assistant Attorney General in
charge of the Antitrust Division, and on reasonable notice to Defendants, be permitted:

(1)    access during Defendants' office hours to inspect and copy, or at the
option of the United States, to require Defendants to provide hard copy or
electronic copies of, all books, ledgers, accounts, records, data, and
documents in the possession, custody, or control of Defendants, relating to
any matters contained in this Final Judgment; and

(2)    to interview, either informally or on the record, Defendants' officers,

17

employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

B.     Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, Defendants shall submit written reports or response to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C.     No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.     If at the time information or documents are furnished by Defendants to the United States, Defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United States shall give Defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XI.  **No Reacquisition**

Pearson may not reacquire any part of the Divestiture Assets during the term of this Final Judgment.

## XII.  **Retention of Jurisdiction**

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIII.  **Expiration of Final Judgment**

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

## XIV. **Public Interest Determination**

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States's responses to comments. Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.


Date: _____

                    Court approval subject to procedures
                    of Antitrust Procedures and Penalties
                    Act, 15 U.S.C. § 16


                    _____
                    United States District Judge

## EXHIBIT A

The Licensed-Back ABAS Content includes all of the items appearing in the ABAS-II Parent/Primary Caregiver (Ages 0-5) that, as of the filing of the Complaint in this matter, also appear as the Adaptive Behavior Scale subtest in Reed Elsevier's Bayley Scales of Infant and Toddler Development ("Bayley-III"). Specifically, the shared content includes all items in the following scales: Communication, Community Use, Functional Pre-Academics, Home Living, Health and Safety, Leisure, Self-Care, Self-Direction, Social, and Motor.

In addition to the shared items, the shared content within the scales listed above also includes the following:

1.    administration instructions and sample items (appearing on pp. 4-5 of the Bayley-III Social-Emotional and Adaptive Behavior Questionnaire, or the "record form");

2.    record form summary page content and design, including the following tables: raw-score to scaled-score conversions, sum of scaled scores to composite-score conversions, skill area scaled score profile, composite score profile and supplemental analysis – discrepancy comparisons (appearing on page 14 of the Bayley-III Social Emotional and Adaptive Behavior Questionnaire);

3.    norms for the Bayley-III Adaptive Behavior subtest appearing in the Bayley-III Administration Manual, which include references describing the adaptive behavior scale, and administration and scoring instructions on pages 4, 30-39 and 173-176; and the following norms tables: A.3 Adaptive Behavior Skill Area Scales Scores by Age (p. 191-197), A.6 Sum of GAC and Adaptive Domain

21

Scaled Scores Converted to Composite Scores and GAC and Adaptive Domain Percentile Ranks and Confidence Intervals (p. 200-209), B.3 Differences Between Adaptive Domain Composite Scores Required For Statistical Significance (p. 216), and B.4 Differences Between Adaptive Domain Composite Scores Obtained By Various Percentages (p. 217); and

4.  norms for the Bayley-III Adaptive Behavior subtest appearing in the Bayley-III Technical Manual, which include references describing the adaptive behavior scale, administration and scoring instructions, and technical information on pages 9, 10, 28, 45-53, 57-59, 61-62, 64-66, 70, 80-83, 97-98, and 116-119.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                Plaintiff,

                v.

PEARSON PLC,
PEARSON EDUCATION INC.,
REED ELSEVIER PLC,
REED ELSEVIER NV, and
HARCOURT ASSESSMENT INC.,

                Defendants.

CASE: 1:08-cv-00143

JUDGE: Kollar-Kotelly, Colleen

DECK TYPE: Antitrust

DATE STAMP:

## CERTIFICATE OF COMPLIANCE WITH PROVISIONS
## OF THE ANTITRUST PROCEDURES AND PENALTIES ACT

       Plaintiff, United States of America, by its undersigned attorney, hereby certifies that, in compliance with the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h), the following procedures have been followed in preparation for the entry of the Final Judgment in the above-captioned matter:

       1.       Plaintiff and defendants, Pearson plc and Pearson Education Inc. (collectively "Pearson") and Reed Elsevier PLC, Reed Elsevier NV, and Harcourt Assessment Inc. (collectively "Reed Elsevier") stipulated to the entry of the proposed Final Judgment in a Hold Separate Stipulation and Order ("HSSO") filed with the Court on January 24, 2008.

       2.       The proposed Final Judgment was filed with the Court on January 24, 2008.

       3.       The Competitive Impact Statement was filed with the Court on January 24, 2008.

       4.       Pursuant to 15 U.S.C. § 16(b), the proposed Final Judgment and Competitive Impact Statement were published in the *Federal Register* on February 8, 2008.  *United States v.*

*Pearson plc*, 73 Fed. Reg. 7593.  A copy of the *Federal Register* notice is attached hereto as Exhibit 1.

5.       Pursuant to 15 U.S.C. § 16(b), copies of the HSSO, proposed Final Judgment, and Competitive Impact Statement were furnished to all persons requesting them and were made available on the Antitrust Division's Internet site.

6.       Pursuant to 15 U.S.C. § 16(c), a summary of the terms of the proposed Final Judgment was published in *The Washington Post*, a newspaper of general circulation in the District of Columbia, for seven days beginning February 16, 2008 and ending on February 22, 2008.  A copy of the Proof of Publication from *The Washington Post* is attached hereto as Exhibit 2.

7.       The sixty-day comment period prescribed by 15 U.S.C. § 16(b) and (d) for the receipt and consideration of written comments, during which the proposed Final Judgment could not be entered, ended on April 22, 2008.

8.       The United States did not receive any comments on the proposed Final Judgment.

9.       On February 1, 2008, defendants Pearson and Reed Elsevier filed with the Court a description of written or oral communications by or on behalf of the defendants, or any other person, with any officer or employee of the United States concerning the proposed Final Judgment, as required by 15 U.S.C. § 16(g).  *See* Exhibit 3.

10.      The parties have satisfied all the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h), as a condition for entering the proposed Final Judgment.

11.     Pursuant to the HSSO entered by the Court on January 24, 2008, and 15 U.S.C. §16(e), this Court may now enter the Final Judgment, if it determines that the entry of the Final Judgment is in the public interest.

12.     Plaintiff's Motion for Entry of the Final Judgment and its Competitive Impact Statement demonstrate that the proposed Final Judgement satisfies the public interest standard of 15 U.S.C. §16(e).

13.     For these reasons, plaintiff requests that this Court enter the Final Judgment without further proceeding.

Dated: May 20, 2008                          Respectfully submitted,

_____
Damon J. Kalt
Attorney
United States Department of Justice
Antitrust Division
Networks and Technology
Enforcement Section
600 E Street, NW, Suite 9500
Washington, D.C. 20530
(202) 307-6200

activity of the group research project. Membership in this group research project remains open, and Network Centric Operations Industry Consortium, Inc. intends to file additional written notifications disclosing all changes in membership.

On November 19, 2004, Network Centric Operations Industry Consortium, Inc. filed its original notification pursuant to Section 6(a) of the Act. The Department of Justice published a notice in the **Federal Register** pursuant to Section 6(b) of the Act on February 2, 2005 (70 FR 5486).

The last notification was filed with the Department on October 12, 2007. A notice was published in the **Federal Register** pursuant to Section 6(b) of the Act on November 7, 2007 (72 FR 62866).

**Patricia A. Brink,**
*Deputy Director of Operations, Antitrust Division.*

[FR Doc. 08–562 Filed 2–7–08; 8:45 am]
**BILLING CODE 4410–11–M**

---

## DEPARTMENT OF JUSTICE

### Antitrust Division

### United States v. Pearson PLC, Pearson Education Inc., Reed Elsevier PLC, Reed Elsevier NV, and Harcourt Assessment Inc.; Proposed Final Judgment and Competitive Impact Statement

Notice is hereby given pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. 16(b)–(h), that a proposed Final Judgment, Stipulation, and Competitive Impact Statement have been filed with the United States District Court for the District of Columbia in *United States* v. *Pearson plc, Pearson Education Inc., Reed Elsevier PLC, Reed Elsevier NV, and Harcourt Assessment Inc.*, Civil Action No. 1:08–cv–00143. On January 24, 2008, the United States filed a Complaint to enjoin the proposed acquisition by Pearson plc and Pearson Education Inc. (collectively "Pearson"), of Harcourt Assessment Inc. ("Harcourt"), a wholly-owned subsidiary of Reed Elsevier PLC and Reed Elsevier, NV, and to obtain equitable and other relief. The Complaint alleges that Pearson's acquisition of Harcourt would substantially lessen competition in the markets for adaptive behavior, speech and language, and adult abnormal personality clinical tests in violation of section 7 of the Clayton Act, 15 U.S.C. 18. The proposed Final Judgment, filed at the same time as the Complaint, requires Pearson to divest: (1) Harcourt's

adaptive behavior clinical test, the Adaptive Behavior Assessment System; (2) Harcourt's adult abnormal personality clinical test, the Emotional Assessment System, which is under development; and (3) in the speech and language clinical test market, either Pearson's Comprehensive Assessment of Spoken Language and the Oral and Written Language Scales or Harcourt's Clinical Evaluation of Language Fundamentals.

Copies of the Complaint, proposed Final Judgment, and Competitive Impact Statement are available for inspection at the United States Department of Justice, Antitrust Division, Antitrust Documents Group, 325 7th Street, NW., Room 215, Washington, DC 20530 (telephone: 202–514–2481), on the United States Department of Justice's Web site at *http://www.usdoj.gov/atr*, and at the Office of the Clerk of the United States District Court for the District of Columbia. Copies of these materials may be obtained from the Antitrust Division upon request and payment of the copying fee set by United States Department of Justice regulations.

Public comment is invited within 60 days of the date of this notice. Such comments, and responses thereto, will be published in the **Federal Register** and filed with the Court. Comments should be directed to James J. Tierney, Chief, Networks and Technology Enforcement Section, Antitrust Division, United States Department of Justice, 600 E Street, NW., Suite 9500, Washington, DC 20530 (telephone: 202–307–6200).

**Patricia A. Brink,**
*Deputy Director of Operations.*

UNITED STATES OF AMERICA Department of Justice, Antitrust Division, 600 E Street, NW., Suite 9500, Washington, DC 20530, Plaintiff, v. Pearson PLC, 80 Strand WC2R 0RL London, England; Pearson Education Inc., One Lake Street, Upper Saddle River, New Jersey 07458; Reed Elsevier PLC, 1–3 Strand WC2N 5JR London, England; Reed Elsevier NV, Radarweg 29, 1043 NX Amsterdam, The Netherlands; Harcourt Assessment Inc., 14500 Bulverde Road, San Antonio, Texas 78259, Defendants.

[Case No.: 1:08–cv–00143, Judge: Kollar-Kotelly, Colleen, Deck Type: Antitrust, Date Stamp: 1/24/2008]

### Complaint

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil antitrust action to enjoin the proposed acquisition by Pearson plc and Pearson Education Inc. (collectively "Pearson"), of Harcourt Assessment Inc. (hereafter "Harcourt"), a wholly-owned subsidiary of Reed Elsevier PLC and

Reed Elsevier, NV (collectively "Reed Elsevier"), and to obtain equitable and other relief. The United States complains and alleges as follows:

### I. Nature of the Action

1. On or about May 4, 2007, and amended on May 21, 2007, Pearson and Reed Elsevier signed a sale and purchase agreement for Pearson to acquire all of the outstanding voting securities of Harcourt, as well as additional Reed Elsevier assets, for approximately $950 million in cash.

2. Pearson and Harcourt both develop, publish, market, sell, and distribute individually-administered standardized norm-referenced comprehensive clinical tests (hereafter "clinical tests"), including adaptive behavior and speech and language clinical tests. Pearson's proposed acquisition of Harcourt would combine the two largest publishers of such tests in the United States. Pearson also develops, publishes, markets, sells, and distributes market-leading adult abnormal personality clinical tests. Harcourt has invested substantial resources in the development of a new adult abnormal personality clinical test and plans to enter the market for such tests within the next year.

3. The markets for adaptive behavior, speech and language, and adult abnormal personality clinical tests are highly concentrated and there are high barriers to enter these markets. Pearson's proposed acquisition of Harcourt will eliminate competition between Pearson and Harcourt in these markets.

4. The United States brings this action to prevent Pearson's proposed acquisition of Harcourt because it would substantially lessen competition in the markets for adaptive behavior, speech and language, and adult abnormal personality clinical tests in violation of Section 7 of the Clayton Act, 15 U.S.C. 18.

### II. Parties to the Proposed Acquisition

5. Pearson plc, a U.K. corporation with its headquarters in London, England, operates businesses in educational publishing, business information, and consumer publishing. Pearson Education Inc. (hereafter "Pearson Education"), a wholly-owned subsidiary of Pearson plc, is a Delaware corporation with its headquarters in Upper Saddle River, New Jersey. Pearson Education develops, markets, sells, and distributes clinical tests throughout the United States.

6. Reed Elsevier PLC; a U. K. corporation with its headquarters located in London, England, and Reed Elsevier NV, a Dutch corporation with

its headquarters located in Amsterdam, Netherlands, jointly own Harcourt. Harcourt, a New York corporation with its headquarters located in San Antonio, Texas, develops, markets, sells, and distributes clinical tests throughout the United States.

### III. Jurisdiction and Venue

7. The United States brings this action under Section 15 of the Clayton Act, as amended, 15 U.S.C. 25, to prevent and restrain the Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. 18.

8. Defendants develop, market, sell, and distribute clinical tests in the flow of interstate commerce. Defendants' activities in developing, marketing, selling, and distributing these products substantially affect interstate commerce. This Court has subject matter jurisdiction over this action pursuant to Section 12 of the Clayton Act, 15 U.S.C. 22, and 28 U.S.C. 1331, 1337(a), and 1345.

9. Defendants have consented to venue and personal jurisdiction in this judicial district and venue is proper under 28 U.S.C. 1391 (d).

### IV. Trade and Commerce

#### A. Clinical Tests Generally

10. Psychologists and clinicians, among others, use a variety of clinical tests to test for, and diagnose individuals with, certain disorders or disabilities, as well as to identify individuals at risk for such disorders or disabilities. Clinical tests can also be used to develop and provide intervention strategies for, and to monitor the progress of treatments for, such disorders or disabilities.

11. Publishers, including the Defendants, develop, edit, standardize, norm-reference, market, and distribute clinical tests for a wide range of disorders and disabilities that have been designed and authored by leading experts in such disciplines.

12. Standardization is the process of developing a test that reliably, validly, and consistently assesses a specific discipline. Standardized tests are authored, designed, and developed so that the test materials, test procedures, and test scoring are consistent across each test administration. Standardized test scores can then be documented empirically and compared across test administrations.

13. Norm-referencing is the process of determining average test scores across demographics. Publishers norm-reference a standardized test by administering the test to a representative sample of individuals

and then determining an average test score. Norm-referenced tests can then be used to compare an individual's test score to an average test score of similarly-situated individuals.

14. Comprehensive tests are tests that fully assess the subject area being tested, as well as its various domains and degrees of affliction. By contrast, non-comprehensive tests, often termed "screeners," are far less thorough and may be designed simply to indicate the likely presence or absence of a disorder or disability.

15. In addition to clinical tests, non-standardized, non-norm-referenced assessments (e.g., charts published in books or journals, single-scale tests, and free material available on the internet) are available to school psychologists and clinicians. However, such test materials are inferior to clinical tests because they do not provide the same levels of validity and reliability, nor can they be used in many situations in which a clinical test is required, for example, where such tests must be administered before a certain diagnosis or classification can be made in order for an individual to qualify for special services, such as special education or speech and language instruction.

#### B. Relevant Product Markets

##### 1. Adaptive Behavior Clinical Tests

16. Pearson and Harcourt each publish the market-leading adaptive behavior clinical tests. Pearson publishes the Vineland Adaptive Behavior Scales, which is currently in its second edition, and Harcourt publishes the Adaptive Behavior Assessment System, which is currently in its second edition.

17. School psychologists and clinicians, among others, use adaptive behavior clinical tests to assess an individual's competence in meeting their independent needs and satisfying the social demands of their environment. Generally, adaptive behavior tests assess three broad domains of adaptive behavior: conceptual (*e.g.*, communication, functional academics, self-direction, and health and safety), social (*e.g.*, social skills and leisure), and practical (*e.g.*, self-care, home living, community use, and work).

18. Non-comprehensive adaptive behavior tests, such as those that only assess narrow adaptive behavior domains, are not substitutes for adaptive behavior clinical tests because such tests are not sufficiently broad to assess all relevant areas of adaptive behavior. Other adaptive behavior assessment scales, such as neuropsychological

behavioral or emotional scales, do not assess the same domains as do adaptive behavior clinical tests. Moreover, non-standardized, non-norm-referenced adaptive behavior tests are not substitutes for adaptive behavior clinical tests because they do not provide the same levels of validity and reliability as clinical tests.

19. A small but significant post-acquisition increase in the price of adaptive behavior clinical tests would not cause customers to substitute other types of tests, or to otherwise reduce their purchases of adaptive behavior clinical tests, in sufficient quantities so as to make such a price increase unprofitable.

20. Accordingly, the development, marketing, sale, and distribution of adaptive behavior clinical tests constitutes a line of commerce and a relevant product market pursuant to Section 7 of the Clayton Act.

##### 2. Speech and Language Clinical Tests

21. Pearson and Harcourt each publish market-leading speech and language clinical tests. Pearson publishes two such tests known as the Comprehensive Assessment of Spoken Language and the Oral and Written Language Scales, each of which is in its first edition. Harcourt publishes a speech and language clinical test known as the Clinical Evaluation of Language Fundamentals, which is currently in its fourth edition.

22. Speech-language pathologists, among others, use speech and language clinical tests to diagnose individuals having difficulties with understanding others, expressing thoughts and ideas, producing speech sounds, as well as other related difficulties. Speech and language clinical tests assess various domains, including receptive and expressive language.

23. Non-comprehensive speech and language tests, such as those that only assess narrow speech and language domains, are not substitutes for speech and language clinical tests because such tests are not sufficiently broad to assess all relevant areas of speech and language. Moreover, non-standardized, non-norm-referenced speech and language tests are not substitutes for speech and language clinical tests because they do not provide the same levels of validity or reliability as clinical tests.

24. A small but significant post-acquisition increase in the price of speech and language clinical tests would not cause customers to substitute other types of tests, or to otherwise reduce their purchases of speech and language clinical tests, in sufficient

quantities so as to make such a price increase unprofitable.

25. Accordingly, the development, marketing, sale, and distribution of speech and language clinical tests constitutes a line of commerce and a relevant product market pursuant to Section 7 of the Clayton Act.

### 3. Adult Abnormal Adult Personality Clinical Tests

26. Pearson publishes two series of adult abnormal personality clinical tests known as the Minnesota Multiphasic Personality Inventories, which are currently in their second edition, and the Millon Clinical Multiaxial Inventories, which are currently in their third edition. Harcourt is developing an adult abnormal personality clinical test known as the Emotional Assessment System that it expects to make commercially available in late 2008.

27. Adult abnormal personality tests are generally used by clinicians and psychologists to diagnose and assess chronic, inflexible, and maladaptive patterns of perceiving, thinking, and behaving that seriously impair an individual's ability to function in social settings. Such disorders include clinical disorders, such as anxiety, as well as personality disorders, such as paranoia. Many clinicians employ adult abnormal personality clinical tests to obtain comprehensive diagnoses of both kinds.

28. Other methods of assessing abnormal personality, such as using structured interviews or non-standardized tests (including developing one's own tests), are inferior to adult abnormal personality clinical tests because they do not have the same degree of reliability, and because interpreting one's own tests would introduce subjective elements into the analysis not present with the use of clinical tests. In addition, in some locations, for some applications, clinical tests are required by law and other methods of assessment cannot be used.

29. Non-comprehensive adult abnormal personality tests, such as those that only assess certain clinical or personality disorders, are not substitutes for adult abnormal personality clinical tests because such tests are not sufficiently broad to assess all relevant disorders of adult abnormal personality. Moreover, non-standardized, non-norm-referenced adult abnormal personality tests are not substitutes for adult abnormal personality clinical tests because they do not provide the same levels of validity or reliability as clinical tests.

30. A small but significant post-acquisition increase in the price of adult abnormal personality clinical tests

would not cause customers to substitute other types of tests, or to otherwise reduce their purchases of adult abnormal personality clinical tests, in sufficient quantities so as to make such a price increase unprofitable.

31. Accordingly, the development, marketing, sale, and distribution of adult abnormal personality clinical tests constitutes a line of commerce and a relevant product market pursuant to Section 7 of the Clayton Act.

### C. Relevant Geographic Market

32. The Defendants sell adaptive behavior, and speech and language clinical tests throughout the United States to psychologists, clinicians, speech-language pathologists, and others. Pearson also sells adult abnormal personality tests to psychologists, clinicians, and others in the United States. In the United States, customers would not purchase clinical tests published outside the United States because such tests have not been standardized or norm-referenced on samples of individuals located in the United States.

33. A small but significant post-acquisition increase in the price of adaptive behavior, speech and language, and adult abnormal personality clinical tests would not cause customers to turn to clinical tests published outside of the United States for the purchase of such tests.

34. Accordingly, the United States constitutes the relevant geographic market pursuant to Section 7 of the Clayton Act.

### D. Anticompetitive Effects: Reduced Price and Innovation Competition

#### 1. Adaptive Behavior Clinical Tests

35. The proposed acquisition will eliminate price and innovation competition between Pearson and Harcourt in the market for adaptive behavior clinical tests throughout the United States.

36. The adaptive behavior clinical test market is highly concentrated. Pearson and Harcourt's revenues currently account for approximately 66 percent and 26 percent of the revenues of the market, respectively. Pearson's proposed acquisition of Harcourt would therefore result in a post-merger share of approximately 92 percent of the adaptive behavior clinical test market.

37. The proposed acquisition will substantially increase the likelihood that Pearson will unilaterally increase the price, or reduce the number or quality, of adaptive behavior clinical tests published in the United States.

38. Any response of competing publishers of adaptive behavior clinical

tests would not be sufficient to constrain the unilateral exercise of market power by Pearson after the acquisition. A significant number of customers regard Pearson and Harcourt as their first and second choices when purchasing adaptive behavior clinical tests, and consider such tests from other publishers to be a distant third choice. Therefore, an insufficient number of customers of adaptive behavior clinical tests would purchase a competing publisher's test to defeat an anti-competitive price increase by Pearson.

39. The proposed acquisition will therefore substantially lessen competition in the development, marketing, sale, and distribution of adaptive behavior clinical tests in the United States in violation of Section 7 of the Clayton Act.

#### 2. Speech and Language Clinical Tests

40. The proposed acquisition will eliminate price and innovation competition between Pearson and Harcourt in the market for speech and language clinical tests throughout the United States.

41. The speech and language clinical test market is highly concentrated. Harcourt and Pearson's revenues currently account for approximately 64 percent and 26 percent of the revenues of the market, respectively. Pearson's proposed acquisition of Harcourt would therefore result in a post-merger share of approximately 90 percent of the speech and language clinical test market. Only one other firm in the United States develops, markets, and publishes a competing speech and language clinical test, and that test accounts for the remaining 10 percent of the market, on a revenue basis.

42. The proposed acquisition will substantially increase the likelihood that Pearson will unilaterally increase the price, or reduce the number or quality, of speech and language clinical tests published in the United States.

43. Any response of the competing publisher of speech and language clinical tests would not be sufficient to constrain the unilateral exercise of market power by Pearson after the acquisition because there are a significant number of customers who regard Pearson and Harcourt's speech and language clinical tests as their first and second choices, and consider the competing publisher's test to be a distant third. Therefore, an insufficient number of customers of speech and language clinical tests would purchase the competing publisher's test to defeat an anti-competitive price increase by Pearson.

44. The proposed acquisition will therefore substantially lessen competition in the development, marketing, sale, and distribution of speech and language clinical tests in the United States in violation of Section 7 of the Clayton Act.

### 3. Adult Abnormal Personality Clinical Tests

45. The proposed acquisition will eliminate price and innovation competition between Pearson and Harcourt in the market for adult abnormal personality clinical tests.

46. The adult abnormal personality clinical test market is highly concentrated and dominated by Pearson, which accounts for approximately 93 percent of the revenues for such tests. After many years of trying, only one other publisher in the United States has managed to obtain more than an insignificant share of this market. Customers prefer Pearson's tests and have made a significant investment in learning how to work with and use Pearson's tests. Such customers are committed to Pearson's tests and thus far have been unwilling to substitute another test. The small share that Pearson's only competitor has gained after many years is an indicator that customers consider the competitor's test to be a distant second choice to Pearson's tests.

47. Harcourt has invested substantial resources over a prolonged period of time in the development of a new computer-based adaptive adult abnormal personality clinical test that will utilize computer technology to reduce test administration time. Harcourt is in the standardization and norm-referencing phase of development and is in the process of collecting data from clinical and non-clinical examinees. Harcourt plans to enter the market for such tests to compete with Pearson in 2008. To date, no other publisher has formed plans to enter this market, and any potential entry by another publisher would require considerable lead time and development effort of the sort that Harcourt has already incurred.

48. Harcourt plans to enter the market with a new adult abnormal personality clinical test that will offer new features and functionality that customers desire. Such new features and functionality are not currently offered by either Pearson or the other competing publisher. Accordingly, Harcourt's entry would likely benefit clinicians and their patients through price and innovation competition for adult abnormal personality clinical tests.

49. The proposed acquisition will therefore substantially lessen competition in the development, marketing, sale, and distribution of adult abnormal personality clinical tests in the United States in violation of section 7 of the Clayton Act.

### E. Entry: New Entrants Will Not Defeat an Exercise of Market Power

50. Successful entry into the markets for the development, marketing, sale, and distribution of adaptive behavior, speech and language, and adult abnormal personality clinical tests in the United States is difficult, time consuming, and costly.

51. Entry into such markets in the United States takes many years. A new entrant would need to contract with an author qualified to write a clinical test and then assemble a sophisticated editorial staff to develop the test. Clinical test development requires analyzing, editing, standardizing, and norm-referencing a new test, which takes two to four years to complete.

52. New entrants also would need to convince customers to switch from their current adaptive behavior, speech and language, or adult abnormal personality clinical test of choice to the entrant's new test.

53. Therefore, entry by any firm into the markets for the development, marketing, sale, and distribution of adaptive behavior, speech and language, and adult abnormal personality clinical tests would not be timely, likely, or sufficient to counter the anticompetitive effects of Pearson's proposed acquisition of Harcourt.

## V. Violations Alleged

### Cause of Action

(Violation of Section 7 of the Clayton Act)

54. The United States incorporates the allegations of paragraphs 1 through 53 above.

55. The proposed acquisition of Harcourt by Pearson would substantially lessen competition in interstate trade and commerce in violation of section 7 of the Clayton Act, 15 U.S.C. 18.

56. Unless restrained, the acquisition will have the following anticompetitive effects, among others:

a. Competition in the adaptive behavior clinical test market in the United States will be lessened substantially;

b. Actual and potential competition between Pearson and Harcourt in the development, marketing, sale, and distribution of adaptive behavior

clinical tests in the United States will be eliminated;

c. Prices for adaptive behavior clinical tests in the United States likely will increase, and innovation likely will decline;

d. Competition in the speech and language clinical test market in the United States will be lessened substantially;

e. Actual and potential competition between Pearson and Harcourt in the development, marketing, sale, and distribution of speech and language clinical tests in the United States will be eliminated;

f. Prices for speech and language clinical tests in the United States likely will increase, and innovation likely will decline;

g. Competition in the adult abnormal personality clinical test market in the United States will be lessened substantially;

h. Actual and potential competition between Pearson and Harcourt in the development, marketing, sale, and distribution of adult abnormal personality clinical tests in the United States will be eliminated; and

i. Potential decreases in prices for adult abnormal personality clinical tests in the United States likely will be eliminated, and innovation likely will decline.

## VI. Request for Relief

57. The United States requests that this Court:

a. Adjudge and decree the proposed acquisition to violate section 7 of the Clayton Act, 15 U.S.C. 18;

b. Enjoin and restrain the Defendants and all persons acting on their behalf from consummating the proposed acquisition or from entering into or carrying out any contract, agreement, plan, or understanding, the effect of which would be to combine Pearson with the operations of Harcourt;

c. Award the United States its costs for this action; and

d. Grant the United States such other and further relief as the Court deems just and proper.

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA:

————/s/————
Thomas O. Barnett (D.C. Bar #426840),
*Assistant Attorney General, Antitrust Division.*

————/s/————
David L. Meyer (D.C. Bar #414420),
*Deputy Assistant Attorney General, Antitrust Division.*

————/s/————
Patricia A. Brink,

*Deputy Director of Operations, Antitrust Division.*

_____/s/_____

James J. Tierney (D.C. Bar #434610),
*Chief, Networks and Technology, Enforcement Section, Antitrust Division.*

_____/s/_____

Scott A. Scheele (D.C. Bar #429061),
*Assistant Chief, Networks and Technology, Enforcement Section, Antitrust Division.*

_____/s/_____

Damon J. Kalt
Sanford M. Adler
John C. Filippini (D.C. Bar #165159)
Danielle M. Ganzi
*Attorneys, United States Department of Justice, Antitrust Division, Networks and Technology, Enforcement Section, 600 E Street, NW., Suite 9500, Washington, DC 20530, (202) 307–6200.*

Dated: January 24, 2008.

**Final Judgment**

Whereas, Plaintiff, United States of America, filed its Complaint on January 24, 2008, and the United States and Defendants, Pearson plc and Pearson Education Inc. (collectively ''Pearson'') and Reed Elsevier PLC, Reed Elsevier NV, and Harcourt Assessment Inc. (collectively ''Reed Elsevier''), by their respective attorneys, have consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law, and without this Final Judgment constituting any evidence against or admission by any party regarding any issue of fact or law;

And whereas, Defendants agree to be bound by the provisions of this Final Judgment pending its approval by the Court;

And whereas, the essence of this Final Judgment is the prompt and certain divestiture of certain rights or assets by the Defendants to assure that competition is not substantially lessened;

And whereas, the United States requires Defendants to make certain divestitures for the purpose of remedying the loss of competition alleged in the Complaint;

And whereas, Defendants have represented to the United States that the divestitures required below can and will be made and that Defendants will later raise no claim of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained below;

Now therefore, before any testimony is taken, without trial or adjudication of any issue of fact or law, and upon consent of the parties, *it is ordered, adjudged and decreed:*

**I. Jurisdiction**

This Court has jurisdiction over the subject matter and each of the parties to this action. The Complaint states a claim upon which relief may be granted against Defendants under Section 7 of the Clayton Act, as amended (15 U.S.C. 18).

**II. Definitions**

As used in this Final Judgment:

A. ''Pearson'' means Defendants Pearson plc, a U.K. corporation with its headquarters in London, England, and Pearson Education Inc., a Delaware corporation with its headquarters in Upper Saddle River, New Jersey, and includes their successors and assigns, and their subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

B. ''Reed Elsevier'' means Defendants Reed Elsevier PLC, a U.K. corporation with its headquarters in London, England, Reed Elsevier NV, a Dutch corporation with its headquarters in Amsterdam, Netherlands, and Harcourt Assessment Inc., (''Harcourt'') a New York corporation with its headquarters in San Antonio, Texas and includes their successors and assigns, and their subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

C. ''ABAS Assets'' means Reed Elsevier's Adaptive Behavior Assessment System (''ABAS'') first- and second-edition titles, incorporating the Downward Extension of the ABAS, and Reed Elsevier's ABAS Second Edition Intervention Planner.

D. ''Speech and Language Assets'' means (1) Pearson's Comprehensive Assessment of Spoken Language, (''CASL'') which is in its first edition (''CASL Assets'') and Pearson's Oral and Written Language Scales (''OWLS''), including the Oral Expression and Listening Comprehension Scales, the Written Expression Scale, and the OWLS second edition, which is under development (collectively ''OWLS Assets'') *or* (2) Reed Elsevier's Clinical Evaluation of Language Fundamentals (''CELF'') including the first-, second-, third-, and fourth-edition titles, the CELF Screener first-, second-, third-, and fourth-edition titles, the CELF Preschool first- and second-edition titles, the CELF Spanish first-, second-, third-, and fourth-edition titles, and the CELF Spanish Preschool, which is under development; excluding however, the Retained CMS and WMS Content (collectively ''CELF Assets'').

E. ''EAS Assets'' means Reed Elsevier's Emotional Assessment System (''EAS''), which is under development.

F. ''Divestiture Assets'' means: (1) the ABAS Assets; (2) the Speech and Language Assets; and (3) the EAS Assets.

The Divestiture Assets include:

1. All tangible assets that comprise each of the Divestiture Assets including, but not limited to, all historic and current research data and activities and development activities relating to the Divestiture Assets; all original and digital artwork, film plates and other reproductive materials relating to the Divestiture Assets including, but not limited to, all manuscripts, illustrations, any other content, and any revisions or revision plans thereof in print or digital form; all finished inventory of the Divestiture Assets including, but not limited to, all examination kits, manuals, test booklets, record forms, and response booklets; all contracts, agreements, commitments, certifications, and understandings relating to the Divestiture Assets, including, but not limited to, publishing agreements, author agreements, research agreements, author permissions and other similar agreements, supply and distribution agreements for the Divestiture Assets; all customer lists, contracts, accounts, and credit records or similar records of all sales and potential sales of the Divestiture Assets; all sales support and promotional materials, advertising materials, and production, sales and marketing files, and all other records relating to the Divestiture Assets;

2. All intangible assets used in the development, production, servicing, sale and distribution of each of the Divestiture Assets, including, but not limited to, all patents, licenses and sublicenses, adaptation licenses, intellectual property, copyrights, contract rights, trademarks (registered and unregistered), trade names, service marks, and service names relating to the Divestiture Assets, but excluding corporate-level trademarks of Pearson and Harcourt; all technical information, computer software and related documentation, know-how, trade secrets, drawings, blueprints, designs, design protocols, scoring rules, scoring algorithms, and specifications for materials relating to the Divestiture Assets; all quality assurance and control procedures, design tools and simulation capability relating to the Divestiture Assets; all manuals and technical information used for any purpose relating to the Divestiture Assets or that Defendants provide to their own employees, customers, suppliers, agents or licensees for use in relation with the Divestiture Assets; and all other intangible research data concerning historic and current research and development efforts relating to the

Divestiture Assets, including, but not limited to, designs of experiments, and the results of successful and unsuccessful designs and experiments;

3. The OWLS Assets also specifically include all tangible assets relating to the development of the OWLS second-edition titles including, but not limited to, all research data and development activities; all tryout and standardization easels, administration materials, record forms, tryout data, standardization data, and data for reliability and validity studies;

4. The EAS Assets also specifically include all tangible and intangible assets relating to the development of the EAS including, but not limited to, all research data and development activities; all tryout and standardization easels, administration materials, record forms, tryout data, standardization data, and data for reliability and validity studies; and all algorithmic data including, but not limited to, data relating to item banking, continuous item rotation, item analysis, item calibration, norming, test equating, scale development, computer-based testing, and computer-adaptive testing; and all applications of Sampling Theory, the Generalized Graded Unfolding model, Generalizability Theory model, Structural Equation model, and other Item Response Theory models;

5. A royalty-free license to the Acquirer(s) of the ABAS Assets and CELF Assets to use the Harcourt corporate trademark and trade name for the sole and limited purpose of distributing finished inventory of the ABAS Assets and CELF Assets;

6. At the option of the Acquirer( s) of the ABAS Assets and CELF Assets, a non-exclusive license to distribute the Scoring Assistant Software for use with the ABAS Assets and CELF Assets; and in the event that the Acquirer exercises such option, the Defendants shall provide to the Acquirer(s) of the ABAS Assets and CELF Assets all technical information and support necessary for the distribution and administration of the Scoring Assistant Software;

7. A royalty-free license to the Acquirer of the CASL Assets and OWLS Assets to use the Pearson corporate trademark and trade name for the sole and limited purpose of distributing finished inventory of the CASL Assets and OWLS Assets;

8. At the option of the Acquirer of the CASL Assets and OWLS Assets, a non-exclusive license to distribute the ASSIST Software for use with the CASL Assets and OWLS Assets; and in the event that the Acquirer exercises such option, the Defendants shall provide to the Acquirer of the CASL Assets and

OWLS Assets all technical information and support necessary for the distribution and administration of the ASSIST Software; and

A license to the Acquirer of the CELF Assets to use the Retained CMS and WMS Content to market, sell or distribute any tests produced by the CELF Assets.

G. "Acquirer" or "Acquirers" means the entity or entities to whom Defendants divest the Divestiture Assets.

H. "Scoring Assistant Software" means Reed Elsevier's software for computerized scoring of individually-administered standardized norm-referenced comprehensive clinical tests ("clinical tests") to assist test administrators including, but not limited to, software related to scoring of test results; tracking test scores and test history; raw-to-derived score conversion; score interpretation; outcomes analysis and reporting capabilities; problem identification and eligibility determination; discrepancy analysis; and intervention recommendations.

1. "ASSIST Software" means Pearson's Automated System for Scoring and Interpreting Standardized Tests and encompasses software for computerized scoring of clinical tests to assist test administrators including, but not limited to, software related to scoring of test results; tracking test scores and test history; raw-to-derived score conversion; score interpretation; outcomes analysis and reporting capabilities; problem identification and eligibility determination; discrepancy analysis; and intervention recommendations.

J. "Licensed-Back ABAS Content" means the two hundred and forty one (241) ABAS items described in Exhibit A that, as of the filing of the Complaint in this matter, are also employed in the marketing, sale, and distribution of Reed Elsevier's Bayley Scales of Infant and Toddler Development second- and third-edition titles.

K. "Retained CMS and WMS Content" means the fifty (50) Children's Memory Scale ("CMS ") and Wechsler Memory Scale ("WMS ") items that, as of the filing of the Complaint in this matter, are also employed in the marketing, sale, and distribution of the CELF Assets appearing as the Number Repetition 1 (15 items) and Familiar Sequences 1 (12 items) subtests of the CELF–4, which are borrowed from the Numbers and Sequences CMS subtests, respectively, and Number Repetition 2 (15 items) and Familiar Sequences 2 (8 items) subtests of the CELF–4, which are borrowed

from the Digit Span and Mental Control WMS subtests, respectively.

**III. Applicability**

A. This Final Judgment applies to Pearson and Reed Elsevier, as defined above, and all other persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

B. If, prior to complying with Sections IV and V of this Final Judgment, Defendants sell or otherwise dispose of all or substantially all of their assets or of lesser business units that include the Divestiture Assets, they shall require the purchaser to be bound by the provisions of this Final Judgment. Defendants need not obtain such an agreement from the Acquirer(s) of the Divestiture Assets pursuant to this Final Judgment.

**IV. Divestitures**

A. Defendants are ordered and directed, within ninety (90) calendar days after the filing of the Complaint in this matter, or five (5) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later, to divest the Divestiture Assets in a manner consistent with this Final Judgment to one or more Acquirers acceptable to the United States, in its sole discretion. The United States, in its sole discretion, may agree to one or more extensions of this time period not to exceed sixty (60) calendar days in total, and shall notify the Court in such circumstances. Defendants agree to use their best efforts to divest the Divestiture Assets as expeditiously as possible.

B. In accomplishing the divestitures ordered by this Final Judgment, Defendants promptly shall make known, by usual and customary means, the availability of the Divestiture Assets. Defendants shall inform any person making inquiry regarding a possible purchase of the Divestiture Assets that they are being divested pursuant to this Final Judgment and provide that person with a copy of this Final Judgment. Defendants shall offer to furnish to all prospective Acquirers, subject to customary confidentiality assurances, all information and documents relating to the Divestiture Assets customarily provided in a due diligence process except such information or documents subject to the attorney-client privilege or work-product doctrine. Defendants shall make available such information to the United States at the same time that such information is made available to any other person.

C. Defendants shall provide the Acquirer(s) and the United States the

identity of any personnel responsible for any editorial content of any Divestiture Asset, and any personnel responsible for the sale, development, production, design, layout, standardization, norming, analysis, or research relating to any of the Divestiture Assets, to enable the Acquirer(s) to make offers of employment. Defendants will not interfere with any negotiations or attempts by the Acquirer(s) to employ or contract with any persons responsible for any such activity related to any Divestiture Asset.

D. Defendants shall permit prospective Acquirers of the Divestiture Assets to have reasonable access to personnel responsible for the Divestiture Assets; and to have access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

E. Defendants shall have the right to obtain, from the Acquirer of the ABAS assets, a license to use the Licensed-Back ABAS Content for a period of time no longer than is necessary for Defendants to market, sell or distribute Reed Elsevier's Bayley Scales of Infant and Toddler Development second- and third-edition titles; such license shall be subject to final review and approval by the United States.

F. To the extent Defendants receive any orders or inquiries for the ABAS, the CASL, the OWLS, or the CELF, and an Acquirer has obtained the Divestiture Assets relating to such test, Defendants shall forward such orders and inquiries to the respective Acquirer for a period of time not to exceed two (2) years.

G. Defendants shall warrant to the respective Acquirer or Acquirers of the ABAS Assets, the CASL Assets and OWLS Assets, and the CELF Assets, that the respective Divestiture Assets will be operational on the date of sale. Defendants shall warrant to the Acquirer of the EAS Assets that the EAS Assets have been developed in a manner no less vigorous than existing development plans, as of the filing of the Complaint in this matter, and maintained in a manner that has preserved the economic viability of the assets, and that, upon divestiture, Acquirer will receive good title to all the assets that comprise the EAS Assets as of the date of sale. Defendants shall warrant to the Acquirer or Acquirers that the Divestiture Assets they acquire have been maintained and operated separately in a manner as required under the Hold Separate Stipulation and Order ("Hold Separate") filed simultaneously with the Court.

H. Nothing in this Final Judgment shall be construed to require the

Acquirer or Acquirers as a condition of any license granted by or to Defendants pursuant to Sections II(F)(6), (8), and (9) and IV(E) to extend to Defendants the right to use any improvements made by the Acquirer or Acquirers to any software or content used in the marketing, sale or distribution of clinical tests.

I. Defendants shall not take any action that will impede in any way the operation or divestiture of the Divestiture Assets.

J. Unless the United States otherwise consents in writing, the divestitures pursuant to Section IV, or by trustee appointed pursuant to Section V, of this Final Judgment, shall include the entire Divestiture Assets, and shall be accomplished in such a way as to satisfy the United States, in its sole discretion, that the Divestiture Assets can and will be used by the Acquirer(s) as part of a viable, ongoing business of publishing clinical tests. Divestiture of the Divestiture Assets may be made to one or more Acquirers, provided that in each instance it is demonstrated to the sole satisfaction of the United States that the Divestiture Assets will remain viable and the divestiture of such assets will remedy the competitive harm alleged in the Complaint. The divestitures, whether pursuant to Section IV or Section V of this Final Judgment,

(1) Shall be made to an Acquirer(s) that, in the United States's sole judgment, has the intent and capability (including the necessary managerial, operational, technical and financial capability) of competing effectively in the business of publishing clinical tests; and

(2) Shall be accomplished so as to satisfy the United States, in its sole discretion, that none of the terms of any agreement between an Acquirer(s) and Defendants give Defendants the ability unreasonably to raise the Acquirer's costs, to lower the Acquirer's efficiency, or otherwise to interfere in the ability of the Acquirer to compete effectively.

## V. Appointment of Trustee

A. If Defendants have not divested the Divestiture Assets within the time period specified in Section IV(A), Defendants shall notify the United States of that fact in writing. Upon application of the United States, the Court shall appoint a trustee selected by the United States and approved by the Court to effect the divestiture of the Divestiture Assets.

B. After the appointment of a trustee becomes effective, only the trustee shall have the right to sell the Divestiture Assets. The trustee shall have the power

and authority to accomplish the divestiture to an Acquirer(s) acceptable to the United States at such price and on such terms as are then obtainable upon reasonable effort by the trustee, subject to the provisions of Sections IV, V, and VI of this Final Judgment, and shall have such other powers as this Court deems appropriate. Subject to Section V(D) of this Final Judgment, the trustee may hire at the cost and expense of Defendants any investment bankers, attorneys, or other agents, who shall be solely accountable to the trustee, reasonably necessary in the trustee's judgment to assist in the divestitures.

C. Defendants shall not object to a sale by the trustee on any ground other than the trustee's malfeasance. Any such objections by Defendants must be conveyed in writing to the United States and the trustee within ten (10) calendar days after the trustee has provided the notice required under Section VI.

D. The trustee shall serve at the cost and expense of Defendants, on such terms and conditions as the United States approves, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to Defendants and the trust shall then be terminated. The compensation of the trustee and any professionals and agents retained by the trustee shall be reasonable in light of the value of the Divestiture Assets and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished, but timeliness is paramount.

E. Defendants shall use their best efforts to assist the trustee in accomplishing the required divestitures. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and complete access to the personnel, books, records, and facilities of the business to be divested, and Defendants shall develop financial and other information relevant to such business as the trustee may reasonably request, subject to reasonable protection for trade secret or other confidential research, development, or commercial information. Defendants shall take no action to interfere with or to impede the trustee's accomplishment of the divestitures.

F. After its appointment, the trustee shall file monthly reports with the United States and the Court setting forth

the trustee's efforts to accomplish the divestitures ordered under this Final Judgment. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. Such reports shall include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person. The trustee shall maintain full records of all efforts made to divest the Divestiture Assets.

G. If the trustee has not accomplished the divestitures ordered under this Final Judgment within six months after its appointment, the trustee shall promptly file with the Court a report setting forth (1) the trustee's efforts to accomplish the required divestitures, (2) the reasons, in the trustee's judgment, why the required divestitures have not been accomplished, and (3) the trustee's recommendations. To the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish such report to the United States which shall have the right to make additional recommendations consistent with the purpose of the trust. The Court thereafter shall enter such orders as it shall deem appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

## VI. Notice of Proposed Divestitures

A. Within two (2) business days following execution of a definitive divestiture agreement, Defendants or the trustee, whichever is then responsible for effecting the divestitures required herein, shall notify the United States of any proposed divestiture required by Section IV or V of this Final Judgment. If the trustee is responsible, it shall similarly notify Defendants. The notice shall set forth the details of the proposed divestiture and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the Divestiture Assets, together with full details of the same.

B. Within fifteen (15) calendar days of receipt by the United States of such notice, the United States may request from Defendants, the proposed

Acquirer(s), any other third party, or the trustee, if applicable, additional information concerning the proposed divestiture, the proposed Acquirer, and any other potential Acquirer. Defendants and the trustee shall furnish any additional information requested within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree.

C. Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the United States has been provided the additional information requested from Defendants, the proposed Acquirer, any third party, and the trustee, whichever is later, the United States shall provide written notice to Defendants and the trustee, if there is one, stating whether or not it objects to the proposed divestiture. If the United States provides written notice that it does not object, the divestiture may be consummated, subject only to Defendants' limited right to object to the sale under Section V(C) of this Final Judgment. Absent written notice that the United States does not object to the proposed Acquirer or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated. Upon objection by Defendants under Section V(C), a divestiture proposed under Section V shall not be consummated unless approved by the Court.

## VII. Financing

Defendants shall not finance all or any part of any purchase made pursuant to Section IV or V of this Final Judgment.

## VIII. Hold Separate

Until the divestitures required by this Final Judgment have been accomplished, Defendants shall take all steps necessary to comply with the Hold Separate entered by this Court. Defendants shall take no action that would jeopardize the divestitures ordered by this Court.

## IX. Affidavits

A. Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the divestitures have been completed under Section IV or V, Defendants shall deliver to the United States an affidavit as to the fact and manner of its compliance with Section IV or V of this Final Judgment. Each such affidavit shall include the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in

acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture Assets, and shall describe in detail each contact with any such person during that period. Each such affidavit shall also include a description of the efforts Defendants have taken to solicit buyers for the Divestiture Assets, and to provide required information to prospective Acquirers, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by the United States to information provided by Defendants, including limitation on information, shall be made within fourteen (14) calendar days of receipt of such affidavit.

B. Within twenty (20) calendar days of the filing of the Complaint in this matter, Defendants shall deliver to the United States an affidavit that describes in reasonable detail all actions Defendants have taken and all steps Defendants have implemented on an ongoing basis to comply with Section VIII of this Final Judgment. Defendants shall deliver to the United States an affidavit describing any changes to the efforts and actions outlined in Defendants' earlier affidavits filed pursuant to this section within fifteen (15) calendar days after the change is implemented.

C. Defendants shall keep all records of all efforts made to preserve and divest the Divestiture Assets until one year after such divestitures have been completed.

## X. Compliance Inspection

A. For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time authorized representatives of the United States Department of Justice, including consultants and other persons retained by the United States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Defendants, be permitted:

(1) Access during Defendants' office hours to inspect and copy, or at the option of the United States, to require Defendants to provide hard copy or electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Defendants, relating to any matters contained in this Final Judgment; and

(2) To interview, either informally or on the record, Defendants' officers,

employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

B. Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, Defendants shall submit written reports or response to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C. No information or documents obtained by the means provided in this section shall be divulged by the United States to any person other than an authorized representative of the executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D. If at the time information or documents are furnished by Defendants to the United States, Defendants represent and identify in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and Defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then the United States shall give Defendants ten (10) calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## XI. No Reacquisition

Pearson may not reacquire any part of the Divestiture Assets during the term of this Final Judgment.

## XII. Retention of Jurisdiction

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## XIII. Expiration of Final Judgment

Unless this Court grants an extension, this Final Judgment shall expire ten years from the date of its entry.

## XIV. Public Interest Determination

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States's responses to comments. Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

Date:_____

Court approval subject to procedures of Antitrust Procedures and Penalties Act, 15 U.S.C. 16

_____

United States District Judge

## Exhibit A

The Licensed-Back ABAS Content includes all of the items appearing in the ABAS–II Parent/Primary Caregiver (Ages 0–5) that, as of the filing of the Complaint in this matter, also appear as the Adaptive Behavior Scale subtest in Reed Elsevier's Bayley Scales of Infant and Toddler Development ("Bayley-III"). Specifically, the shared content includes all items in the following scales: Communication, Community Use, Functional Pre-Academics, Home Living, Health and Safety, Leisure, Self-Care, Self-Direction, Social, and Motor.

In addition to the shared items, the shared content within the scales listed above also includes the following:

1. Administration instructions and sample items (appearing on pp. 4–5 of the Bayley-III Social-Emotional and Adaptive Behavior Questionnaire, or the "record form");

2. Record form summary page content and design, including the following tables: raw-score to scaled-score conversions, sum of scaled scores to composite-score conversions, skill area scaled score profile, composite score profile and supplemental analysis—discrepancy comparisons (appearing on page 14 of the Bayley-III Social Emotional and Adaptive Behavior Questionnaire);

3. Norms for the Bayley-III Adaptive Behavior subtest appearing in the Bayley-III Administration Manual, which include references describing the adaptive behavior scale, and administration and scoring instructions on pages 4, 30–39 and 173–176; and the following norms tables: A.3 Adaptive Behavior Skill Area Scales Scores by Age (p. 191–197), A.6 Sum of GAC and Adaptive Domain Scaled Scores

Converted to Composite Scores and GAC and Adaptive Domain Percentile Ranks and Confidence Intervals (p. 200–209), B.3 Differences Between Adaptive Domain Composite Scores Required For Statistical Significance (p. 216), and B.4 Differences Between Adaptive Domain Composite Scores Obtained By Various Percentages (p. 217); and

4. Norms for the Bayley-III Adaptive Behavior subtest appearing in the Bayley-III Technical Manual, which include references describing the adaptive behavior scale, administration and scoring instructions, and technical information on pages 9, 10, 28, 45–53, 57–59, 61–62, 64–66, 70, 80–83, 97–98, and 116–119.

## Competitive Impact Statement

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. 16(b)–(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

## I. Nature and Purpose of the Proceeding

The United States filed a civil antitrust Complaint on January 24, 2008, seeking to enjoin the proposed acquisition by Pearson plc and Pearson Education Inc. (collectively "Pearson") of Harcourt Assessment Inc. (hereafter "Harcourt"), a wholly-owned subsidiary of Reed Elsevier PLC and Reed Elsevier NV (collectively "Reed Elsevier"). The Complaint alleges that the likely effects of this acquisition would be to lessen competition substantially in the markets for individually-administered standardized norm-referenced comprehensive clinical tests (hereafter "clinical tests") in the subject areas of: (1) Adaptive behavior; (2) speech and language; and (3) adult abnormal personality, in violation of Section 7 of the Clayton Act, 15 U.S.C. 18. The loss of competition caused by the acquisition will result in increased prices and decreased innovation for adaptive behavior and speech and language clinical tests in the United States. It will also eliminate likely reductions in prices for adult abnormal personality clinical tests and increased innovation for such tests that would otherwise result from Harcourt's impending entry into this market.

At the same time the Complaint was filed, the United States also filed a Hold Separate Stipulation and Order ("Hold Separate") and a proposed Final Judgment, which are designed to eliminate the anticompetitive effects of the acquisition. Under the proposed

**7602**    **Federal Register** / Vol. 73, No. 27 / Friday, February 8, 2008 / Notices

Final Judgment, which is explained more fully below, the Defendants are required to divest certain adaptive behavior, speech and language, and adult abnormal personality clinical tests (hereafter ''Divestiture Assets''). Until the divestitures required by the Final Judgment have been accomplished, the Hold Separate requires Pearson and Harcourt to take steps to ensure that their clinical assessment businesses— Pearson Clinical Assessments (as defined in the Hold Separate) and Harcourt Clinical Assessments (as defined in the Hold Separate)—will continue to operate as separate, independent, economically viable, and ongoing competitive businesses; that the Divestiture Assets will be maintained and operated by Pearson Clinical Assessments and Harcourt Clinical Assessments as ongoing, economically viable, and active business concerns; and that competition is maintained during the pendency of the ordered divestitures.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II. Description of the Events Giving Rise to the Alleged Violations

### A. The Defendants and the Proposed Transaction

Pearson plc, a U.K. corporation with its headquarters in London, England, operates businesses in educational publishing, business information, and consumer publishing. Pearson Education Inc. (hereafter ''Pearson Education''), a wholly-owned subsidiary of Pearson plc, is a Delaware corporation with its headquarters in Upper Saddle River, New Jersey. Pearson Education develops, markets, sells, and distributes clinical tests throughout the United States.

Reed Elsevier PLC, a U.K. corporation with its headquarters located in London, England, and Reed Elsevier NV, a Dutch corporation with its headquarters located in Amsterdam, Netherlands, jointly own Harcourt. Harcourt, a New York corporation with its headquarters located in San Antonio, Texas, develops, markets, sells, and distributes clinical tests throughout the United States.

On or about May 4, 2007, and amended on May 21, 2007, Pearson and

Reed Elsevier signed a sale and purchase agreement for Pearson to acquire all of the outstanding voting securities of Harcourt, as well as additional assets, for approximately $950 million in cash.

### B. The Competitive Effects of the Transaction on Clinical Test Publishing

#### 1. Clinical Test Publishing

Clinical tests are used to screen, diagnose, provide intervention strategies for, and to monitor progress of individuals with disabilities or individuals at risk for disabilities. These tests are individually administered and scored by trained clinicians such as psychologists or speech-language pathologists rather than being administered and scored on a mass scale like state-wide summative educational achievement tests. These tests are also standardized by publishers. Standardization is the process of developing a test that reliably, validly, and consistently assesses a specific discipline. Standardized tests are authored, designed, and developed so that the test materials, test procedures, and test scoring are consistent across each test administration. Standardized test scores can be documented empirically and compared across test administrations, and if normed, compared across populations and relative to others in similarly-situated groups. Norming is the expensive and time-consuming process of giving a standardized test to a representative sample of individuals in order to determine average (or normal) test scores. Norms can then be used to compare the scores of an individual with those of other individuals in the specified representative sample.

In addition to clinical tests, non-standardized, non-norm-referenced assessments (*e.g.*, charts published in books or journals, single-scale tests, and free material available on the internet) are available to school psychologists and clinicians. However, such test materials are inferior to clinical tests because they do not provide the same levels of validity and reliability, nor can they be used in many situations in which a clinical test is required, for example, where such tests must be administered before a certain diagnosis or classification can be made in order for an individual to qualify for special services, such as special education or speech and language instruction.

#### 2. Relevant Product Markets

The Complaint alleges that the development and sale of adaptive behavior, speech and language, and

adult abnormal personality clinical tests are relevant product markets pursuant to Section 7 of the Clayton Act.

##### a. Adaptive Behavior Clinical Tests

Pearson and Harcourt each publish the market-leading adaptive behavior clinical tests. Pearson publishes the Vineland Adaptive Behavior Scales, which is currently in its second edition, (''Vineland'') and Harcourt publishes the Adaptive Behavior Assessment System, which is currently in its second edition (''ABAS'').

Adaptive behavior generally reflects an individual's competence in meeting their independent needs and satisfying the social demands of their environment in three broad domains: conceptual (*i.e.*, communication, functional academics, self-direction, and health and safety), social (*i.e.*, social skills and leisure), and practical (*i.e.*, self-care, home living, community use, and work). School psychologists and clinicians, among others, use adaptive behavior clinical tests to assess an individual's ability to meet these needs and demands. Other adaptive behavior assessment scales, such as neuropsychological behavioral or emotional scales, do not assess the same domains as do adaptive behavior clinical tests. Moreover, non-standardized charts or scales for adaptive behavior provide inferior assessments of adaptive behavior and do not provide the same levels of validity and reliability as do clinical tests.

A small but significant post-acquisition increase in the price of adaptive behavior clinical tests would not cause customers to substitute other types of tests, charts, or scales, or to otherwise reduce their purchases of adaptive behavior clinical tests, in sufficient quantities so as to make such a price increase unprofitable. For these reasons, such other tests, charts, and scales are not in the same product market as adaptive behavior clinical tests. Accordingly, the development, marketing, sale, and distribution of adaptive behavior clinical tests constitutes a line of commerce and a relevant product market pursuant to Section 7 of the Clayton Act.

##### b. Speech and Language Clinical Tests

Pearson and Harcourt each publish market-leading speech and language clinical tests. Pearson publishes two such tests, known as the Comprehensive Assessment of Spoken Language (''CASL'') and the Oral and Written Language Scales (''OWLS''), which are each in their first edition. Harcourt publishes a speech and language clinical test known as the Clinical Evaluation of Language Fundamentals,

which is currently in its fourth edition ("CELF").

Speech and language disorders generally refer to problems with understanding others, expressing thoughts and ideas, and producing speech sounds. Speech and language clinical tests may assess several areas such as vocabulary, grammar, receptive and expressive language, semantics, morphology, and pragmatics. Other speech and language assessments, such as those that only assess narrow areas like phonology or grammar, are not as broad as clinical tests. Moreover, non-standardized, non-norm-referenced comprehensive speech and language tests are inferior to clinical tests as they do not provide the same levels of validity or reliability as do clinical tests.

A small but significant post-acquisition increase in the price of speech and language clinical tests would not cause customers to substitute other types of tests or non-standardized, non-norm-referenced tests, or to otherwise reduce their purchases of speech and language clinical tests, in sufficient quantities so as to make such a price increase unprofitable. For these reasons, such other tests are not in the same product market as speech and language clinical tests. Accordingly, the development, marketing, sale, and distribution of speech and language clinical tests constitutes a line of commerce and a relevant product market pursuant to Section 7 of the Clayton Act.

### c. Adult Abnormal Personality Clinical Tests

Pearson publishes two series of adult abnormal personality clinical tests known as the Minnesota Multiphasic Personality Inventories, which are currently in their second edition ("MMPI"), and the Millon Clinical Multiaxial Inventories, which are currently in their third edition ("MCMI"). Harcourt is developing an adult abnormal personality clinical test known as the Emotional Assessment System ("EAS") that it expects to make commercially available in late 2008.

Generally, abnormal personality disorders are chronic, inflexible, maladaptive patterns of perceiving, thinking, and behaving that seriously impair an individual's ability to function in social settings. Adult abnormal personality disorders include: (1) Clinical disorders such as anxiety, and (2) personality disorders such as paranoia. Many clinicians employ adult abnormal personality clinical tests to obtain comprehensive diagnoses of both kinds. Other methods of assessing abnormal personality, such as using

structured interviews or non-standardized tests (including developing one's own tests), are inferior to adult abnormal personality clinical tests because they do not have the same degree of reliability, and because interpreting one's own tests would introduce subjective elements into the analysis not present with the use of clinical tests. In addition, in some locations, for some applications, clinical tests are required by law and other methods of assessment cannot be used.

A small but significant post-acquisition increase in the price of adult abnormal personality clinical tests would not cause customers to substitute structured interviews or non-standardized tests, or to otherwise reduce their purchases of adult abnormal personality clinical tests, in sufficient quantities so as to make such a price increase unprofitable. For these reasons, structured interviews and non-standardized tests are not in the same product market as adult abnormal personality clinical tests. Accordingly, the development, marketing, sale, and distribution of adult abnormal personality clinical tests constitutes a line of commerce and a relevant product market pursuant to Section 7 of the Clayton Act.

### 3. Relevant Geographic Market

The Complaint alleges that the Defendants sell adaptive behavior and speech and language clinical tests throughout the United States, and that Pearson also sells adult abnormal personality clinical tests throughout the United States. United States customers of Defendants' clinical tests would not purchase other clinical tests published outside the United States because such other tests have not been standardized or norm-referenced on samples of individuals located in the United States. Because customers in the United States would not substitute other clinical tests published outside of the United States for the Defendants' clinical tests published in the United States, the United States constitutes the relevant geographic market for all three relevant products pursuant to Section 7 of the Clayton Act.

### 4. Anticompetitive Effects of the Acquisition

#### a. Adaptive Behavior and Speech and Language Clinical Test Markets

The proposed acquisition will eliminate competition between Pearson and Harcourt and substantially increase market concentration in the already highly-concentrated markets for adaptive behavior and speech and

language clinical tests. In the adaptive behavior clinical test market, the proposed acquisition will result in Pearson controlling 92 percent of the market for such tests in which Pearson's Vineland and Harcourt's ABAS are considered to be the best substitutes for each other. In the speech and language clinical test market, the proposed acquisition will result in Pearson controlling 90 percent of the market for such tests where Pearson's CASL and OWLS are considered substitutes for Harcourt's CELF.

The loss of this head-to-head competition in these markets will make it likely that Pearson will unilaterally increase the price of, or reduce innovation with respect to, these clinical tests. The responses of other publishers of adaptive behavior and speech and language clinical tests would not be sufficient to constrain a unilateral exercise of market power by Pearson after the acquisition, and new entry would not be timely, likely, or sufficient to defeat the likely anticompetitive effects of Pearson's proposed acquisition of Harcourt. For all of these reasons, the proposed transaction would substantially lessen competition in the development, marketing, sale, and distribution of adaptive behavior and speech and language clinical tests in the United States in violation of Section 7 of the Clayton Act.

#### b. Adult Abnormal Personality Clinical Tests

Pearson is the dominant supplier of adult abnormal personality clinical tests, with its MMPI and MCMI having approximately 93 percent share of the market for such tests sold in the United States. Harcourt is developing a computer-based adaptive adult abnormal personality clinical test known as the EAS, which it plans to make commercially available in late 2008. Harcourt is in the standardization and norm-referencing phase of development and is in the process of collecting data from clinical and non-clinical examinees. The EAS will offer new, desirable features and functionality that are not currently offered by either Pearson or the other competitor. Harcourt plans to sell and market the EAS to Pearson's adult abnormal personality clinical test customers and projects that the EAS will achieve a significant market share within a number of years.

The proposed acquisition would eliminate Harcourt as a new supplier of adult abnormal personality clinical tests and thereby prevent the reduction in prices and greater innovation for such

tests that would have otherwise resulted from Harcourt's entry. Other new entry would not be timely, likely, or sufficient to defeat the likely anticompetitive effects of Pearson's proposed acquisition of Harcourt. For all of these reasons, the proposed transaction would substantially lessen actual and potential competition in the development, marketing, sale, and distribution of adult abnormal personality clinical tests in the United States in violation of Section 7 of the Clayton Act.

## III. Explanation of the Proposed Final Judgment

### A. The Divestiture Assets

The proposed Final Judgment requires that the Defendants divest all of its assets related to clinical tests in these markets where competition would otherwise be harmed. The divestitures provided for in the proposed Final Judgment will eliminate the anticompetitive effects of the proposed acquisition in the markets for adaptive behavior, speech and language, and adult abnormal personality clinical tests. The Divestiture Assets must be divested in such a way as to satisfy the United States in its sole discretion that they can and will be operated by the acquirer(s) as viable, ongoing clinical test publishing concerns that can compete effectively in their respective relevant markets; and the Defendants must take all reasonable steps necessary to accomplish the divestitures quickly and shall cooperate with prospective acquirers.

Specifically, the Divestiture Assets include:

a. In the adaptive behavior clinical tests market, Harcourt's ABAS first- and second-edition titles, incorporating the Downward Extension of the ABAS, and Harcourt's ABAS Second Edition Intervention Planner (collectively "ABAS Assets");

b. In the speech and language clinical tests market, either:

(1) Pearson's CASL, which is in its first edition ("CASL Assets"); *and,* Pearson's OWLS, including the Oral Expression and Listening Comprehension Scales, the Written Expression Scale, and the OWLS second edition, which is under development (collectively "OWLS Assets"); *or*

(2) Harcourt's CELF, including the first-, second-, third-, and fourth-edition titles, the CELF Screener first-, second-, third-, and fourth-edition titles, the CELF Preschool first- and second-edition titles, the CELF Spanish first-, second-, third-, and fourth-edition titles, and the CELF Spanish Preschool, which is under development; excluding

however, the Retained CMS and WMS Content (collectively "CELF Assets"); and

c. In the adult abnormal personality clinical tests market, Harcourt's EAS, which is under development ("EAS Assets").

The Divestiture Assets also include all tangible and intangible assets that comprise each of the above-listed Divestiture Assets; the OWLS Assets also include all tangible assets relating to the development of the OWLS second-edition titles; and the EAS Assets also include all tangible and intangible assets relating to the development of the EAS.

The sale of the Divestiture Assets according to the terms of the proposed Final Judgment will eliminate the anticompetitive effects of the acquisition in the markets for adaptive behavior, speech and language, and adult abnormal personality clinical tests. In each market, the divestitures will establish a new, independent, and economically viable competitor.

### B. Selected Provisions of the Proposed Final Judgment

In antitrust cases involving acquisitions in which the United States seeks a divestiture remedy, it requires completion of the divestiture within the shortest period of time reasonable under the circumstances. A quick divestiture has the benefits of restoring competition lost in the acquisition and reducing the possibility of dissipation of the value of the assets. Paragraph IV(A) of the proposed Final Judgment requires the Defendants to divest, as independent and economically viable ongoing clinical test publishing concerns, the Divestiture Assets within ninety (90) calendar days after the filing of the Complaint in this matter, or five (5) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later.[1] The Divestiture Assets must be divested in such a way as to satisfy the United States in its sole discretion that they can and will be operated by the acquirer(s) as viable, ongoing clinical test publishing concerns that can compete effectively in their respective relevant markets; and Defendants must take all reasonable steps necessary to accomplish the divestitures quickly and shall cooperate with prospective acquirers.

Several provisions of the proposed Final Judgment address licenses needed

to effectuate the divestitures or to tailor the proposed relief to the anticompetitive concerns without disrupting the Defendants' other businesses. For example, paragraph II(F)(5) provides that the acquirer(s) of the ABAS Assets and CELF Assets will obtain royalty-free licenses to use the Harcourt corporate trademark and trade name for the purpose of distributing finished inventory of the ABAS Assets and CELF Assets held by Harcourt. Similarly, paragraph II(F)(7) provides that the acquirer of the CASL Assets and OWLS Assets will obtain a royalty-free licenses to use the Pearson corporate trademark and trade name for the purpose of distributing finished inventory of the CASL Assets and OWLS Assets held by Pearson. These licenses will ensure that the acquirer(s) of the Divestiture Assets will not infringe the Defendants' intellectual property rights in the course of distributing the finished inventory of products sold by or under any of the Divestiture Assets.

Paragraphs II(F)(6) and II(F)(8) provide for licenses relating to Pearson and Harcourt's scoring software, which the Defendants currently distribute for use with products sold by or under the Divestiture Assets. Paragraph II(F)(6) provides that the acquirer(s) of the ABAS Assets and CELF Assets will have the option to obtain a non-exclusive license to distribute Harcourt's Scoring Assistant Software (as defined in the proposed Final Judgment) for use with the ABAS Assets and CELF Assets; if the acquirer(s) exercise this option, the Defendants shall provide to the acquirer(s) all technical information and support necessary for the distribution and administration of the Scoring Assistant Software. Similarly, paragraph II(F)(8) provides that the acquirer of the CASL Assets and OWLS Assets will have the option to obtain a non-exclusive license to distribute Pearson's ASSIST Software (as defined in the proposed Final Judgment) for use with the CASL Assets and OWLS Assets; if the acquirer exercises this option, the Defendants shall provide to the acquirer all technical information and support necessary for the distribution and administration of the ASSIST Software. These provisions assure the acquirer(s)' access to scoring software that may be needed to facilitate the future sale and marketing of products sold by or under the Divestiture Assets by the acquirer(s).

Paragraphs II(F)(9) and IV(E) provide for licenses relating to certain content of the Divestiture Assets that is also employed in the marketing, sale, and

---

[1] The proposed Final Judgment also provides that this ninety-(90) day time period may be extended by the United States in its sole discretion for a total period not exceeding sixty (60) calendar days, and that the Court will receive prior notice of any such extension.

distribution of other Harcourt tests that the proposed Final Judgment does not require the Defendants to divest. First, Harcourt's CELF employs certain content used in Harcourt's Children's Memory Scale ("CMS") and Harcourt's Wechsler Memory Scale ("WMS"). Since the proposed Final Judgment does not require the Defendants to divest the CMS or WMS, paragraph II(F)(9) provides that the acquirer of the CELF Assets will obtain a license to use the Retained CMS and WMS Content (as defined in the proposed Final Judgment) to market, sell or distribute any tests produced by the CELF Assets. This license will permit the acquirer of the CELF Assets unfettered rights to use the Defendants' Retained CMS and WMS Content, and to do so without infringing the Defendants' intellectual property rights.

Second, Harcourt's Bayley Scales of Infant and Toddler Development (the "Bayley"), another test that the proposed Final Judgment does not require the Defendants to divest, employs certain content used in the ABAS. That content will be divested to the acquirer, but paragraph IV(E) provides that the Defendants shall have the right to obtain from the acquirer a license to use the Licensed-Back ABAS Content (defined in the proposed Final Judgment) for a period of time no longer than is necessary for the Defendants to market, sell or distribute the Bayley, and that such license shall be subject to final review and approval by the United States. This license will permit the Defendants to continue to use the Licensed-Back ABAS Content without interfering with the acquirer's use of that content, and infringing intellectual property rights relating to the ABAS Assets that will be divested to the acquirer.

Paragraph IV(F) of the Proposed Final Judgment provides for an orderly transition of the Divestiture Assets to the acquirer(s). It addresses the possibility that customers might continue to place orders for the divested clinical tests with Pearson or Harcourt. To the extent that Defendants receive any purchase orders or inquiries for the ABAS, the CASL, the OWLS, or the CELF tests, and an acquirer has already purchased the Divestiture Assets relating to such test, Defendants shall forward such orders and inquiries to the respective acquirer. The Defendants' obligation under this provision shall not exceed two (2) years.

Paragraph V of the proposed Final Judgment provides that in the event the Defendants do not accomplish the divestitures within the periods prescribed in the proposed Final Judgment, the Court will appoint a trustee selected by the United States to effect the divestitures. If a trustee is appointed, the proposed Final Judgment provides that Defendants will pay all costs and expenses of the trustee. The trustee's commission will be structured so as to provide an incentive for the trustee based on the price obtained and the speed with which the divestitures are accomplished. After his or her appointment becomes effective, the trustee will file monthly reports with the Court and the United States setting forth his or her efforts to accomplish the divestiture. At the end of six (6) months, if the divestitures have not been accomplished, the trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate, in order to carry out the purpose of the trust, including extending the trust or the term of the trustee's appointment.

### C. The Hold Separate Stipulation and Order

In order to help ensure that, pending the divestitures, competition between the Divestiture Assets and the competing assets retained by Defendants is preserved, the Divestiture Assets are maintained as ongoing, economically viable, and active business concerns, and Defendants will accomplish the divestitures required by the proposed Final Judgment, Defendants have entered into the Hold Separate filed simultaneously with the Court. The Hold Separate requires Pearson and Harcourt to take steps to ensure that their clinical assessment businesses— Pearson Clinical Assessments and Harcourt Clinical Assessments—will each continue to operate as separate, independent, economically viable, and ongoing competitive businesses with management, development, sales, and marketing held separate and apart from those of each other as well as those of Defendants' other operations; and that management of the Divestiture Assets by Pearson Clinical Assessments and Harcourt Clinical Assessments will not be influenced by Defendants. In order to help implement the Hold Separate obligations, Defendants will appoint a person or persons to oversee Pearson Clinical Assessments and Harcourt Clinical Assessments, and those persons will be responsible for Defendants' compliance with the provisions of the Hold Separate. The Hold Separate does not require the Defendants to operate separate and independent support and operational services relating to the Divestiture Assets. Such support and operational services include warehousing, printing, order processing, accounting, customer service, technical assistance, merchandising, distribution, and delivery and are used by numerous Pearson and Harcourt products that are not being divested. The Hold Separate requires the Defendants to provide support and operational services to the businesses being held separate, including the Divestiture Assets, and also requires them to maintain such services relating to the Divestiture Assets at 2007 or previously approved levels for 2008, whichever are higher.

### IV. Remedies Available to Potential Private Litigants

Section 4 of the Clayton Act, 15 U.S.C. 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against Defendants.

### V. Procedures Available for Modification of the Proposed Final Judgment

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the **Federal Register**, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the

Court and published in the **Federal Register.**

Written comments should be submitted to: James J. Tierney, Chief, Networks and Technology Enforcement Section Antitrust Division, United States Department of Justice, 600 E Street, NW., Suite 9500, Washington, DC 20530.

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the Defendants may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI. Alternatives to the Proposed Final Judgment

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against Defendants. The United States could have continued the litigation and sought preliminary and permanent injunctions against Pearson's acquisition of all of the outstanding voting securities of Harcourt, as well as additional assets, from Reed Elsevier. The United States is satisfied, however, that the divestiture of assets described in the proposed Final Judgment will preserve competition for the provision of clinical tests in the relevant markets identified by the United States. Thus, the proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII. Standard of Review Under the APPA for the Proposed Final Judgment

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest" 15 U.S.C. 16(e)(1). In making that determination, the court, in accordance with the statute as amended in 2004, is required to consider:

(A) The competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) The impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and

individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. 16(e)(1)(A) & (B). In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest" *United States* v. *Microsoft Corp.,* 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States* v. *SBC Commc'ns, Inc.,* 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act).[2]

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft,* 56 F.3d at 1458–62. With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States* v. *BNS, Inc.,* 858 F.2d 456, 462 (9th Cir. 1988) (citing *United States* v. *Bechtel Corp.,* 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft,* 56 F.3d at 1460–62; *United States* v. *Alcoa, Inc.,* 152 F. Supp. 2d 37, 40 (D.D.C. 2001). Courts have held that:

[t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is *"within the reaches of the public interest."* More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel,* 648 F.2d at 666 (emphasis added) (citations omitted).[3] In

determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns,* 489 F. Supp. 2d at 17; *see also Microsoft,* 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States* v. *Archer-Daniels-Midland Co.,* 272 F. Supp. 2d 1,6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.' " *United States* v. *Am. Tel. & Tel. Co.,* 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States* v. *Gillette Co.,* 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland* v. *United States,* 460 U.S. 1001 (1983); *see also United States* v. *Alcan Aluminum Ltd.,* 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns,* 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft,* 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that

---

[2] The 2004 amendments substituted "shall" for "may" in directing relevant factors for a court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. Compare 15 U.S.C. 16(e) (2004), with 15 U.S.C. 16(e)(1) (2006); see also SBC Commc'ns, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

[3] Cf BNS, 648 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree");

---

*United States* v. *Gillette Co.,* 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). See generally Microsoft, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest' ").

"the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459–60. As this court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest detennination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns,* 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made dear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. 16(e)(2). The language wrote into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Senator Tunney). Rather, the procedure for the public interest determination is left to the discretion of the court, with the recognition that the court's "scope of review remains sharply proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns,* 489 F. Supp. 2d at 11.[4]

## VIII. Determinative Documents

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: January 24, 2008.

Respectfully submitted,

_____/s/_____
Damon J. Kalt
Sanford M. Adler

[4] *See United States* v. *Enova Corp.,* 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); S. Rep. No. 93–298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized."); *United States* v. *Mid-Am. Dairymen, Inc.,* 1977–1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should * * * carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances.").

John C. Filippini (D.C. Bar # 165159)
Danielle M. Ganzi
*Attorneys, United States Department of Justice, Antitrust Division, Networks and Technology Enforcement Section, 600 E Street, NW., Suite 9500, Washington, DC 20530, (202) 307–6200.*

[FR Doc. 08–532 Filed 2–7–08; 8:45 am]

**BILLING CODE 4410–11–M**

## DEPARTMENT OF LABOR

**Office of the Secretary**

**Submission for OMB Review: Comment Request**

February 5, 2008

The Department of Labor (DOL) hereby announces the submission of the following public information collection request (ICR) to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act of 1995 (Pub. L. 104–13, 44 U.S.C. chapter 35). A copy of this ICR, with applicable supporting documentation; including among other things a description of the likely respondents, proposed frequency of response, and estimated total burden may be obtained from the *RegInfo.gov* Web site at *http://www.reginfo.gov/ public/do/PRAMain* or by contacting Darrin King on 202–693–4129 (this is not a toll-free number) / e-mail: *king.darrin@dol.gov.*

Interested parties are encouraged to send comments to the Office of Information and Regulatory Affairs, Attn: Bridget Dooling, OMB Desk Officer for the Employment Standards Administration (ESA), Office of Management and Budget, Room 10235, Washington, DC 20503, Telephone: 202–395–7316 / Fax: 202–395–6974 (these are not toll-free numbers), E-mail: *OIRA_submission@omb.eop.gov* within 30 days from the date of this publication in the **Federal Register**. In order to ensure the appropriate consideration, comments should reference the OMB Control Number (see below).

The OMB is particularly interested in comments which:

• Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

• Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

• Enhance the quality, utility, and clarity of the information to be collected; and

• Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, e.g., permitting electronic submission of responses.

*Agency:* Employment Standards Administration

*Type of Review:* Extension without change of currently approved collection

*Title:* Pre-Hearing Statement

*OMB Control Number:* 1215–0085

*Form Number:* LS–18

*Estimated Number of Respondents:* 5,400

*Total Estimated Annual Burden Hours:* 918

*Total Estimated Cost Burden:* $2,376

*Affected Public:* Individuals or households

*Description:* The Form LS–18 is used to refer cases to the Department's Office of Administrative Law Judges for formal hearing under the Longshore and Harbor Workers' Compensation Act [33 U.S. C. 901].

**Darrin A. King,**
*Acting Departmental Clearance Officer.*

[FR Doc. E8–2368 Filed 2–7–08; 8:45 am]

**BILLING CODE 4510–CF–P**

## DEPARTMENT OF LABOR

**Employment and Training Administration**

**Science, Technology, Engineering, and Mathematics (STEM) Opportunities in the Workforce System Initiative; Solicitation for Grant Applications (SGA) SGA/DFA PY 07–03, Amendment Number 1**

**AGENCY:** Employment and Training Administration (ETA), Labor.

**ACTION:** Amendment.

**SUMMARY:** The Employment and Training Administration published a document in the **Federal Register** of January 15, 2008, announcing the availability of funds and solicitation for grant applications for the Science, Technology, Engineering, and Mathematics (STEM) Opportunities in the Workforce System Initiative. This amendment will make changes to the January 15 document by clarifying and correcting this Solicitation.

**FOR FURTHER INFORMATION CONTACT:** Marsha Daniels, Grants Management Specialist, Telephone (202) 693–3504.

**Amendment**

In the **Federal Register** of January 15, 2008, in FR Volume 73, Number 10, the

Ad # 10319206     Name US DEPT OF JUSTICE/ANTI TRUS ATTN:  MAUR     Size 80 Lines                    T0001
Class 820   PO# JJ08P2ATR0301   Authorized by KELLY SIMON                          Account 1010122583

PROOF OF PUBLICATION

District of Columbia, ss., Personally appeared before me, a Notary Public in and for the
said District, Nicole McKinney well known to me to be Billing Manager
of The Washington Post, a daily newspaper published in the City of Washington,
District of Columbia, and making oath in due form of law that an advertisement containing
the language annexed hereto was published in said newspaper on the dates mentioned in the
certificate herein.

I Hereby Certify that the attached advertisement was published in
The Washington Post, a daily newspaper, upon the following date(s) at a cost of $5,046.80
and was circulated in the Washington metropolitan area.

Published 7 time(s). Date(s):16,17,18,19,20,21 and 22 of February 2008

Account 1010122583

_____

Witness my hand and official seal this ___ day of _____ 20 __

_____

My commission expires _____

-------------------------------------------------------------------------------------------

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION  UNITED
STATES v. PEARSON plc, et al.
Take notice that a proposed
Final Judgment has been filed
in a civil antitrust case,
United States v. Pearson plc,
et al., Civil Action No. 1:08-
cv-00143.  On January 24, 2008,
the United States filed a
Complaint to enjoin the
proposed acquisition by Pearson
plc and Pearson Education Inc.
(collectively #Pearson"), of
Harcourt Assessment Inc.,
(#Harcourt") a wholly-owned
subsidiary of Reed Elsevier PLC
and Reed Elsevier, NV, and to
obtain equitable and other
relief.  The Complaint alleges
that Pearson's acquisition of
Harcourt would substantially
lessen competition in the
markets for adaptive behavior,
speech and language, and adult
abnormal personality clinical
tests in violation of Section 7
of the Clayton Act, 15 U.S.C. §
18.  The proposed Final
Judgment, filed at the same
time as the Complaint, requires

Ad # 10319206    Name US DEPT OF JUSTICE/ANTI TRUS ATTN:  MAUR    Size 80 Lines                T0002
Class 820    PO# JJ08P2ATR0301    Authorized by KELLY SIMON                      Account 1010122583

Pearson to divest:  (1)
Harcourt's adaptive behavior
clinical test, the Adaptive
Behavior Assessment System; (2)
Harcourt's adult abnormal
personality clinical test, the
Emotional Assessment System,
which is under development; and
(3) in the speech and language
clinical test market, either
Pearson's Comprehensive
Assessment of Spoken Language
and the Oral and Written
Language Scales or Harcourt's
Clinical Evaluation of Language
Fundamentals.   A Competitive
Impact Statement filed by the
United States describes the
Complaint, proposed Final
Judgment, the industry, and the
remedies available to private
litigants who may have been
injured by the alleged
violation.  Copies of the
Complaint, proposed Final
Judgment, and Competitive
Impact Statement are available
for inspection at the
Department of Justice,
Antitrust Division, Antitrust
Documents Group, 325 7th
Street, NW, Room 215,
Washington, DC 20530
(telephone: 202-514-2481), on
the Department of Justice's Web
site at http://www.usdoj.gov/
atr, and at the Office of the
Clerk of the United States
District Court for the District
of Columbia.  Interested
persons may address comments to
James J. Tierney, Chief,
Networks and Technology
Enforcement Section, Antitrust
Division, Department of
Justice, 600 E Street, NW,
Suite 9500, Washington, DC
20530, (telephone: 202-307-
6200), within 60 days of the
date of this notice.

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
U.S. Department of Justice
Antitrust Division, Networks and
Technology Enforcement Section
600 E Street, NW, Suite 9500
Washington, DC 20530

                    Plaintiff,

       v.

PEARSON PLC,
80 Strand
London WC2R ORL
England

PEARSON EDUCATION, INC.,
One Lake Street
Upper Saddle River, NJ 07458

REED ELSEVIER PLC,
1-3 The Strand
WC2N 5JR
London, England

REED ELSEVIER NV, and
Radarweg 29
1043 NX Amsterdam
The Netherlands

HARCOURT ASSESSMENT INC.,
14500 Bulverde Road
San Antonio, TX 78259

                 Defendants.

Civil Action No.: 1:08-cv-00143 (CKK)
Filed: February 1, 2008

## DEFENDANTS' DESCRIPTION OF WRITTEN OR ORAL COMMUNICATIONS CONCERNING THE PROPOSED FINAL JUDGMENT IN THIS ACTION

Pursuant to Section 2(g) of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(g),

Defendants Pearson plc and Pearson Education, Inc. (collectively "Pearson"), by its attorneys, submit the following description of all written or oral communications by or on behalf of the Pearson Defendants with any officer or employee of the United States concerning or relevant to the proposed Final Judgment filed in this action on January 24, 2008.  In accordance with Section 2(g), the description excludes any communications "made by counsel of record alone with the Attorney General or the employees of the Department of Justice alone." 15 U.S.C. § 16(g).  Description:

(a) On June 5, 2007, Douglas Kubach, President and CEO of Pearson Educational Testing, a division of Pearson Education, Inc., accompanied Harry T. Robins, partner of Morgan, Lewis & Bockius LLP, and other counsel for Pearson and counsel for Defendants Reed Elsevier PLC, Reed Elsevier NV, and Harcourt Assessment Inc., met with Department of Justice Staff. The meeting concerned an overview of the proposed acquisition and competitive aspects of the transaction.  Mr. Kubach made a written presentation and answered questions of the Department of Justice staff.

(b) On August 9, 2007, Carol Watson, EVP and Publisher, Pearson Assessments, accompanied Harry T. Robins, partner of Morgan, Lewis & Bockius LLP, and other counsel for Pearson and counsel for Defendants Reed Elsevier PLC, Reed Elsevier NV, and Harcourt Assessment Inc., met with Department of Justice Staff.  The meeting concerned competitive aspects of the transaction relating to the clinical testing business.  Ms. Watson answered questions of the Department of Justice staff.

Pearson intend to certify compliance with 15 U.S.C. § 16(g) prior to entry of any consent judgment pursuant to the antitrust laws

Dated: February 1, 2008

Respectfully submitted,

FOR DEFENDANTS
PEARSON PLC and PEARSON
EDUCATION INC.:


  /s/ Jonathan M. Rich
Jonathan M. Rich, Esq. (D.C. Bar# 447942)
Morgan, Lewis & Bockius, LLP
1111 Pennsylvania Avenue, NW
Washington, DC  20004
(202) 739-5433

Attorney for *Defendants* Pearson plc and
Pearson Education, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2008 a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF System for the the United States District Court for the District of Columbia and served by email on the below-identified attorneys:

Damon J. Kalt, Esq.
U.S. Department of Justice
Antitrust Division, Networks and Technology
Enforcement Section
600 E Street, NW, Suite 9500
Washington, DC  20530

Attorney for *Plaintiff*

Robert A. Lipstein, Esq.
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004

Attorney for *Defendants* Reed Elsevier PLC, Reed Elsevier NV, and Harcourt Assessment Inc.:

   /s/ Jonathan M. Rich
Jonathan M. Rich, Esq. (D.C. Bar# 447942)
Morgan, Lewis & Bockius, LLP
1111 Pennsylvania Avenue, NW
Washington, DC  20004
(202) 739-5433

Attorney for *Defendants* Pearson plc and Pearson Education, Inc.

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| |
|---|
| UNITED STATES OF AMERICA, |
| *Plaintiff,* |
| v. |
| PEARSON PLC, |
| PEARSON EDUCATION INC., |
| REED ELSEVIER PLC, |
| REED ELSEVIER NV, and |
| HARCOURT ASSESSMENT INC., |
| *Defendants.* |

Case No. 1:08-cv-00143-CKK

## CERTIFICATE REQUIRED BY LCVR 7.1 OF THE LOCAL RULES OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

I, the undersigned, counsel of record for Reed Elsevier PLC, Reed Elsevier NV, and

Harcourt Assessment Inc. (collectively Reed Elsevier), certify that to the best of my knowledge

and belief, the following are parent companies, subsidiaries or affiliates of Reed Elsevier which

have any outstanding securities in the hands of the public:

> Reed Elsevier PLC
> Reed Elsevier NV

These representations are made in order that judges of this court may determine the

need for recusal.

Respectfully submitted,

Robert A. Lipstein
D.C. Bar #253724
Crowell & Moring LLP
1001 Pennsylvania Ave, NW
Washington, D.C. 20004
*Attorney for Defendants Reed Elsevier PLC; Reed Elsevier NV and Harcourt Assessment, Inc.*

Dated: February 1, 2008

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

        *Plaintiff,*

    v.

PEARSON PLC,
PEARSON EDUCATION INC.,
REED ELSEVIER PLC,
REED ELSEVIER NV, and
HARCOURT ASSESSMENT INC.,

        *Defendants.*

Case No. 1:08-cv-00143-CKK

**REPORT AND CERTIFICATION OF COMPLIANCE WITH TUNNEY ACT
REQUIREMENTS ON BEHALF OF DEFENDANTS REED ELSEVIER PLC, REED
ELSEVIER NV, AND HARCOURT ASSESSMENT INC.**

Pursuant to 15 U.S.C. § 16(g) (the Tunney Act), defendants Reed Elsevier PLC, Reed

Elsevier NV, and Harcourt Assessment Inc. (collectively Reed Elsevier), by its attorneys, submit

the following description and certification of all written or oral communications by or on behalf

of Reed Elsevier with any officer or employee of the United States concerning or relevant to the

proposed Final Judgment filed in this action on January 24, 2008.  In accordance with Section

16(g), this description excludes any communications by outside counsel alone with employees of

the Department of Justice alone.

    1. On September 6, 2007, Ms. Susan Middleton, Sr. Director, Strategy & Business

Development, Harcourt Assessment Inc., and Mr. David Shafer, Product Line Manager, Harcourt

Assessment Inc., met with Mr. Damon J. Kalt, Mr. Sanford M. Adler, and Mr. John C. Filippini,

along with other employees of the U.S. Department of Justice Antitrust Division Networks and

Technology Enforcement Section, to discuss the Emotional Assessment System, one of the

divestiture assets.

2. On October 29, 2007, Mr. Aurelio Prifitera, President-Clinical, Harcourt Assessment Inc., met with Mr. Kalt, Mr. Adler, and Mr. Filippini, along with other employees of the U.S. Department of Justice Antitrust Division Networks and Technology Enforcement Section, regarding the divestiture assets, specifically the Emotional Assessment System and the Adaptive Behavior Assessment System.

Defendant Reed Elsevier hereby certifies that this description of communications by or on behalf of Reed Elsevier is true and correct and includes all of the communications about which Reed Elsevier knows or should have known, and that with this filing, Reed Elsevier has satisfied the requirements of Section 16(g).

Respectfully submitted,

Robert A. Lipstein
D.C. Bar #253724
Crowell & Moring LLP
1001 Pennsylvania Ave, NW
Washington, D.C. 20004
*Attorney for Defendants Reed Elsevier PLC; Reed Elsevier NV and Harcourt Assessment, Inc.*

Dated: February 1, 2008

2

CERTIFICATE OF SERVICE

I, Robert A. Lipstein, hereby certify that, on February 1, 2008, I caused a copy of the

foregoing Report and Certification of Compliance with Tunney Act Requirements on Behalf of

Defendants Reed Elsevier PLC, Reed Elsevier NV, and Harcourt Assessment Inc., to be served

by first-class mail on the following:

> Damon J. Kalt, Esq.
> U.S. Department of Justice
> Antitrust Division
> Networks and Technology Enforcement Section
> 600 E. St., N.W., Suite 9500
> Washington, D.C. 20530

> Harry T. Robins, Esq.
> Morgan Lewis & Bockius, LLP
> 101 Park Avenue
> New York, New York 10178

Robert A. Lipstein

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 20, 2008, I caused a copy of the foregoing Certificate of Compliance with Provisions of the Antitrust Procedures and Penalties Act, and Motion and Memorandum of the United States in Support of Entry of the Final Judgment to be served on the duly authorized legal representatives of the Defendants in this matter in the manner set forth below:

By U.S mail and electronic mail:

**Counsel for Defendants Pearson plc and Pearson Education Inc.**
Harry T. Robins, Esq.
Morgan, Lewis & Bockius, LLP
101 Park Avenue
New York, New York 10178
(212) 309-6728
hrobins@morganlewis.com

**Counsel for Defendants Reed Elsevier PLC, Reed Elsevier NV, and Harcourt Assessment Inc.**
Robert A Lipstein, Esq.
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
(202) 624-2630
rlipstein@crowell.com

**For Plaintiff United States:**

/s/
_____
Damon J. Kalt, Esq.
United States Department of Justice
Antitrust Division
Networks and Technology Enforcement Section
600 E Street, NW, Suite 9500
Washington, DC 20530
(202) 307-6164